# EXHIBIT A

Dockets.Justia.com

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, Southwest Gas, Pacific Gas and Electric, and Southern California Edison and their impact on the Gas Price Spikes experienced at the California Border from March 2000 through May 2001. | FILED PUBLIC UTILITIES COMMISSION NOVEMBER 21, 2002 SAN FRANCISCO OFFICE INVESTIGATION 02-11-040 |

## ORDER INSTITUTING INVESTIGATION
## PHASE I

**Summary**

    The price of natural gas delivered to the California border was extraordinarily high in 2000 and 2001, particularly during the period between December 2000 and May 2001. The Commission has already filed a complaint at the Federal Energy Regulatory Commission (FERC) and litigated against El Paso Natural Gas Company (El Paso) and its marketing affiliate for their manipulation of natural gas supplies to California, which was a substantial cause of the natural gas price spikes. In this investigation, the Commission will examine if there were additional reasons for these price spikes. We will approach this investigation in two phases. In Phase I we name as Respondents the Sempra Energy Companies, Southern California Gas Company (SoCalGas) and San Diego Gas & Electric Company (SDG&E). Respondents in Phase II are Southwest Gas (SW Gas), Pacific Gas and Electric Company (PG&E), and Southern California Edison

136051                              - 1 -

**Exhibit A  006**

Company (Edison). Phase II will commence at a time to be set forth in a future Commission Ruling. In each Phase, respondents are ordered to present evidence which supports all gas market activity that may have affected gas prices during the period March 2000 through May 2001, and to submit testimony explaining the reasons for the natural gas price spikes during this same period. Other non-jurisdictional entities and especially affiliate trading entities of the utilities are also encouraged to submit evidence and testimony related to the reasons for the natural gas price spikes that occurred during this period.

The focus of Phase I of this proceeding is investigatory and fact-finding. The Commission will investigate the past conduct of the respondents with regard to gas price spikes at the California Border from March 2000 through May 2001. The proceeding is categorized as ratesetting. If the investigation reveals that the conduct of respondents contributed to the gas price spikes at the California border during the named period, it may modify or eliminate the respondent's Gas Cost Incentive Mechanism (GCIM), reduce the amount of the shareholder award for the period involved, or order respondents to issue a refund to ratepayers to offset the higher rates paid. If the investigation reveals that statutory laws, or rules or orders of the Commission were violated, the Commission may enter into an ad judicatory phase of this investigation.

## Background

### Decision 02-06-023

On June 6, 2002, the Commission issued Decision (D.) 02-06-023 in the Matter of the Application of Southern California Gas Company Regarding Year Six (1999-2000) under its Experimental GCIM and Related Gas Supply Matters. During the course of that proceeding, some of the parties raised concerns about

Exhibit A 007

causes of the extreme border price spikes of natural gas in 2000 and 2001. The decision approved SoCalGas' application, with modifications, and ordered the Energy Division to prepare an Order Instituting Investigation (OII) into the causes of the extreme border price spikes during the period December 2000 through spring 2001.

During hearings on Application (A.) 00-06-023, the Southern California Generation Coalition (SCGC) argued that the GCIM should be modified to encourage SoCalGas to purchase gas at or below prevailing market prices, rather than relying on hub services and financial trades to reduce overall cost of gas. Edison faulted the GCIM for relying on wholesale physical and financial transactions with noncore customers rather than encouraging the utility to acquire gas at the lowest possible cost on behalf of core customers.[1] Edison's position was that the GCIM, both in its current form and in settlement form, encourages perverse incentives and market manipulation through the utility's monopoly position in its storage services, intrastate transmission, and core procurement. Edison argued that since noncore customers are on the other side of swaps or other ancillary transactions that benefit core customers, consumers ultimately pay for this benefit when electric generators and others pass on the costs to consumers through increased prices. SoCalGas testified in rebuttal that the high price of gas in winter 2000/2001 was caused by factors beyond the control of SoCalGas, in particular, unusually cold weather, reduced supplies of

---

[1] Core customers are defined as those who lack alternatives to natural gas service. Most core customers are residential and small commercial customers. Noncore customers are relatively large and are generally capable of switching from natural gas to an alternative fuel, such as oil.

Exhibit A 008

hydroelectric power, increased electric generation gas load, the rupture and shutdown on an El Paso pipeline, and inefficient use of gas storage by generators. SoCalGas testified that it represents only 3% to 4% of the total volumes on which the benchmark indices are based.

### The California Natural Gas Infrastructure Outlook Report

In November 2001, the Commission issued its "California Natural Gas Infrastructure Outlook Report."[2] In Chapter 2 of that report, there is a discussion about the "skyrocketing prices experienced in California in 2000 and 2001." The report concludes that the following four factors were responsible for California's gas price spikes: (1) anticompetitive actions by El Paso, the owner of an interstate pipeline, drove up gas prices at the California border; (2) low rainfall limited the supply of hydroelectric generation, resulting in increased demand of gas-fired electric generation; (3) noncore customers did not have sufficient gas in storage; and (4) gas prices were higher, not only in California, but across the country, during that period.

**Demand**: The report attributes price spikes at the southern California border to the high demand for gas by electric generators along with the low precipitation in 2000 and 2001 in California and the Pacific Northwest. The report estimates that demand for natural gas in California increased 22 per cent during the period from 1996 to 2000. Low precipitation in 2000 and 2001 in California and the Pacific Northwest limited the amount of hydroelectric generation available to California. The report also states that when California's restructured electricity market began to collapse in May 2000, gas demand from

---

[2] California Public Utilities Commission, 2002-2006, California Natural Gas Infrastructure Outlook, Natural Gas, November 2001.

**Exhibit A 009**

gas-fired power plants soared. PG&E and SoCalGas' gas deliveries increased nearly 20% over the previous year, and SDG&E was forced to curtail noncore gas customers in the winter of 2000-2001 because of unusually high electric generation demand.

**Storage:** The report notes the neglect of noncore customers to inject enough gas into storage as another reason for the high price spikes. When demand increased, noncore customers could not rely on stored gas to meet their requirements and had to transport gas across the border, further exacerbating escalating prices.

Although the Natural Gas Infrastructure Report identifies factors both external to California (the El Paso contract, dry hydro conditions in the Pacific Northwest and higher gas prices across North America), and internal to California (dry hydro conditions in California, failure of California noncore customers to store adequate gas, and increased demand of California's electric generators) as reasons for high price spikes at the California border, it did not investigate any gas trading activities of regulated utilities or other entities at the border. We open this proceeding because gas trading activities of utilities under California jurisdiction as one possible cause of the gas price spikes experienced at the southern California border in the winter of 2000/2001 remain unexplored.

### FERC Review of Gas Activity at the California Border

The San Juan and Permian Basins are natural gas reserves located in New Mexico and Texas. The price of gas from these basins was historically used as a benchmark for the Southern California border price. In March 2000, El Paso Merchant Energy contracted for 1,220 million cubic feet per day (MMcfd) of El Paso pipeline capacity. By the summer of 2000, the price of gas at the border began to reflect a substantial mark-up from these southwest producing basins'

- 5 -

**Exhibit A 010**

prices. On April 4, 2000, the Commission filed a Complaint with the FERC arguing that a 15-month contract between El Paso (the owner of the pipeline) and El Paso Merchant Energy (an affiliate of El Paso) had the potential for market power and affiliate abuse. On March 28, 2001, the FERC dismissed the affiliate abuse aspects of the complaint, but set for hearing the issue of "whether El Paso Pipeline and/or El Paso Merchant Energy had market power and, if so, exercised it."[3] Shortly after the El Paso Merchant Energy contract expired in May 2001, California border prices again corresponded to San Juan Basin prices. The Commission and others filed requests for rehearing on the affiliate abuse issue and on June 11, 2001, the FERC issued its Order on Rehearing which set for hearing, "the allegations of affiliate abuse and possible violations of the Affiliate Standards raised by the complaint."[4]

On October 9, 2001, in the Initial Decision on the CPUC v El Paso complaint, the FERC's Chief Administrative Law Judge (Chief Judge) agreed that El Paso violated the FERC affiliate abuse regulations and that El Paso and El Paso Merchant Energy had the ability to exercise market power. This decision, however, ruled that no clear evidence was shown to demonstrate an exercise of market power.[5] The Commission, Edison, and PG&E appealed this finding to the FERC. On December 27, 2001, the FERC subsequently agreed that additional

---

[3] Public Utilities Commission of the State of California v. El Paso Natural Gas Company, et al., 94 FERC ¶ 61,338 at 62,255 (2001).

[4] Public Utilities Commission of the State of California v. El Paso Natural Gas Company, et al., 95 FERC ¶ 61,368 at 62,397 (2001).

[5] Public Utilities Commission of the State of California v. El Paso Natural Gas Company, et al., 97 FERC ¶ 63,004 (2001).

Exhibit A 011

hearings were warranted. Additional hearings were held in March and April 2002. The FERC Chief Judge issued a new initial decision on September 23, 2002, this time concluding that El Paso Corporation exercised market power when it withheld large amounts of capacity that it could have flowed to its California delivery points. The ruling states that El Paso's actions significantly increased the price of natural gas flowing to California and substantially tightened the supply of natural gas at the California border.[6]

On February 13, 2002, the FERC issued an Order entitled "Order Directing Staff Investigation."[7] In this Order, FERC directed its Staff to "undertake a fact-finding investigation into whether any entity, including Enron Corporation, manipulated short-term prices in electric energy or natural gas markets in the West or otherwise exercised undue influence over wholesale prices in the West, for the period January 1, 2000 forward."[8] On August 13, 2002, FERC Staff published its *Initial Report on Company-Specific Separate Proceedings and Generic Reevaluations; Published Natural Gas Price Data; And Enron Strategies* ("Initial Report").[9] Among other things, the Initial Report states that, "While Staff is continuing to investigate whether there was actual manipulation of spot gas

---

[6] <u>Public Utilities Commission of the State of California v. El Paso Natural Gas Company, et al.</u>, 100 FERC ¶ 63,041 (2002)

[7] <u>Public Utilities Commission of the State of California v. El Paso Natural Gas Company, et al.</u>, 98 FERC ¶ 61,165 (2002)

[8] <u>Public Utilities Commission of the State of California v. El Paso Natural Gas Company, et al.</u>, 98 FERC at 61,614

[9] Docket # PA02-2-000 http://www.ferc.gov/Electric/bulkpower/PA02-2/Initial-Report-PA02-2-000.pdf

**Exhibit A 012**

prices, we have preliminary indications that this may have occurred. Also, market participants had the incentive to manipulate spot prices upward for natural gas at the California delivery points."[10]

---

[10] *Id.*

Exhibit A 013

### Nevada Antitrust Suite

On November 1, 2002, the Nevada Attorney General filed an antitrust suite through the Nevada Bureau of Consumer Protection, alleging that several interstate gas pipelines and local distribution companies conspired to overcharge Nevada consumers for gas and electricity over the past five years. The suit alleges that the companies including El Paso and Sempra Energy engaged in an elaborate conspiracy to manipulate the supply of natural gas and refrain from competing against each other thereby causing the tremendous natural gas spikes in the Western energy markets. The suit further claims the defendants plotted to exercise market dominance and stifle the construction of competing pipelines serving the southwestern U.S. and northern Mexico beginning in 1996 and lasting through June 2001. The suit alleges that the conspiracy between El Paso and SoCalGas drove up prices in the southern California gas market, which harmed consumers.

### Preliminary Scoping Memo

The scope of this proceeding shall include all issues raised in this order, but will not be limited to these issues. Any party may suggest related issues for the Commission's consideration.

In D.02-06-023, the Commission ordered the Energy Division to prepare an OII of the cause of border price spikes experienced during the period from December 2000 through spring 2001. We are broadening the specified time period of this investigation back to March 2000 to coincide with the commencement of the El Paso contract with El Paso Merchant Energy.

At a minimum, we are interested in investigating the following questions:

1. Did any of the entities under our regulatory jurisdiction play a role in causing the increase in California border prices between March 2000 and May 2001?

**Exhibit A 014**

2. Did any of the utilities' affiliates or parent companies play a role in causing the increase in border prices? Did concerns about affiliates or parents' financial position cause utilities to take actions that may have increased gas costs?

3. What were the primary factors that caused the increase in prices? In addition to the increase in gas costs caused by El Paso's actions, what other factors may have caused gas prices to increase to such high levels? Did recently acknowledged inaccurate reporting of gas price information to energy trade publications by energy trading companies have any affect on published index prices?

4. Did the utilities' gas cost incentive mechanisms create perverse incentives to increase or otherwise manipulate natural gas prices at the California border? We shall examine whether SoCalGas' Year 7 and Year 8 operations under the GCIM, enabled them to exercise market power and/or anticompetitive behavior. If so, should these incentive mechanisms be modified or eliminated to prevent such activity?

We now order Phase I of an investigation into the gas transactions of SoCalGas, SDG&E, and Sempra Energy Trading for the period March 2000 through May 2001. We prefer to initially focus on the Sempra Energy Companies to more fully explore the issues raised in SoCalGas' GCIM proceeding, A.00-06-023, as well as other evidence to be obtained in the course of this investigation. Phase II of this Investigation will address the transactions of PG&E, PG&E Energy Trading, SW Gas, Alenco Gas Services Inc., Conwest Exploration, Ltd., Edison, and Edison Mission Energy for the same period. Phase II of this investigation will commence at a time to be set forth in a future Commission Ruling.

- 10 -

**Exhibit A 015**

We expect cooperation in this investigation from other non-jurisdictional entities, especially from the affiliate trading entities of the utilities.

Discovery in Phase I of this investigation may commence upon issuance of this OII.

This OII is today served on the parties on the service lists of SoCalGas A.00-06-023, and on the service list of SoCalGas' most recent Biennial Cost Allocation Proceeding (BCAP) A.01-09-024, SDG&E BCAP A.01-10-005, PG&E BCAP A.00-04-002, SW Gas General Rate Case (GRC) A.02-02-012, and Edison GRC A.02-05-004.

The rules and procedures implementing many of the reforms contained in Senate Bill (SB 960) are found in Article 2.5 of the Rules of Practice and Procedure (Rules), which are posted on the Commission's website. Pursuant to Rule 4(a) the rules in Article 2.5 shall apply to this proceeding. As per the provisions of SB 960, Phase I of the present investigation is categorized as a Ratesetting proceeding and is expected to require a hearing.

The assigned Commissioner and Administrative Law Judge shall convene a prehearing conference (PHC) within 60 days of this Order to develop a service list for this proceeding and to delineate further issues related to scope and schedule for this proceeding. Notice of the PHC will be provided by a ruling.

Any person who objects to the categorization of this investigation must file an appeal no later than ten days after the date of this OII, pursuant to Rule 6.4(a).

The temporary service list is attached to this order and shall be used for service until a service list for this proceeding is established at the PHC. Persons who want to become a party to this proceeding shall appear at the PHC, or at the formal hearing, and fill out the "Notice of Party/Non-Party Status" form (appearance form).

- 11 -

**Exhibit A 016**

Those persons who do not want to be parties, and only want notice of the hearings, rulings, proposed decisions, and decisions, may either appear either at the PHC or at the formal hearing and fill out an appearance form, or they may mail a written request to the Process Office requesting that they be added to the service list for information only.

Those persons employed by the State of California who are interested in this proceeding may be added to the "state service" section of the service list by appearing either at the prehearing conference or at the formal hearing and filling out an appearance form, or they may mail a written request to the Process Office requesting that they be added to the state service list. All of the names appearing on the state service list shall be served with all documents that parties may submit or file in connection with this proceeding.

The Process Office shall develop an initial service list based on the appearances at the first PHC. This initial service list shall be posted on the Commission's website, www.cpuc.ca.gov, as soon as it is practicable.

Any party interested in participating in this investigation who is unfamiliar with the Commission's procedures should contact the Commission's Public Advisor Office in Los Angeles at (213) 649-7055, or in San Francisco at (415) 703 2074.

Consistent with Rule 6(e), we expect this proceeding to be concluded within 18 months.

### Ex Parte Communications

This proceeding is subject to Rule 7(c) of the Commission's Rules of Practice and Procedure. In addition to placing specific requirements on ex parte communications, Rule 7 (c) also requires parties to report ex parte communications pursuant to Rule 7.1.

- 12 -

# ORDER

**IT IS ORDERED** that:

1. An investigation is instituted into the gas market activity of Southern California Gas Company (SoCalGas), San Diego Gas & Electric Company (SDG&E), Sempra Energy Trading, Southwest Gas (SW Gas), Pacific Gas and Electric Company (PG&E), PG&E Energy Trading, Alenco Gas Services, Conwest Exploration, Ltd., Southern California Edison Company (Edison), and Edison Mission Energy which may have affected prices at the California border during the period from March 2000 through May 2001.

2. SoCalGas, SDG&E, PG&E, SW Gas, and Edison are made respondents to this proceeding.

3. The respondents are required to retain all documents which pertain to transactions affecting gas prices at the California border during the period March 2000 through May 2001.

4. We will approach this Investigation in two phases: Phase I will address the activities of the Sempra Energy Companies of SoCalGas, SDG&E, and Sempra Energy Trading. Phase I will commence immediately.

5. Phase II will focus on the transactions of SW Gas, PG&E, PG&E Energy Trading, Alenco Gas Services, Conwest Exploration, Ltd., Edison, and Edison Mission Energy. Phase II of this investigation will commence at a time set forth in a future Ruling of the Commission in this proceeding.

6. Phase II will focus on the transactions of SW Gas, PG&E, PG&E Energy Trading, Alenco Gas Services, Conwest Exploration, Edison, and Edison Mission Energy. Phase II of this investigation will commence at a time set forth in a future Ruling of the Commission in this proceeding.

- 13 -

**Exhibit A 018**

7. Discovery in Phase I of this proceeding may commence immediately.

8. At a hearing to be scheduled by the Assigned Commissioner and Administrative Law Judge, Phase I respondents shall appear and show cause demonstrating why gas prices at the California border dramatically increased during the period from March 2000 through May 2001.

9. Respondents in Phase I shall file and serve written testimony in accordance with the schedule set forth in the assigned Commissioner Scoping Memo issued after the first PHC. Other parties may file and serve testimony in accordance with the schedule set forth in the Assigned Commissioner's Scoping Memo.

10. The Executive Director shall cause this Order Instituting Investigation to be served on the respondents and on the service lists of SoCalGas Gas Cost Incentive Mechanism Application (A.) 00-06-023, SoCalGas Biennial Cost Allocation Proceeding (BCAP) A.01-09-024, SDG&E BCAP A.01-10-005, PG&E BCAP A.00-04-002, SW GAS General Rate Case (GRC) A.02-02-012, and Edison GRC A.02-05-004.

11. The temporary service list is attached and shall be used for service of all pleadings until a service list for this proceeding is established. An initial service list for this proceeding shall be created by the Process Office and posted on the Commission's website (www.cpuc.ca.gov) as soon as it is practicable after the first prehearing conference. Parties may also obtain the service list by contacting the Commission's Process Office at (415) 703 2021.

12. The category of the investigation is determined to be Ratesetting as that term is defined in Rule 5(c) of the Commission's Rules of Practice and Procedure.

**Exhibit A 019**

13. Persons interested in this proceeding shall follow the procedures described in this investigation to get on the service list.

This order is effective today.

Dated November 21, 2002, at San Francisco, California.

LORETTA M. LYNCH
President
HENRY M. DUQUE
CARL W. WOOD
MICHAEL R. PEEVEY
Commissioners

Commissioner Geoffrey F. Brown, being necessarily absent, did not participate.

Exhibit A 020

# EXHIBIT B

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, Southwest Gas, Pacific Gas and Electric, and Southern California Edison and their impact on the Gas Price Spikes experienced at the California Border from March 2000 through May 2001. | Investigation 02-11-040 (Filed November 21, 2002) |
| Order Instituting Investigation whether San Diego Gas & Electric Company, Southern California Gas Company and their holding company, Sempra Energy, respondents, have complied with relevant statutes and Commission decisions, pertaining to respondents' holding company systems and affiliate activities. | Investigation 03-02-033 (Filed February 27, 2003) |

## SCOPING MEMO FOR PHASE I OF I.02-11-040 AND RULING OF ASSIGNED COMMISSIONER

**Summary**

Pursuant to Article 2.5 of the Commission Rules of Practice and Procedure,[1] and following a prehearing conference (PHC) held on January 9, 2003, this ruling sets forth the scope and procedural schedule of Phase I of

---

[1] Unless otherwise indicated, all citations to sections refer to the Public Utilities Code and citations to rules refer to the Commission Rules of Practice and Procedure, which are codified at Chapter 1, Division 1 of Title 20 of the California Code of Regulations.

- 1 -

**Exhibit B 021**

Investigation (I.) 02-11-040 and designates the principal hearing officer of the proceeding. It also addresses discovery, service, and other procedural issues for the proceeding.

The issue of whether consolidation of I.02-11-040 and I.03-02-033 should affect the schedule in Phase I of I.02-11-040 may be discussed at the PHC to be held pursuant to the Order Instituting Investigation (OII) initiating I.03-02-033. Unless determined otherwise, Phase I should proceed as discussed at the January 9, 2003, PHC and confirmed in this scoping memo.

**Background**

On November 21, 2002, the California Public Utilities Commission (Commission) issued an OII in I.02-11-040, to examine the past conduct of the respondents with regard to gas price spikes at the California border from March 2000 through May 2001. The OII provided that the investigation would proceed in two phases. The Commission named Southern California Gas Company (SoCalGas) and San Diego Gas & Electric Company (SDG&E) as respondents in Phase I. Respondents in Phase II are Southwest Gas, Pacific Gas and Electric Company (PG&E), and Southern California Edison Company (SCE).

The OII in I.02-11-040 provided the basic framework for both Phase I and Phase II of the investigation and required that, in each of the two phases, respondents present evidence and testimony regarding gas market activity that may have affected gas prices during the period March 2000 through May 2001. The OII included a preliminary scoping memo for the proceeding, required that a PHC be held within 60 days, and specified that Phase II will commence at a time to be set in a future Commission ruling.

- 2 -

On February 27, 2003, the Commission issued an OII initiating I.03-02-033 to evaluate the business activities of the companies named as respondents in I.03-02-033--SDG&E, SoCalGas, and their holding company, Sempra Energy (Sempra)--to ensure they have complied with relevant statutes and Commission decisions in the management, oversight, and operations of their companies. The Commission consolidated I.03-02-033 with I.02-11-040.

## Categorization

In the OII initiating I.02-11-040, the Commission categorized the investigation as ratesetting and specified that there may be an adjudicatory phase if the investigation reveals that statutory laws, or rules or orders of the Commission were violated. (Rule 6(c)(1); OII, page 13.) Persons had ten days to appeal. (Rule 6.4(a).) No appeals were filed, so the categorization of this proceeding as ratesetting is final. Ex parte communications in this investigation proceeding are subject to § 1701.3(c) and Rule 7(c).

## January 9, 2003 PHC

A PHC was held in I.02-11-040 on January 9, 2003. SoCalGas and SDG&E filed a Joint PHC Statement on behalf of themselves, the Office of Ratepayer Advocates, and The Utility Reform Network. SCE filed a separate PHC Statement. At the PHC, appearances were taken and a service list for the proceeding was established. The scope and schedule of Phase I and related procedural matters were discussed.

## Scoping Memo for Phase I

The preliminary scoping memo in the OII initiating I.02-11-040 laid out the issues that the Commission identified to be addressed in the gas price spike investigation. In their Joint PHC Statement, SoCalGas and SDG&E stated that the submitting parties have not identified any additional substantive issues they

- 3 -

Exhibit B 023

believe should be within the scope of the proceeding. In its PHC Statement, SCE agreed with the scope of the proceeding as set forth in the OII, but proposed a list of specific sub-issues to be included within the scope of Phase I. At the PHC, counsel for SoCalGas and SDG&E agreed that these sub-issues would be addressed in Phase I.

The scope of Phase I shall include all issues identified in the OII and shall encompass the sub-issues identified by SCE. An additional area of inquiry discussed at the PHC regarding the effect of activities in the electric marketplace on California border gas prices shall also be included as a sub-issue of Issue 3. Several revisions and additions suggested by Staff are also incorporated. The scope of Phase I shall include the following issues and shall encompass, but not be limited to, the identified sub-issues:

1. Did SoCalGas and/or SDG&E play a role in causing the increase in California border prices between March 2000 and May 2001 (the subject period)?

   a. Did loans by SoCalGas' Gas Acquisition Group to non-core customers with repayment due in the winter of 2000/2001 affect border prices during the subject period?

   b. Did the management of storage (injection/withdrawal) and/or associated storage services provided by SoCalGas' Gas Acquisition Group and/or SDG&E affect border prices during the subject period?

   c. Did SoCalGas and/or SDG&E report false trades and/or false prices to the trade press? Did any such false reporting to the trade press affect border prices during the subject period?

   d. Did SoCalGas and /or SDG&E selectively report trades to the trade press in a way that would enhance any financial position they had in the market?

- 4 -

  e. Did the procurement behavior of SoCalGas and/or SDG&E affect border prices during the subject period?

  f. Were hedging activities by SoCalGas' Gas Acquisition Group during the subject period influenced by the group's loaning behavior?

  g. Did SoCalGas' Gas Acquisition Group benefit from higher border prices due to gas sales it made to third parties?

  h. Did any of SoCalGas' short-term or long-term capacity releases arranged during the subject period, including releases to entities serving markets outside of California, contribute to the high border prices or provide evidence of an intent to tighten interstate pipeline capacity to California?

2. Did any of SoCalGas and SDG&E's affiliates or their parent company, Sempra, play a role in causing the increase in border prices? Did concerns about affiliates or the parent's financial position cause SoCalGas and/or SDG&E to take actions that may have increased gas costs?

  a. Did any activities of Sempra's Energy Risk Management Department create an incentive for SoCalGas and/or SDG&E to act in a manner that affected border prices during the subject period?

  b. Did Sempra Energy Trading (SET) take positions in the electric market that allowed it or any of its affiliates to unjustifiably benefit from increased border prices during the subject period?

  c. Did SET become aware of SoCalGas' gas hedging activities during the subject period? If so, did SET use that knowledge to its benefit?

  d. Did SET report false trades and/or false prices to the trade press? Did any such false reporting to the trade press affect border prices during the subject period?

  e. Did SoCalGas, SDG&E, and SET share information?

**Exhibit B 025**

3. What were the primary factors that caused the increase in border prices? In addition to the increase in gas costs caused by El Paso's actions, what other factors may have caused gas prices to increase to such high levels? Did recently acknowledged inaccurate reporting of gas price information to energy trade publications by energy trading companies have any effect on published index prices?

    a. Did El Paso's actions, specifically its withholding behavior, cause a change in the demand for the services (third party sales, loans, and storage) of SoCalGas' Gas Acquisition Group and Gas Operations Department during the subject period?

    b. Did any of the rules of SoCalGas' Gas Operations Department, e.g., imbalance rules and related penalties, affect border prices during the subject period?

    c. Did activities in the electric marketplace and electricity price increases affect border prices during the subject period?

4. Did SoCalGas' and SDG&E's gas cost incentive mechanisms (GCIMs) create perverse incentives to increase or otherwise manipulate natural gas prices at the California border? Did SoCalGas' Year 7 and Year 8 operations under the GCIM enable it to exercise market power and/or anticompetitive behavior? If so, should these incentive mechanisms be modified or eliminated to prevent such activity?

For each identified activity or factor, parties should address whether and, if so, how it occurred and with what effect.

Parties should be aware of the March 2003 Federal Energy Regulatory Commission (FERC) Final Report on Price Manipulation in Western Markets and the discovery documents that FERC has released in conjunction with its investigation. These documents can be accessed via the following web sites:

http://www.ferc.gov/western.htm

http://www.ferc.gov/Electric/bulkpower/PA02-2/release.htm

**Exhibit B 026**

In their testimony, Phase I respondents shall, and other parties may, address the extent to which any information in the FERC report or the underlying discovery documents is relevant to our investigation.

**Procedural Schedule for Phase I**

The schedule developed at the PHC is adopted. Discovery restrictions are also established, as indicated in the following schedule:

| | |
|---|---|
| Initial testimony by SoCalGas and SDG&E | June 11, 2003 |
| Initial testimony by all other parties | August 27, 2003 |
| Moratorium on new discovery requests | September 18, 2003 through October 15, 2003 |
| Concurrent rebuttal testimony by all parties | October 15, 2003 |
| Deadline for discovery requests | October 22, 2003 |
| Hearings | November 3 through November 7, 2003 |
| Opening briefs | December 5, 2003 |
| Reply briefs and submission of Phase I | January 6, 2004 |

Pursuant to Rule 8(d), parties requesting final oral argument before the Commission should include that request in their concurrent opening briefs.

The assigned administrative law judge (ALJ) may adjust the schedule as necessary during the course of the proceeding. In Section 1 of Senate Bill 960 (Ch.96-0856), the Legislature urges the Commission to resolve the issues within the scope of a proceeding categorized as ratesetting, such as this, within 18 months. Consistent with that guidance, my goal is that a Phase I decision be issued by May 21, 2004.

**Exhibit B 027**

I.02-11-040, I.03-02-033  LYN/CFT/jyc

**Principal Hearing Officer**

In accordance with Rule 5(k) and (l), ALJ Charlotte F. TerKeurst is designated as the principal hearing officer for this proceeding.

**Discovery**

As indicated above, no new discovery requests will be allowed in Phase I between September 18 and October 15, 2003, or after October 22, 2003. Parties shall provide responses within 10 days to all discovery requests, including any discovery requests pending at the beginning of the discovery moratorium, except that parties shall provide responses no later than October 29, 2003, to all discovery requests submitted between October 20 and October 22, 2003.

Parties shall provide a copy of each discovery request to all other parties at the time the request is sent. Parties shall provide a copy of their discovery responses to each party that makes a request for that specific response. Electronic copies of discovery requests and discovery request responses are sufficient unless the receiving party requests a paper copy.

The parties shall attempt to resolve any discovery disputes with a good faith meet and confer, which may occur telephonically if that is more convenient than an in-person meeting. If that attempt does not resolve the dispute, the parties are to e-mail the assigned ALJ regarding the dispute. The assigned ALJ may schedule a conference call, ask for written motions, refer the discovery dispute to the Law and Motion ALJ, or take other steps as deemed appropriate. The assigned ALJ's e-mail address is cft@cpuc.ca.gov.

**Service of Documents**

The official service list for I.02-11-040 is on the Commission's web page. Parties should confirm that the information on the service list and the comma-

- 8 -

delimited file is correct, and serve notice of any errors on the Commission's Process Office, the service list, and the ALJ.

On March 17, 2003, an ALJ ruling established a temporary service list for consolidated I.02-11-040/I.03-02-033, comprised of the service lists for I.02-11-040, Application (A.) 94-11-013, A.96-10-038, and Rulemaking 97-04-011/I.97-04-012. Each of these service lists is on the Commission's web site. At this time, all documents should be served on the offices of all five Commissioners, the ALJ, and all parties on the temporary service list. During the PHC required by the OII initiating I.03-02-033, an updated service list for I.02-11-040/I.03-02-033 may be developed.

Parties shall serve, but not file, initial testimony and rebuttal testimony.

Service of testimony and pleadings by electronic means is encouraged, pursuant to Rule 2.3(b). The use of PDF format is also encouraged, to avoid confusion regarding pagination. Any party who wishes to receive served documents in a hard copy may make that request by serving a notice to that effect. All parties shall honor such requests. Parties shall e-mail courtesy copies of all served documents to the entire service list, including those appearing on the list as "Information Only."

Hard copies, in addition to electronic copies if made available, shall be served on the Assigned Commissioner, the ALJ, and Energy Division representatives.

**Other Procedural Issues**

The parties should comply with the Procedural Ground Rules set forth in Appendix A hereto.

**Exhibit B 029**

Therefore, **IT IS RULED** that:

1. Ex parte communications in this proceeding are subject to Pub. Util. Code § 1701.3(c), and Rule 7(c).

2. The scope of Phase I of this proceeding is as set forth herein.

3. The schedule for Phase I of this proceeding is as set forth herein.

4. A party may request final oral argument as set forth herein.

5. The principal hearing officer in this proceeding pursuant to Rule 5(k) and (l) is Administrative Law Judge Charlotte F. TerKeurst.

6. Parties shall follow the discovery, service, and service list rules as set forth herein.

7. Parties shall comply with the Procedural Ground Rules set forth in Appendix A hereto.

Dated April 16, 2003, at San Francisco, California.


___/s/  LORETTA M. LYNCH___
Loretta M. Lynch
Assigned Commissioner

**Exhibit B  030**

# APPENDIX A
## (Page 1)

## PROCEDURAL GROUND RULES

### Exhibit Format

See Rule 70 of the Rules of Practice and Procedure.  Parties often fail to include a blank space two inches high by four inches wide to accommodate the ALJ's exhibit stamp.  If necessary, add a cover sheet to the front of the exhibit. The common practice of pre-printing the docket number, a blank line for the exhibit number, and witness name(s) is not a substitute for the required two by four inch blank space to accommodate the exhibit stamp.  If the docket number and related information is pre-printed, it should be below or to the left of the required two by four inch blank space.

Exhibits should be bound on the left side or upper left-hand corner. Rubber bands and paper clips are unacceptable.

Excerpts from lengthy documents should include the title page and, if necessary for context, the table of contents of the document.

### Exhibit Copies

See Rule 71.  The original and one copy of each exhibit shall be furnished to the presiding officer and a copy shall be furnished to the reporter.  The copy furnished to the presiding officer may be the mailed copy.  Except for exhibits that are served prior to the hearing, parties are responsible for having sufficient copies available in the hearing room for each party in attendance.

### Cross-Examination Exhibits

Requiring witnesses to review new or unfamiliar documents during the hearing can waste hearing time.  The general rule is that a party who intends to

introduce an exhibit in the course of cross-examination should provide a copy to the witness and the witness' counsel before the witness takes the stand on the

**APPENDIX A**
**(Page 2)**

day the exhibit is to be introduced.  Documents in excess of two pages should be provided the day before.  Generally, parties need not provide advance copies of documents to be used for impeachment or to obtain the witness' spontaneous reaction.

**Corrections**

Generally, corrections to an exhibit should be made in advance and not orally from the witness stand.  If revised exhibit pages are prepared, the original text to be deleted should be lined out with the substitute or added text shown above or inserted.  If a separate correction exhibit describing the needed corrections is prepared, it should indicate both deletions and insertions.  Revised exhibit pages or separate correction exhibits should indicate the revision date.

**Hearing Hours**

Hearings will generally run from 9:00 a.m. to 12:00 a.m. with one morning break and from 1:30 p.m. to 3:30 p.m. with one afternoon break.  On Mondays, hearings will begin at 10:00 a.m. unless scheduled otherwise.  If hearings appear to be on schedule, hearings may run from 9:00 a.m. to 1:00 p.m. on Fridays.

**Cross Examination Time**

Parties are placed on notice that it may be necessary to limit and allocate cross-examination time as well as time for redirect and recross-examination.

**Rebuttal Testimony**

Prepared rebuttal testimony should include appropriate references to the testimony being rebutted. It is inappropriate, and potential grounds for striking, for any party to hold back direct presentations for introduction in rebuttal testimony.

## APPENDIX A
### (Page 3)

### Court Reporters

Common courtesy should always be extended to the reporters. Counsel should wait for witnesses to finish their answers, and witnesses should likewise wait for the whole question to be asked before answering. Counsel shall refrain from simultaneous arguments on motions and objections. Conversations at the counsel table or in the audience can be distracting to the reporter and other participants. Such distractions should be avoided.

(END OF APPENDIX A)

**Exhibit B 033**

I.02-11-040, I.03-02-033  LYN/CFT/jyc

## CERTIFICATE OF SERVICE

I certify that I have by mail this day served a true copy of the original attached Scoping Memo for Phase I of I.02-11-040 and Ruling of Assigned Commissioner on all parties of record in this proceeding or their attorneys of record.

Dated April 16, 2003, at San Francisco, California.

___/s/  JEANNIE CHANG___
Jeannie Chang

**N O T I C E**

Parties should notify the Process Office, Public Utilities
Commission, 505 Van Ness Avenue, Room 2000,
San Francisco, CA  94102, of any change of address to insure
that they continue to receive documents.  You must indicate
the proceeding number on the service list on which your
name appears.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The Commission's policy is to schedule hearings (meetings, workshops, etc.) in locations that are accessible to people with disabilities.  To verify that a particular location is accessible, call:  Calendar Clerk (415) 703-1203.

If specialized accommodations for the disabled are needed, e.g., sign language interpreters, those making the arrangements must call the Public Advisor at (415) 703-2074, TTY 1-866-836-7825 or (415) 703-5282 at least three working days in advance of the event.

I.02-11-040, I.03-02-033 LYN/CFT/jyc

**Exhibit B 035**

# EXHIBIT C

# STROOCK

June 30, 2003

Alan Z. Yudkowsky
Direct Dial 310-556-5829
AYudkowsky@stroock.com

Leon Bass Jr., Esq.
Southern California Edison
P. O. Box 800
2244 Walnut Grove Avenue
Rosemead, California 91770

Re:    SCE Data Requests to Sempra Energy Trading Corp.

Dear Mr. Bass:

As you know, this office represents non-party Sempra Energy Trading Corp. ("SET") in connection with the Border Price Spikes OII proceeding.

As we discussed last week, it is SET's position that only certain of the requests contained in Southern California Edison Company's ("SCE's") first and second sets of Data Requests to SET (the "Requests") might, in whole or part, pertain to matters that potentially could fall within the California Public Utilities Commission's subject matter jurisdiction. I identify those requests below. In so doing, SET does not concede the relevance of any portion of the Requests identified to the Border Price Spikes OII proceeding. Moreover, as you know, the Requests were never properly served upon SET, and this letter should not be construed as either a response to the Requests nor as a waiver of any of SET's rights (including the right to assert all relevant objections and/or to contest service), all of which are expressly reserved.

First Set of Data Requests (SCE-SET-01)

Request No. 1; that portion of Request No. 10 that relates to SoCalGas or SDG&E; that portion of Request No. 25 that relates to SoCalGas; that portion of Request No. 26 that relates to SoCalGas; that portion of Request No. 27 that relates to SoCalGas; that portion of Request No. 28 that relates to SoCalGas; Request No. 33; Request No. 34; and Request No. 37.

STROOCK & STROOCK & LAVAN LLP · LOS ANGELES · NEW YORK · MIAMI
2029 CENTURY PARK EAST, LOS ANGELES, CA 90067-3086 TEL 310.556.5800 FAX 310.556.5959 WWW.STROOCK.COM

**Exhibit C 036**

Leon Bass Jr., Esq.
June 30, 2003
Page 2


Second Set of Data Requests (SCE-SET-02)

Request Nos. 6, 7, and 8.

I will be out of the country until July 9, 2003. In the interim, please feel free to contact my colleague Dan Hecht at 212-806-6222 if you would like to discuss this matter further. Otherwise, we can continue the discussion upon my return.

Very truly yours,

Alan Z. Yudkowsky

Cc:    Daniel M. Hecht, Esq.

STROOCK & STROOCK & LAVAN LLP · LOS ANGELES · NEW YORK · MIAMI
2029 CENTURY PARK EAST, LOS ANGELES, CA 90067-3086 TEL 310.556.5800 FAX 310.556.5959 WWW.STROOCK.COM

Exhibit C 037

# EXHIBIT D



**SOUTHERN CALIFORNIA**
**EDISON**
An *EDISON INTERNATIONAL* Company

Leon Bass Jr.
Senior Attorney
leon.bass@sce.com

August 14, 2003

**VIA FACSIMILE & U.S. MAIL**

Alan Z. Yudkowsky, Esq.
Stroock & Stroock & Lavan LLP
2029 Century Park East
Los Angeles, California 90067-3086

> Re:   Order Instituting Investigation 02-11-040
>       Southern California Edison Company (SCE) Data
>       Requests to Sempra Energy Trading Corporation
>       (SET)

Dear Mr. Yudkowsky:

Enclosed are the first and second sets of Southern California Edison Company (SCE) Data Requests (DRs) to Sempra Energy Trading Corporation (SET). Per our telephone conversation of today, you have agreed to accept service of these DRs on behalf of SET.

In your letter to me dated June 30, 2003, you set forth SET's position that certain of the questions within the DRs could fall within the subject matter jurisdiction of the California Public Utilities Commission (Commission). Those portions are as follows:

**SCE to SET, DR No. 1:**

That portion of Question 10 that relates to Southern California Gas Company (SoCalGas) and San Diego Gas and Electric Company (SDG&E)

Those portions of Questions 25, 26, 27 and 28 that relate to SoCalGas

Questions 33, 34 and 37

P.O. Box 800      2244 Walnut Grove Ave.      Rosemead, California 91770 (626) 302-6967      Fax (626) 302-3990

**Exhibit D 038**

Alan Z. Yudkowsky, Esq.
Page 2
August 14, 2003

## SCE to SET, DR No.2:

Questions 6, 7 and 8

     Please confirm whether SET will respond to the above-identified Questions by the due date listed in the enclosed DRs. SCE also requests that SET reconsider its position regarding the remaining questions within SCE to SET, DR Nos. 1 and 2 particularly given the Commission's statement on page 9 of its Order Instituting Investigation: "We expect cooperation in this investigation from other non-jurisdictional entities, especially from the affiliate trading entities of the utilities."

     If you wish to discuss this matter further, please contact me either via e-mail (Leon.Bass@sce.com) or telephone (626 302 6967). Thank you.

Very truly yours,

Leon Bass Jr.

LBJ:lc:LW032200018.doc

# EXHIBIT E

# STROOCK

August 21, 2003

Alan Z. Yudkowsky
Direct Dial 310-556-5829
AYudkowsky@stroock.com

Leon Bass Jr., Esq.
Southern California Edison
P. O. Box 800
2244 Walnut Grove Avenue
Rosemead, California 91770

Re:     Order Instituting Investigation 02-11-040

Dear Mr. Bass:

I write in response to your August 14, 2003 letter enclosing Southern California Edison Company's ("SCE") first and second sets of data requests ("DRs") to Sempra Energy Trading Corp. ("SET") in connection with the above-referenced matter.

As a threshold matter, I agreed to accept subpoenas, on SET's behalf, the substance of which were to be the DRs described above. Inasmuch as you have served data requests instead, I must note that SCE accordingly has no legal basis to compel SET, as a non-party, to comply with the DRs. Nonetheless, consistent with the spirit of our discussions and without waiving SET's continuing jurisdictional objection, SET will provide responses and objections to the DRs by the dates set forth therein. As we also discussed, you and I will meet and confer on an appropriate date for production, to the extent there are documents to be produced, at that time.

Nothing herein should be construed as a waiver of SET's rights, all of which are expressly reserved.

Very truly yours,

Alan Z. Yudkowsky

STROOCK & STROOCK & LAVAN LLP · LOS ANGELES · NEW YORK · MIAMI
2029 CENTURY PARK EAST, LOS ANGELES, CA 90067-3086 TEL 310.556.5800 FAX 310.556.5959 WWW.STROOCK.COM

# EXHIBIT F

Subpoena Requested by:

Leon Bass, Jr. Esq. )
(Name) )
2244 Walnut Grove Ave./P.O. Box 800 )
)
Rosemead, California 91770 )
(Address) )
(626) 302-6967 )
(Telephone No.) )
)
Representing: Southern California Edison Co. )
)
Interested Party )
(Complainant, Defendant, Other) )

COPY
55764-0089
~~BY~~ 7-8-200
FORWARDED _____
XXY/CLL

# Public Utilities Commission Of The State Of California

(Caption of Proceeding) )
Order Instituting Investigation Into The )
Gas Market Activities of Southern )
California Gas Company, et. al. and Their )
Impact on the Gas Price Spikes Experienced )
at the California Border from March 2000 )
through May 2001 )
)
)

I.02-11-040
_____
(Proceeding Number)

**SUBPOENA OR
SUBPOENA DUCES TECUM**

_____Hearing _____Deposition

## THE PEOPLE OF THE STATE OF CALIFORNIA,

TO: Custodian of Records for Sempra Energy Trading

You are ordered to appear before the California Public Utilities Commission, located at 505 Van Ness
(Address)
Avenue, San Francisco, CA 94102-3298 on September 24, 2003 at 10:00 a.m.
(Date) (Time)
to testify as a witness in this matter unless you make a special agreement with Leon Bass, Jr., Esq.
(Name of Attorney or Party requesting Subpoena)

_____ to appear at another time. You are:

_____ Ordered to appear in person.

_____ Ordered to appear in person and produce the records described in the attached affidavit. The personal
attendance of the custodian or other qualified witness and the production of the original records is
required by this subpoena.

__X__ Not required to appear in person if you produce the records described in the attached affidavit in
compliance with Evidence Code Sections 1560 and 1561.

If you have been subpoenaed as a witness, you are entitled to witness fees and mileage actually traveled, as
provided by law. You may request one day's witness and mileage fees for travel to and from the place you are required to
appear. You may demand these fees at the time of service from the process server or from the party or attorney requesting
the subpoena. If they are not paid or tendered at that time, or unless the subpoena was obtained by the Commission staff,
you are not required to appear (Public Utilities Commission Section 1791).

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COMMISSION.**

By order of the Public Utilities Commission of the State of California. Given under the seal of this Commission

this 27th day of August , 19 2003 .

_____
(Chief Administrative Law Judge)

**Exhibit F 041**

## PROOF OF SERVICE OF SUBPOENA

I served this _____ subpoena/_____ subpoena duces tecum and supporting affidavit by delivering a copy personally to the person served as follows:

Person served (name) _____

Address where served _____

_____

Date of delivery _____

Time of delivery _____

Witness fees (check one)

_____ Were demanded and paid or tendered (Amount $_____ )

_____ Were not demanded or paid

Fees for service $_____

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration is executed on

_____

(Date)

_____

(Signature)

**Exhibit F 042**

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE

STATE OF CALIFORNIA

| | | |
|---|---|---|
| Order Instituting Investigation Into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, Southwest Gas, Pacific Gas and Electric, and Southern California Edison and Their Impact on the Gas Price Spikes Experienced at the California Border from March 2000 through May 2001. | ) ) ) ) ) ) ) ) ) | Investigation 02-11-040 (Filed November 21, 2002) <br><br> Investigation 03-02-033 (Filed February 27, 2003) |

| | |
|---|---|
| Order Instituting Investigation Whether San Diego Gas & Electric Company, Southern California Gas Company and Their Holding Company, Sempra Energy, Respondents, Have Complied With Relevant Statutes and Commission Decisions, Pertaining to Respondents' Holding Company Systems and Affiliate Activities. | ) ) ) ) ) ) ) ) ) |

AFFIDAVIT OF STEVEN H. LEVINE SUPPORTING THE ISSUANCE OF SOUTHERN CALIFORNIA EDISON COMPANY SUBPOENA DUCES TECUM TO SEMPRA ENERGY TRADING

I, Steven H. Levine, hereby declare as follows:

1.      I am a Senior Associate of The Brattle Group and a member of the firm's utilities practice area. I am one of a group of consultants from The Brattle Group who have been retained by the Southern California Edison Company (SCE) to provide litigation support in the Order Instituting Investigation 02-11-040 ("OII").

2.      In that capacity, I have participated in the drafting of SCE Data Requests to entities SCE believes are in possession of information relevant to this proceeding, including Sets

SubpoenaAffidavittoNonparties-SempraEnergyTrading.doc                    - 1 -

**Exhibit F 043**

One and Two of the Data Requests with Cover Letter served by SCE on Sempra Energy Trading ("SET"). The information sought by SCE pursuant to this subpoena duces tecum is the information requested by each and every question within those Data Requests which, along with the accompanying Cover Letters, are attached hereto as Exhibit "A" and are hereby incorporated by reference into this affidavit.

3.     The questions within Data Request, Set One ask SET to produce information regarding Southern California Gas Company's ("SoCalGas") activities in western gas markets, including SET's negotiations and transactions with SoCalGas for the purchase and sale of natural gas, transportation services, hub services and storage services. The Data Request also seeks from SET information it may have regarding conditions in the western United States gas markets, including but not limited to the use of EnronOnLine for gas purchases and sales and data provided to gas trade publications. Any gas price or wash trade information SET may have developed and/or conveyed to gas trade publications is also requested. Set One also requests information about SET's use of interstate and intrastate pipeline capacity, its use of storage capacity, its gas purchases and sales, and its hedging activities. It also requests SET's communications with its affiliates and with Sempra Corporation.

4.     The questions within Data Request, Set Two ask SET to produce, among other things, information regarding its negotiations and transactions in or around California for electricity purchase and sales (including hedging activities) and any information regarding the impact of SoCalGas activities in western US physical and forward gas markets on western US physical and forward electricity markets. Set Two also requests SET's communications with its affiliates and with Sempra Corporation regarding western electricity markets. I am informed and believe that the requested information in Set Nos.One and Two is within the possession or under the control of SET.

5.     Good cause exists for the production by SET of the information sought in the Data Requests. The information sought is necessary for SCE to fully investigate the issues set forth in this proceeding. There are several issues set forth in the OII and in the Scoping Memo

SubpoenaAffidavittoNonparties-SempraEnergyTrading.doc     - 2 -

for Phase 1 of this proceeding that inquire about the role affiliates of SoCalGas and San Diego Gas & Electric Company ("SDG&E") played in causing the increase in border prices.[1] Several questions contained within Set One seek information about SET's gas market activities to understand its position in the gas market. Other questions seek information regarding SET's views of the gas markets. Obtaining this information from large traders like SET is important because, as a large trader of gas and electricity, SET was likely to have closely followed gas market conditions and likely has information the Commission will find useful regarding the causes of the gas price spikes. It also may have information about the activities of other gas market participants that may have contributed to the price spikes.

Because natural gas plays an important role in the production and price of electricity, it is important that SCE investigate both SET's gas market activities and its electric market activities (since SET could benefit from proprietary knowledge of SoCalGas's activities in either the gas or electric markets). In fact, sub-issue 2b of the Scoping Memo for Phase 1 specifically inquires about SET's electric market positions. Most of the questions in Set Two seek information regarding SET's electric market activities.

Finally, both Set One and Set Two seek information regarding the flow of information between SET and its affiliates, including Sempra Corporation. These questions are critical to understanding whether information about the activities of SoCalGas was made available to SET in a way that benefited it without being made available to other market participants. Sub-issue 2e of the Scoping Memo specifically asks about the possible sharing of information between SoCalGas, SDG&E, and SET, and many questions in Set One and Set Two seek to address that issue.

6.    Without the data requested from SET, SCE will not have access to information that is essential to examining the issues the Commission has raised in the OII and Scoping Memo. In order to thoroughly investigate the issues raised in the OII and the Scoping Memo,

---

[1]    See Scoping Memo for Phase 1 of I.02-11-040 and Ruling of Assigned Commissioner (Scoping Memo), Issue 2, p.5.

SCE requires the data it requested of SET. SET is the only available source for the data requested. That data is crucial both to understanding the behavior of parties to this investigation, and to investigating whether there has been any activity that contributed to the gas price spikes at issue in this proceeding.

7.     The foregoing facts are within my personal knowledge and, if called and sworn as a witness, I could testify competently thereto.

Executed this _3rd_ day of September, 2003 at Cambridge, Massachusetts.

_Steven H. Levine_ (signature)

Steven H. Levine

Subscribed and sworn to before me this
_3rd_ day of September, 2003.

_Debra A. Paolo_ (signature)

Notary Public in and for the County of Middlesex

```
DEBRA A. PAOLO
Notary Public, Commonwealth of Massachusetts
My Commission Expires October 23, 2009
```

# EXHIBIT A



SOUTHERN CALIFORNIA
**EDISON**

An *EDISON INTERNATIONAL* Company

Leon Bass Jr.
Senior Attorney
Leon.Bass@sce.com

May 15, 2003

Michael Thorp, Esq.
Southern California Gas Company
555 West Fifth Street, 14th Floor
Los Angeles, CA 90013-1011

      Re:    SCE Data Request to SEMPRA ENERGY
              TRADING (SCE-SET-01) in 2003 OII 02-11-040

Dear Mr. Thorp:

    Enclosed is Southern California Edison Company's (SCE) first set of Data
Requests to Sempra Energy Trading (SET) in the OII on Border Price Spikes
proceeding, Phase 1, I.02-11-040. SCE requests your responses on or before **May 30, 2003**. Please provide your responses by e-mail and hard copy.

    If you are unable to provide the information by the due date, please notify me at
the number below by May 27, 2003 as to why the due date cannot be met and by what
date you will provide your responses.

                 Very truly yours,

                 Leon Bass Jr.

LBJ:jli:LW031330024.doc

Enclosure(s)

P.O. Box 800    2244 Walnut Grove Ave.    Rosemead, California 91770 (626) 302-6967    Fax (626) 302-3990

**Exhibit F 048**

# DEFINITIONS

As used in this Request, the following terms have the meanings indicated:

1. The word "Document" shall include, but is not limited to, all physical or tangible things, including any and all writings, printed matter, correspondence, transcripts, minutes, telegrams, cables, telexes, video or audio tapes, recordings, films, photographs, negatives, memoranda, work papers, outlines, notes, doodles, drafts, press releases, news articles, diaries, employment records, time records, logs, statements, evaluations, appraisals, studies, ledgers, journals, books, records of account, registers, contracts, receipts, invoices, shipping slips, tax returns, reports, evaluations, dockets, filings and any other copy of whether sent or received. The term "document" shall also include any other form of reporting, storing, maintaining, or indexing such, information including, but not limited to, electronic storage, digital storage, shorthand notes, diagrams, magnetic card, e-mail or other information capable of reduction to or retrieval into tangible copy. The term "document" shall include any copy of any document to extent that such copy is not identical to the original.

2. The term "**[Electronic]**" prior to a data request question shall mean that the Documents sought in that particular data request are to be produced in electronic form on a Compact Disc ("CD"). The contents of the CD shall be organized in a fashion that identifies the data contained within the CD by the number of the data request question to which that data is responsive.

3. The use of any singular or plural shall include both the singular and the plural. The use of any word connoting gender (such as he, she or it) shall include all genders.

4. The term "Sempra" refers to Sempra Energy Corporation and its divisions, representatives, assigns and each of their present and former officers, directors, employees, agents, attorneys and other persons acting or purporting to act on any of their behalf.

5. The term "SoCalGas" refers to Respondent Southern California Gas Company and its divisions, representatives, assigns and each of their

**Exhibit F 049**

present and former officers, directors, employees, agents, attorneys and other persons acting or purporting to act on any of their behalf.

6.  The term "SDG&E" refers to Respondent San Diego Gas and Electric Company and its divisions, representatives, assigns and each of their present and former officers, directors, employees, agents, attorneys and other persons acting or purporting to act on any of their behalf.

7.  The term "SCE" refers to Southern California Edison Company and any of its divisions, representatives, assigns and each of their present and former officers, directors, employees, agents, attorneys and other persons acting or purporting to act on any of their behalf.

8.  The term "CPUC" refers to the California Public Utilities Commission and any of its divisions (including but not limited to the Office of Ratepayer Advocates ("ORA") and the Energy Division), representatives, assigns and each of their present and former officers, directors, employees, agents, attorneys and other persons acting or purporting to act on any of their behalf.

9.  The term "GCIM" refers to Applications and other proceedings before the CPUC that pertain to the Gas Cost Incentive Mechanism of SoCalGas.

10. The term "Subject Period" refers to the time period from March 2000 through May 2001.

11. The term "California Border" refers to the following natural gas delivery points along the California border: Topock, Needles, Ehrenberg, Blythe, Daggett, and Kern River Station.

12. The term "El Paso" refers to the El Paso Natural Gas Company and any of its divisions, representatives, assigns and each of their present and former officers, directors, employees, agents, attorneys and other persons acting or purporting to act on any of their behalf.

13. The term "El Paso Merchant" refers to El Paso Merchant Energy and any of its divisions, representatives, assigns and each of their present and former officers, directors, employees, agents, attorneys and other persons acting or purporting to act on any of their behalf.

LW031330029 - 2 -

**Exhibit F 050**

14.    The term "Transwestern" refers to the Transwestern Pipeline Company and any of its divisions, representatives, assigns and each of their present and former officers, directors, employees, agents, attorneys and other persons acting or purporting to act on any of their behalf.

15.    The term "Mojave" refers to the Mojave Pipeline Company and any of its divisions, representatives, assigns and each of their present and former officers, directors, employees, agents, attorneys and other persons acting or purporting to act on any of their behalf.

16.    The term "Kern River" refers to the Kern River Gas Transmission and any of its divisions, representatives, assigns and each of their present and former officers, directors, employees, agents, attorneys and other persons acting or purporting to act on any of their behalf.

17.    The term "Gas Acquisition" refers to the SoCalGas Gas Acquisition Department or its successor entity.

18.    The term "Gas Operations" refers to the SoCalGas Gas Operations Department or its successor entity.

19.    The term "California Production Sources" refers to any production area in the state of California which has the ability to deliver pipeline quality gas supplies into the SoCalGas pipeline system.

20.    The term "Enron On-Line" refers to a subsidiary of Enron Corp. and any of its divisions, representatives, assigns and each of their present and former officers, directors, employees, agents, attorneys and other persons acting or purporting to act on any of their behalf.

## INSTRUCTIONS

1.    If any document request would call for an unduly burdensome production, Respondent should indicate the nature of the burden and propose a less burdensome alternative to provide the same information.  SCE stands ready to meet and confer regarding same.

2.    If any requested document is not or cannot be produced, it should be produced to the extent possible, and Respondent should indicate

**Exhibit F 051**

what document or portion of any such document is not or cannot be produced and the reason why it cannot be produced.

    3.    In producing Documents, Respondent should produce the original of each document requested together with all non-identical copies and drafts of that document including all copies which bear any marginalia, mark or notation not present on the original.

    4.    All Documents should be produced in the file, folder, envelope or other container in which the Documents are kept or maintained. If for any reason the container cannot be produced, copies of all labels or other identifying markings should be produced.

    5.    Documents attached to each other should not be separated.

    6.    Documents not otherwise responsive to this request shall be produced if such Documents refer to, describe, or explain the attached Documents called for by this request and constitute routing slips, transmittal memoranda or letters, comments, evaluations, or similar Documents.

    7.    If Respondent claims that the attorney-client privilege, work-product doctrine or any other privilege is applicable to any Documents, it should provide the following information with respect to each such document:

    a. the date of the document;
    b. the identity of each and every author of the document;
    c. the identity of each person who participated in the preparation of the document;
    d. the identity of each and every person who received the document;
    e. the identity of each and every person from whom the document was received; and
    f. a description of the subject matter of the document, and each and every fact supporting the claim of privilege.

    8.    This Data Request shall be construed to encompass responsive Documents, wherever located, in the custody, possession or control of SoCalGas or its agent, employees, representatives, attorneys, accountants, or other persons acting or purporting to act on its behalf.

SOUTHERN CALIFORNIA EDISON COMPANY
ORDER INSTITUTING INVESTIGATION
I.02-11-040
Data Request No. SCE-SET-01
Dated: 05/15/03

**Question No. 1:**

Please provide all documents (including any internal memos, emails, presentations, graphs, charts, or meeting minutes) in your possession that discuss, analyze or refer to Southern California Gas Company's activities in western US physical and forward gas markets during the Subject Period. Your response should include, but not be limited to, all documents referring to:

   a) All negotiations with SoCalGas for the purchase or sale of natural gas, transportation services, hub services, or storage services
   b) Purchases of natural gas from SoCalGas or sales of natural gas to SoCalGas in production basins or at the California border
   c) Purchases of hub (loan, park, or wheel) services from SoCalGas
   d) Purchases of storage services from SoCalGas
   e) Purchases of transportation services from SoCalGas
   f) Purchases of financial instruments (futures contracts, forward contracts, option contracts, etc.) from SoCalGas or sales of financial instruments to SoCalGas
   g) The operation of SoCalGas' gas transmission and storage system
   h) SoCalGas' summer and winter balancing rules (e.g., use of OFO's, overnomination events, etc.)
   i) SoCalGas' nominations or use of interstate pipeline capacity
   j) The behavior of SoCalGas' Gas Acquisition (core procurement) department, including Gas Acquisitions' procurement activities and use of storage
   k) The release of interstate pipeline capacity by SoCalGas
   l) SoCalGas' gas cost incentive mechanism
   m) Imbalance trades done with SoCalGas, or transactions done with SoCalGas in order to avoid imbalance penalties

**Question No. 2:**

Please provide all documents (including any internal memos, emails, presentations, graphs, charts or meeting minutes) in your possession that refer to gas market conditions in western US gas markets during the Subject Period. Your response should include, but not be limited to, all documents that discuss or analyze gas prices, alleged gas price manipulation in the western US physical and forward gas markets, or the behavior of other participants in the western US physical and forward gas markets.

LW031330029

- 5 -

**Question No. 3:**

Please provide all documents (including any internal memos, emails, presentations, graphs, charts or meeting minutes) in your possession that refer to the use of Enron On-Line for gas purchases and sales in western US physical and forward gas markets during the Subject Period.

**Question No. 4:**

Please provide all documents (including any internal memos, emails, presentations, graphs, charts or meeting minutes) that discuss the impact of Enron or Enron On-Line on US physical and forward gas markets and prices during the Subject Period, and all documents that discuss the use of Enron On-Line by Enron or other market participants to manipulate, impact, or affect US physical or forward gas market prices during the Subject Period.

**Question No. 5:**

a) Please explain by what method (e.g. telephone, fax, email) any price survey information was conveyed by Sempra Energy Trading to any gas trade publication during the Subject Period.

b) Please provide all documents, e-mails, and other communications (including audio tape recordings of phone conversations) that involve or refer to the reporting of gas price information to any gas trade publication during the Subject Period.

**Question No. 6:**

Please provide all studies, documents, e-mails and other communications that involve or refer to the misreporting of information to any gas trade publication during the Subject Period.

**Question No. 7:**

Please provide all studies, documents, e-mails and other communications that involve or refer to wash trading in western US physical and forward gas markets during the Subject Period.

Exhibit **F** **054**

**Question No. 8:**

Please provide all documents provided to any state or government agency
(including, but not limited to, the Securities and Exchange Commission, the
U.S. Department of Justice, the Federal Energy Regulatory Commission and
the Commodities Futures Trading Commission) that relate to the reporting of
gas price information to gas trade publications and/or to wash trading in
western US gas markets during the Subject Period.

**Question No. 9:**

Please provide all instructions, guidelines, and communications (provided via
e-mails, memoranda, training manuals or any other means) related to gas
purchasing in western US physical or forward gas markets either provided to
or circulated by your traders who bought, sold, traded, or otherwise
transacted in western US physical or forward gas markets, including but not
limited to, traders who purchased gas to be used as a fuel in generating
plants owned or partially owned by you or your affiliates that sell in to
California.

**Question No. 10:**

Please provide all documents that describe, refer, or relate to your strategies
for purchasing natural gas in western US physical gas markets during the
Subject Period (1) to supply other market participants or end-users, (2) to
supply generating plants owned by your company or affiliated companies that
serve California, (3) as part of a gas supply portfolio used for general trading
purposes in western US gas markets, or (4) to repay gas loaned by SoCalGas,
PG&E, or other western US gas market participants.

**Question No. 11:**

Please provide all documents that describe, refer or relate to your strategies
for purchasing or utilizing gas storage in California during the Subject
Period.

**Question No. 12:**

Please provide all documents that describe, refer or relate to your strategies for contracting for, releasing or utilizing firm interstate pipeline capacity on the El Paso Natural Gas, Transwestern, Kern River, Mojave and PG&E Gas Transmission Northwest pipelines during the Subject Period.

**Question No. 13:**

Please provide all documents that describe, refer or relate to your strategies for contracting for or utilizing interruptible interstate pipeline capacity on the El Paso Natural Gas, Transwestern, Kern River, Mojave and PG&E Gas Transmission Northwest pipelines during the Subject Period.

**Question No. 14:**

Please provide all daily, weekly, monthly, and quarterly position reports for your natural gas trades in western US gas markets during the Subject Period.

**Question No. 15:**

[**Electronic**] Please provide the following data for gas purchases and sales in or around California (including, but not limited to, purchases and sales at Topock, Needles, Daggett, Ehrenberg, Blythe, Kern River Station, PG&E City Gate, Malin, and California in-state production) during the Subject Period:
    (a) Price
    (b) Whether the price was fixed or indexed, and for indexed transactions, which index was used
    (c) Whether the transaction was a purchase or a sale
    (d) Counterparty name
    (e) Quantity
    (f) Term (start date and end date)
    (g) Date of agreement
    (h) Location

For any transactions that extend beyond one month, please provide price and quantity data by month.

LW031330029        - 8 -

**Exhibit F 056**

**Question No. 16:**

**[Electronic]** Please provide the following data for gas purchases and sales in producing basins (including, but not limited to, purchases and sales in the Permian, San Juan, Anadarko, Rocky Mountain and Western Canadian Sedimentary basins) for delivery into California during the Subject Period:

   (a) Price
   (b) Whether the price was fixed or indexed, and for indexed transactions, which index was used
   (c) Whether the transaction was a purchase or a sale
   (d) Counterparty name
   (e) Quantity
   (f) Term (start date and end date)
   (g) Date of agreement
   (h) Location

For any transactions that extend beyond one month, please provide price and quantity data by month.

**Question No. 17:**

**[Electronic]** Please provide data regarding all attempts by others to purchase gas from Sempra Energy Trading during the Subject Period, where the prospective transactions were not consummated. For each inquiry by a prospective buyer, please provide the date of the proposal, the quantity requested, the purchase price offered by the prospective purchaser and all other terms of the sale proposed by the prospective purchaser.

**Exhibit F 057**

## Question No. 18:

**[Electronic]** Please provide the following transaction data for each gas futures, forward, or option contract or any other hedging instrument with a settlement location in the San Juan Basin, Permian Basin, Anadarko Basin, within California, or at the California border during the Subject Period:

  (a) Type of instrument
  (b) Transaction date
  (c) Settlement date
  (d) Purchase price
  (e) Settlement price
  (f) Quantity
  (g) Settlement location
  (h) Gain or loss
  (i) Other relevant data (strike price for options contracts, options premiums, etc.)

## Question No. 19:

For all storage contracts in California in effect during anytime during the Subject Period, please describe the contracts in detail. Please include


  a. Name of storage provider
  b. Contract Number
  c. The date that the contract was executed;
  d. The duration of the contract (commencement date and termination date);
  e. The Inventory Maximum Quantity stated in Dth (please indicate whether the service is Firm or As-Available and indicate whether the Service Period is different than the duration of the contract as specified in subpart c of this request);
  f. The Injection Maximum Quantity stated in Dth (please indicate whether the service is Firm or As-Available and indicate whether the Service Period is different than the duration of the contract as specified in subpart c of this request);
  g. The Withdrawal Maximum Quantity stated in Dth (please indicate whether the service is Firm or As-Available and indicate whether the Service Period is different than the duration of the contract as specified in subpart c of this request);

**Exhibit F 058**

h. The Inventory Reservation Charge stated in $/Dth/day;

i. The Inventory Reservation Charge stated in $/Dth/day;

j. The Injection Variable Charges (in-kind fuel charge and O&M);

k. The Withdrawal Reservation Charge stated in $/Dth/day;

l. The Withdrawal Variable Charges (O&M);

m. The applicable tariff class of the contract; and

n. All amendments or addendums to the contract that were in effect at any time during the duration of the contract that would alter the contract's injection and/or withdrawal rights (please indicate all changes the amendment or addendum makes to items a through m above).

**Question No. 20:**

[Electronic] Please provide by day the volume of gas injected into or withdrawn from storage and your storage balance (i.e., the level of inventory) by day during the Subject Period for each contract identified in the above question.

**Question No. 21:**

[Electronic] For all hub or market center (park, loan, wheeling) services transactions entered into with any entity located in California during anytime during the Subject Period, please describe the transaction in detail. Please include the price, start date, end date, agreement date, quantity, counterparty name, and provide by day the outstanding balance of each transaction.

**Question No. 22:**

For each firm contract for transportation on the El Paso Natural Gas, Transwestern, Kern River, Mojave and PG&E Gas Transmission Northwest pipelines in effect during the Subject Period, please provide:

(a) contract number

(b) pipeline

(c) effective date

(d) termination date

(e) contract capacity

(f) whether the contract was acquired through a capacity release (include the price terms and name of the releasing shipper).

**Exhibit F 059**

**Question No. 23:**

For each transaction where you released firm capacity on the El Paso
Natural Gas, Transwestern, Kern River, Mojave and PG&E Gas
Transmission Northwest pipelines effective during the Subject Period, please
provide:
  (a) pipeline
  (b) counterparty
  (c) effective date
  (d) termination date
  (e) released capacity
  (f) price.

**Question No. 24:**

**[Electronic]** For all of the firm transportation contracts identified in
response to Question 22, please provide daily nominations and throughput
(by receipt point and delivery point combinations) specified separately by
contract during the Subject Period. Please identify by day the magnitude of
any differences between your nominations and actual throughput due to
curtailments, pro rata allocations and other pipeline-imposed system
constraints. To the extent that you on any day revised your second, third, or
fourth cycle nominations relative to its initial nominations, please provide
the receipt point, delivery point, and nominated volumes for both the initial
cycle and the subsequent cycles in which the nomination was changed. For
each cycle, please identify nominations, scheduled volumes, and all cuts
received as well as the reason provided for each type of cut.

**Question No. 25:**

**[Electronic]** Please provide your imbalance positions by day on the
SoCalGas and PG&E systems during the Subject Period. Please also provide
your month ending imbalance positions on the SoCalGas and PG&E systems
for each month during the Subject Period.

**Exhibit F 060**

**Question No. 26:**

[**Electronic**] Please provide the amount of all daily imbalance penalties
that you incurred on the SoCalGas and PG&E systems separately by day for
each day in which you incurred imbalance penalties during the Subject
Period.

**Question No. 27:**

Please provide the amount of all monthly imbalance penalties that you
incurred on the SoCalGas and PG&E systems separately by month for each
month in which you incurred imbalance penalties during the Subject Period.

**Question No. 28:**

[**Electronic**] Please provide the following data for all imbalance trades on
the SoCalGas or PG&E systems during the Subject Period:
  (a) Price
  (b) Counterparty
  (c) Quantity
  (d) Transaction date
Location (SoCalGas system or PG&E system)

**Question No. 29:**

Please provide organizational charts for Sempra Energy Trading's trading
operations during the Subject Period. The chart should identify by name and
title the individuals involved in Sempra Energy Trading's trading operations
and provide job descriptions for each position.

**Question No. 30:**

Please provide all documents in Sempra Energy Trading's possession
describing how the operations of the El Dorado power plant affected
California gas or electricity markets during the Subject Period.

**Question No. 31:**

Please provide all documents related to any role that Sempra Energy Trading
had in procuring natural gas for use by the El Dorado plant during the

Exhibit F 061

1 Subject Period. Please include any written contracts or agreements under
2 which Sempra Energy Trading procured natural gas or acted as the fuel
3 supply agent for the El Dorado plant during the Subject Period.
4
5 **Question No. 32:**
6
7 [**Electronic**] Please provide, on a day-to-day basis, Sempra Energy Trading's
8 internal 24-month ahead (or as many months as available if less than 24)
9 forward monthly natural gas price curves for: the California Border, the San
10 Juan Basin, Henry Hub, and the Permian Basin. These curves should
11 represent curves developed or used internally by Sempra Energy Trading
12 based on vendor-supplied forward prices.
13
14 **Question No. 33:**
15
16 Please provide all documents, communications, emails, memos,
17 presentations, and reports by Sempra Energy Trading that were sent,
18 presented, or made available to either SoCalGas or SDG&E during the
19 Subject Period, pertaining to Western U.S. physical and forward gas markets
20 (including risk management issues). Nominations made using GasSelect
21 may be excluded from your response.
22
23 **Question No. 34:**
24
25 Please provide all documents, communications, emails, memos,
26 presentations, and reports by SoCalGas or SDG&E that were sent, presented,
27 or made available to Sempra Energy Trading during the Subject Period,
28 pertaining to Western U.S. physical and forward gas markets (including risk
29 management issues). Communications through GasSelect that are made to
30 all SoCalGas shippers may be excluded from your response.
31
32 **Question No. 35:**
33
34 Please provide documents, communications, emails, memos, presentations,
35 and reports by any Sempra Energy Corporation employee that were sent,
36 presented, or made available to any Sempra Energy Trading employee during
37 the Subject Period, pertaining to Western U.S. physical and forward gas
38 markets (including risk management issues).
39

**Exhibit F 062**

**Question No. 36:**

Please provide documents, communications, emails, memos, presentations, and reports by any Sempra Energy Trading employee that were sent, presented, or made available to any Sempra Energy Corporation employee during the Subject Period, pertaining to Western U.S. physical and forward gas markets (including risk management issues).

**Question No. 37:**

Please provide all audio recordings of conversations between Sempra Energy Trading employees and employees at SoCalGas or SDG&E during the Subject Period.

**Question No. 38:**

Please provide all daily or periodic risk management reports, net open position reports or statistics, and value at risk reports or statistics pertaining to Sempra Energy Trading's natural gas trades in Western U.S. physical and forward gas markets during the Subject Period.

**Question No. 39:**

Please provide any documents that discuss or explain Sempra Energy Trading's risk management policies, procedures, guidelines, strategies, targets or goals during the Subject Period.

**Prepared By:**    **Leon Bass, Jr., Esq.**
**Title:**           **Senior Attorney**
                 **Southern California Edison Company**

# EXHIBIT G

## BEFORE THE PUBLIC UTILITIES COMMISSION OF THE

## STATE OF CALIFORNIA

| | | |
|---|---|---|
| Order Instituting Investigation Into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, South- west Gas, Pacific Gas and Electric, and South- ern California Edison and Their Impact on the Gas Price Spikes Experienced at the California Border from March 2000 through May 2001. | ) ) ) ) ) ) ) ) ) | Investigation 02-11-040 (Filed November 21, 2002) |
| Order Instituting Investigation Whether San Diego Gas & Electric Company, Southern Cali- fornia Gas Company and Their Holding Com- pany, Sempra Energy, Respondents, Have Complied With Relevant Statutes and Commis- sion Decisions, Pertaining to Respondents' Holding Company Systems and Affiliate Activi- ties. | ) ) ) ) ) ) ) ) ) ) | Investigation 03-02-033 (Filed February 27, 2003) |

## SEMPRA ENERGY TRADING'S MOTION TO QUASH SUBPOENA DUCES TECUM FROM SOUTHERN CALIFORNIA EDISON

ALAN Z. YUDKOWSKY
PETER F. JAZAYERI
ALEX M. WEINGARTEN

Attorneys for
SEMPRA ENERGY TRADING CORP.

2029 Century Park East, Suite 1800
Los Angeles, California 90067
Telephone:    (310) 556-5800
Facsimile:    (310) 556-5959
E-mail:Ayudkowsky@stroock.com
Pjazayeri@stroock.com
Aweingarten@stroock.com

03 SEP 24 PM 3: 25
RECEIVED
PUBLIC UTILITIES COMMISSION
LOS ANGELES OFFICE

COPY

Exhibit G 064

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE

STATE OF CALIFORNIA

| | | |
|---|---|---|
| Order Instituting Investigation Into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, Southwest Gas, Pacific Gas and Electric, and Southern California Edison and Their Impact on the Gas Price Spikes Experienced at the California Border from March 2000 through May 2001. | ) ) ) ) ) ) ) ) | Investigation 02-11-040 (Filed November 21, 2002) |
| Order Instituting Investigation Whether San Diego Gas & Electric Company, Southern California Gas Company and Their Holding Company, Sempra Energy, Respondents, Have Complied With Relevant Statutes and Commission Decisions, Pertaining to Respondents' Holding Company Systems and Affiliate Activities. | ) ) ) ) ) ) ) ) ) ) ) | Investigation 03-02-033 (Filed February 27, 2003) |

## SEMPRA ENERGY TRADING'S MOTION TO QUASH SUBPOENA DUCES TECUM FROM SOUTHERN CALIFORNIA EDISON

### I.     INTRODUCTION

Pursuant to Rules 45 and 61 of the California Public Utilities Commission's (the "Commission") Rules of Practice and Procedure, Sempra Energy Trading Corp. ("SET"), appearing specially, respectfully moves to quash the subpoena propounded by the Commission, on behalf of Southern California Edison ("Edison"), to SET in this proceeding (the "Subpoena"). SET's motion to quash is based on the grounds that, *inter alia*, (1) as a non-utility, SET is not subject to the jurisdiction of the Commission; (2) the Edison data requests at issue in the Subpoena dramatically exceed the scope of the Commission's power to subpoena non-utilities; and (3) the data requests exceed the scope of issues properly before the Commission in this investigation. As

Exhibit G 065

SET already has informed Edison, it is willing to produce documents responsive to those requests that are within the scope of the Commission's jurisdiction, subpoena power and this particular investigation; however, the majority of Edison's data requests fall outside of those parameters.

## II.  STATEMENT OF FACTS

SET, a Delaware corporation, is a wholesale power marketer based in Connecticut, and not a party to this investigation. SET is not public utility, does not own generation nor does it serve retail load in California. As a subsidiary of corporate parent Sempra Energy ("Sempra"), SET is an affiliate of Sempra subsidiaries San Diego Gas & Electric Company ("SDG&E") and Southern California Gas Company ("SoCalGas"), both of which are public utilities. Edison, a subsidiary of Edison International, also is a public utility.

On November 21, 2002, the Commission issued an order instituting a two-phase investigation examining the price of natural gas delivered at the California border from March 2000 through May 2001. Phase One of the investigation named SDG&E and SoCalGas as Respondents. Phase Two named Southwest Gas ("SW Gas"), Pacific Gas and Electric Co. ("PG&E"), and Edison as respondents. In each phase of the investigation, respondents have been ordered to present evidence that supports all natural gas market activity that may have affected natural gas prices during the period March 2000 through May 2001, and to submit testimony explaining the reasons for natural gas price spikes during the same period.

On April 16, 2003, the Commission issued a Scoping Memo (the "Scoping Memo") that identified four specific issues to be investigated:

1.  First, "did SoCalGas and/or SDG&E play a role in a causing the increase in California border prices between March 2000 and May 2001?"

2.  Second, "did any of SoCalGas' and SDG&E's affiliates or their parent company, Sempra Energy, play a role in causing the increase in border prices? Did concerns about affiliates or the parent's financial position cause SoCalGas and/or SDG&E to take actions that may have increased gas costs?" With respect to these issues, the Commission identified four sub-issues that specifically name SET: (a) Did SET take positions in the electric market that allowed it or any of its affiliates

to unjustifiably benefit from increased border prices during the subject period?; (b) Did SET become aware of SoCalGas' gas hedging activities during the subject period, and if so, did SET use that knowledge to its benefit?; (c) Did SET report false trades or prices to the trade press and did any such false reporting affect border prices during the subject period?; and (d) Did SoCalGas, SDG&E, and SET share information?

3.  Third, "What were the primary factors that caused the increase in border prices? In addition to the increase in gas costs caused by El Paso's actions, what other facts may have caused gas prices to increase to such high levels? Did recently acknowledged inaccurate reporting of gas price information to energy trade publications by energy trading companies have any effect on published index prices?"

4.  Fourth, "Did SoCalGas' and SDG&E's gas cost incentive mechanisms (GCIMs) create perverse incentives to increase or otherwise manipulate natural gas prices at the California border?

*See* Commission Scoping Memo at 4-6 (April 16, 2003).

On May 15, 2003 and June 5, 2003, respectively, Edison propounded its first and second sets of data requests to SET. (Declaration of Alan Z. Yudkowsky ("Yudkowsky Decl.") ¶ 4.) On June 30, 2003, SET indicated to Edison that SET would produce documents responsive to those requests that related to matters within the scope of the Commission's jurisdiction.[1] Of the 73 requests propounded by Edison, however, 61 did not bear any reasonable relation to the scope of the instant investigation and/or did not concern areas that are within the jurisdiction of the Commission. Nonetheless, SET attempted — in good faith — to negotiate with Edison to address these concerns, including the jurisdictional issues raised by the instant motion. Edison, instead, served the Subpoena, without narrowing the scope of any of the requests. Again, in the spirit of good faith, SET has agreed voluntarily to produce documents responsive to those 12 requests (or portions thereof) that do fall within the scope of the investigation and jurisdiction of the Commission but must maintain its position that Edison has asked for much more than it is

---

[1] SET has already indicated to Edison that it will produce documents responsive to requests 1, 10, 25, 26, 27, 28, 33, 34 and 37 of set one and requests 6, 7 and 8 of set two. (Yudkowsky Decl. ¶ 3. )

3

entitled to and that most of these requests are not relevant to matters properly before the Commission.[2]

## III.   DISCUSSION

### A.   The Commission Has Jurisdiction Over Public Utilities

Article XII, Section 6 of the California Constitution sets forth the mandate for the Public Utilities Commission, stating that the "Commission may fix rates, establish rules, examine records, issue subpenas [sic], administer oaths, take testimony, punish for contempt, and prescribe a uniform system of accounts for all public utilities subject to its jurisdiction." While the Commission possesses a wide range of powers in this regard, the Commission is limited by the scope of its jurisdiction as set forth in the Constitution and California Public Utilities Code (the "Code"). Thus, "[u]nless the enterprise or activity in question is a public utility as defined in the Constitution or Public Utilities Code, it is not subject to the jurisdiction of [the Commission]." *City and County of San Francisco v. Western Air Lines, Inc.*, 204 Cal. App. 2d 105, 131 (1962). Accordingly, as a threshold matter, the Commission may only exercise its powers over public utilities. *See e.g. Henderson v. United States*, 827 F. 2d 1233, 1238 (9th Cir. 1987) (holding that Commission does not have authority over non-utilities.)

Under the Code, a "'Public Utility' includes every common carrier, toll bridge corporation, pipeline corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, sewer system corporation, wharfinger, warehouseman, and heat corporation, where the service is performed for or the commodity delivered to the public or any portion thereof." Cal. Pub. Util. Code § 314. SET, as an interstate energy wholesaler, does not fit into any of these categories. *Television Transmission, Inc. v. Public Utilities Commission*, 47 Cal. 2d 82, 85 (1956) (finding that any enterprise that does not fall within the specifically enumerated categories of Public Utilities Code section 314, is not a public utility). Thus, SET is

_____

[2] SET's willingness to produce these documents, however, is subject to appropriate objections to the data requests all of which are expressly reserved. Moreover, any production would be made subject to an appropriate protective order respecting confidential and proprietary information.

**Exhibit G 068**

not a public utility and, therefore, SET is not subject to the Commission's general jurisdiction[3]. *Western Air Lines*, 204 Cal. App. 2d at 131.

Moreover, the constraints on the Commission's jurisdiction also limit the extent of its investigatory power. The Commission cannot conduct an investigation into topics that do not fall within its purview; unless the enterprise or activity in question is a public utility, it is not subject to the jurisdiction of the Commission. *Id.* As shown below, the scope of Edison's data requests offend the jurisdictional limits of the Commission.

## B.    Edison Exceeds the Commission's Limited Subpoena Power

Edison's Data Requests far exceed the limited scope of the Commission's power to subpoena documents from non-utilities. Indeed, with respect to non-utility affiliates of public utilities, the Legislature has decreed that the Commission's subpoena power is carefully circumscribed. Specifically, the Commission may only subpoena:

> the accounts, books, papers, and documents of any business which is a subsidiary or affiliate of or a corporation which holds a controlling interest in, an electrical, gas or telephone corporation with respect to any transaction between the electrical, gas, or telephone corporation and the subsidiary, affiliate, or holding corporation on any matter that might adversely affect the interests of the electrical, gas or telephone corporation.

*See* Pub. Util. Code § 314(b). Accordingly, with respect to non-utilities, the Commission may only subpoena documents from an affiliate of a public utility that concern transactions between the non-utility and the affiliated utility.

Here, Edison seeks to do what the Commission itself may not. SET is an affiliate of SDG&E and SoCalGas; all three companies are subsidiaries of the holding company parent Sempra. These relationships, however, do not give Edison *carte blanche* to propound data requests to SET on any topic. Moreover, SET already has informed Edison that it is willing to voluntarily produce all records responsive to Edison's data requests that concern affiliate transac-

---

[3]   As set forth in part C, *infra*, SET concedes that the Commission has jurisdiction over some of SET's affiliates.

Exhibit G 069

tions. (Yudkowsky Decl. ¶¶ 3 & 5.)  But the majority of Edison's data requests go far beyond this limited scope.  Indeed, only 12 of the 73 data requests pertain to affiliate dealings with SET.  The other 61 requests cover topics as far ranging as SET's use of the trading platform Enron On-Line (set one requests 3 and 4) to SET's risk management practices (set one requests 38 and 39).

Simply put, the majority of Edison's data requests do not seek the production of information concerning affiliate dealings with SET and, thus, are beyond the Commission's limited subpoena power.  To the extent that the requests are tailored to comport with the requirements of the Code, SET will voluntarily produce responsive documents; otherwise the Subpoena should be quashed.

## C.  Edison's Data Requests Are Outside the Reach of the Scoping Memorandum

Moreover, Edison's data requests fall outside the scope of this particular investigation as proscribed by the Commission.

> The Code requires the Commission to promulgate a scoping memorandum at the outset of any investigation.  The purpose of this memorandum is to describe "the issues to be considered and the applicable timetable for resolution."

Pub. Util. Code § 1701.1(b).  Indeed, of the four sets of issues identified in the Scoping Memo, only the second pertains to SET[4]:

> (a) Did SET take positions in the electric market that allowed it or any of its affiliates to unjustifiably benefit from increased border prices during the subject period?; (b) Did SET become aware of SoCalGas' gas hedging activities during the subject period, and if so, did SET use that knowledge to its benefit?; (c) Did SET report false trades or prices to the trade press and did any such false reporting affect border prices during the subject period?; and (d) Did SoCalGas, SDG&E, and SET share information?

But, as set forth above, SET is not a public-utility, and therefore is not subject to the Commission's jurisdiction.  *Western Air Lines*, 204 Cal. App. 2d at 131.  Accordingly, the

---

[4]  The first, third and fourth issues in the Scoping Memo do not pertain to SET on their face.  Therefore, it is axiomatic that Edison cannot use these categories as a means to justify its requests to SET.  Moreover, SET respectfully posits that these issues are not properly before the Commission as it is beyond the scope of its jurisdiction.

**Exhibit  G  070**

Commission — and by extension, Edison — may not generally inquire into the conduct of SET's business. Indeed, matters involving interstate transportation and wholesale sale of natural gas are within the exclusive jurisdiction of the Federal Energy Regulatory Commission pursuant to the Natural Gas Act.[5] Because sub-issue (c), asking whether SET reported false trades or prices to the trade press and whether any such false reporting affected border prices during the subject period, involves an inquiry into interstate commerce and wholesale natural gas transaction, it is beyond the scope of Public Utilities Code Section 314(b). Thus, discovery regarding whether SET reported false trading information is not reasonably calculated to lead to admissible evidence, and is manifestly improper.

Instead, discovery may only be had to the extent that SET possesses information or things relevant to the Commission's inquiry into the conduct of the public utilities over which it exercises jurisdiction. For example, sub-issues (a), (b), and (d) all pertain to the flow of information between SET, SDG&E, and SoCalGas. Sub-issue (a) asks whether SET took electricity positions that "allowed . . .its affiliates to unjustifiably benefit from increased border prices;" the implication being that SET coordinated its activities with its affiliates.[6] Sub-issues (b) and (d) more directly asks what knowledge SET may have had of SDG&E's activities and what information, if any, SET, SDG&E, and SoCalGas shared.

Requests concerning transactions and the flow of information between SET and Sempra's regulated utilities are proper and those inquires that are narrowly tailored to inquire about such

---

[5] Congress empowered FERC with exclusive jurisdiction over the sale of natural gas for resale. *Schneidewind v. ANR Pipeline*, 485 U.S. 293, 300-01 (1988). It is well settled law that if the Congress grants jurisdiction to FERC over a matter, that jurisdiction is exclusive. *Cascade Natural Gas Corp. v. FERC*, 955 F. 2d 1412, 1421 (10th Cir. 1992), *see also Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 377 (1988) (Scalia, J., concurring) ("It is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject.")

[6] Issue (a) also purports to inquire into the impact of gas prices on SET's electricity positions. SET's wholesale electricity positions, however, are not properly the subject of the Commission's scrutiny.

Exhibit G 071

information are entirely appropriate. SET will, as it already informed Edison, respond to the requests that meet this criteria. (Yudkowsky Decl. ¶¶ 3 & 5.) The remaining requests, however, which seek information pertaining to SET's business generally, including its wholesale transactions, constitute an improper fishing expedition, which the Commission should not countenance. *Greyhound Corp. v. Superior Court*, 56 Cal. 2d 355, 384-85 (1961) ("Such improper methods of 'fishing' may be (and should be) controlled by the trial court under the powers granted to it by the statute.") Moreover, "the concerns for avoiding undue burdens on the "adversary" in the litigation expressed in *Greyhound* apply with even more weight to a nonparty." *Calcor Space Facility, Inc. v. Superior Court*, 53 Cal. App. 4th 216, 224-25 (1997). Accordingly, in addition to the jurisdictional impediments to Edison's data requests, the data requests also do not comport with the requirements of discovery in as proscribed by the Code, particularly as applied to nonparties like SET. *See* Pub. Util. Code § 314(b), *see also* Cal. Code Civ. Proc. § 2017(a).

Simply put, Edison is only entitled to documents responsive to those categories within the Scoping Memo that seek information within the jurisdiction and subpoena power of the Commission. To the extent that Edison seeks more, the Subpoena should be quashed.

## IV.   CONCLUSION

SET respectfully requests that the Commission quash the Subpoena. SET has, in good faith, already agreed to produce any and all documents responsive to Edison's requests that fall within the reach of the Commission's jurisdiction and subpoena power. The other 61 requests propounded by Edison, however, are beyond the scope of this investigation as they relate to SET

Exhibit G 072

or beyond the scope of the Commission's jurisdiction. Edison cannot used this exercise to exceed the powers of the Commission.

Dated: September 24, 2003

STROOCK & STROOCK & LAVAN LLP
ALAN Z. YUDKOWSKY
PETER F. JAZAYERI
ALEX M. WEINGARTEN

By: _____
    Peter F. Jazayeri

    Attorneys for Non-Party Respondent
    Sempra Energy Trading

Exhibit G 073