**EXHIBIT A**

Dockets.Justia.com

MARK P. RAPAZZINI (SB #111944)
M. ELIZABETH GRAHAM (SB #143085)
RAPAZZINI & GRAHAM LLP
One Market, Spear Tower, Suite 2000
San Francisco, CA 94105-1104
Telephone: (415) 371-2272
Facsimile: (415) 371-2290

COLIN L. PEARCE (SB #137252)
TIMOTHY W. MOPPIN (SB #133363)
MATTHEW K. KLISZEWSKI (SB #218832)
DUANE MORRIS LLP
One Market, Spear Tower, Suite 2000
San Francisco, CA 94105-1104
Telephone: 415-371-2200
Facsimile: 415-371-2201

Attorneys for Plaintiffs
CINDY DALLA and JOSEPH DALLA

ORIGINAL
FILED

JUN 12 '03

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CINDY DALLA and JOSEPH DALLA, individuals,<br><br>Plaintiffs,<br><br>v.<br><br>OLIN CORPORATION, a corporation, STANDARD FUSEE CORPORATION, doing business as ORION SAFETY PRODUCTS, a Delaware corporation, and DOES 1 through 50,<br><br>Defendants. | NO. C03 02748 JW<br><br>COMPLAINT FOR<br>(1) NEGLIGENCE;<br>(2) NEGLIGENCE *PER SE*;<br>(3) STRICT LIABILITY FOR ULTRA HAZARDOUS ACTIVITY;<br>(4) TRESPASS;<br>(5) PRIVATE NUISANCE;<br>(6) PUBLIC NUISANCE;<br>(7) INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS;<br>(8) DAMAGES UNDER CERCLA; AND<br>(9) DECLARATORY RELIEF UNDER CERCLA<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Cindy Dalla and Joseph Dalla allege as follows:

## INTRODUCTION

1. This action is brought by Cindy Dalla and Joseph Dalla (collectively, the "Dallas"), a married couple who own a home and reside in San Martin, California, an unincorporated area south of the City of Morgan Hill in Santa Clara County. There is no public water supply available to San

Filed By
One Legal

1  Martin. The Dallas, like the rest of their neighbors, obtain all of the water for their property,

2  including drinking water, from a private groundwater well. Like many of their neighbors, the Dallas

3  very recently learned that their groundwater supply is contaminated with potassium perchlorate, an

4  extremely toxic contaminant used as an oxidizer and explosive propellant in rocket fuel, flares and

5  other products.

6       2.       Defendants Olin Corporation and Standard Fusee Corporation (these entities are

7  referred to herein, when appropriate, as "Olin" and "Standard Fusee," or collectively as

8  "Defendants") are directly responsible for the presence of this contaminant in the soil and

9  groundwater beneath the San Martin community. For more than forty years, Olin and later Standard

10  Fusee (operating under an agreement with Olin and using Olin's name) owned, operated and

11  maintained a manufacturing facility on a thirteen acre site located at 425 Tennant Avenue, in

12  Morgan Hill, California (hereinafter the "Site"). From 1956 until approximately 1996, Defendants

13  manufactured, among other things, emergency and safety flares. Defendants used potassium

14  perchlorate in their manufacturing processes, specifically as an oxidizer in flares, throughout this

15  entire time period. Defendants were careless in their handling and in their disposal of this dangerous

16  chemical. They improperly, negligently, continuously and in violation of state and federal law

17  disposed of perchlorate, thus causing perchlorate to migrate into the local groundwater basin and the

18  area's water supply.

19       3.       The perchlorate contamination has created a "plume" in the groundwater basin in

20  Southern Santa Clara County, which plume has migrated in directions away from the Site, to San

21  Martin, and eventually contaminated the Dallas' property and drinking water supply. The

22  groundwater below the Site is located within an aquifer that flows Northwest to Southeast.

23       4.       By Defendants' own admissions, perchlorate should not be ingested. Perchlorate is

24  known to have numerous adverse health effects, including causing thyroid disorders, tumors, thyroid

25  cancer, and birth defects. Studies show that at even low levels of concentration, perchlorate can be

26  harmful to one's health. It is particularly harmful when ingested by pregnant women, and by

27  children.

28

5.     The Dallas cannot avoid the effects of perchlorate through boiling water or other water filtration systems.  Further, the Dallas cannot leave their property because they cannot sell their property at fair market value, thereby allowing them to relocate.  The Dallas have invested substantial sums of money in their property, and had no idea that perchlorate was in the groundwater.  Informed purchasers do not want to buy a home or any real estate in a community that has no drinkable or useable water, and sits above a toxic plume.

6.     Presently there are no available or known methods to satisfactorily clean up or remediate the perchlorate in the groundwater basin.  Indeed, experts from the United States Environmental Protection Agency ("EPA") have gone on record as saying that it likely will take more than forty years to clean up the toxic plume created by Defendants, if it is possible at all.  Accordingly, the water supply for the Dallas' property is presently and permanently contaminated with a toxic chemical.

7.     The Dallas bring this action to recover actual, present damage caused by the presence of perchlorate in their water supply and soil, the loss of their use and enjoyment of their property, losses to the value of their property caused by Defendants' contamination of their drinking water supply, emotional distress damages, consequential damages resulting from the contamination of their property and drinking water supply, and related damages.

8.     The Dallas' damages, including property damage, are caused by exposure to hazardous substances, pollutants and/or contaminants released into the environment from the Site.

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 28 U.S.C. § 1441(a) because the amount in controversy exceeds the sum of $75,000, and there is a complete diversity of citizenship among the parties to the action.

10.     Venue in the Northern District of California, and assignment to the San Jose Division of this Court, is proper pursuant to 28 U.S.C. § 1391, and Local Rules 3-2(c) and (e) of the United States District Court for the Northern District of California, because the Dallas own property at issue in this action and reside within this district and in Santa Clara County, and the releases, discharges,

occurrences, violations and damages alleged in this complaint occurred within this district and in Santa Clara County.

**PARTIES**

11.     Plaintiffs Cindy Dalla and Joseph Dalla are individuals, husband and wife, and residents of San Martin, County of Santa Clara, State of California.

12.     The Dallas reside in and own property on Fircrest Drive, San Martin, California. The property consists of 1.25 acres of land, a single family house, and related improvements. The Dallas have lived and resided at the property with their child since 1989.

13.     Defendant Olin Corporation is a corporation organized and existing under the laws of the State of Virginia, with headquarters in Norwalk, Connecticut. At all times material herein Olin was authorized to do business, and did business, in the State of California. Among other things, Olin is a chemical manufacturer that has been in business for over one hundred years. Currently, Olin is a leading North American producer of copper alloys, chlorine and caustic soda. In 2001, Olin posted sales of approximately $1.3 billion. The company has three business lines, including Winchester ammunition, and has approximately 5,900 employees and manufacturing locations throughout the United States. Since 1956, Olin owned and operated a highway flare factory and related structures and facilities on the Site, located within some ten miles of the Dallas' property, at 425 Tennant Avenue, Morgan Hill, California.

14.     Defendant Standard Fusee Corporation, currently doing business as Orion Safety Products, is a corporation organized and existing under the laws of the State of Delaware. At all times material herein Standard Fusee was authorized to do business, and did business, in the State of California. Standard Fusee is the world's largest manufacturer of emergency flares. Standard Fusee acquired the Signal Products Division from Olin in 1988, and as part of the agreement between these two Defendants, Standard Fusee was allowed to use the Olin name for five years. That agreement expired in 1993, and the name Orion supplanted Olin on all packaging and literature.

15.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants named fictitiously herein as DOES 1 through 50, inclusive, are presently unknown to the Dallas, who therefore sue said Defendants by such fictitious names. The fictitiously named

1  Defendants include, but are not limited to, the successors, predecessors, principals, agents, servants,

2  employees and independent contractors of the Defendants named hereinabove. The Dallas are

3  informed and believe, and on that basis allege, that each of the fictitiously named Defendants is

4  legally responsible for the events hereinafter described and is jointly and severally liable to the

5  Dallas, as more particularly alleged hereinafter. The Dallas will amend this complaint to set forth

6  the true names and capacities of said DOE Defendants as soon as the same have been ascertained.

7       16.     The Dallas are informed and believe, and on that basis allege, that at all times

8  relevant hereto each Defendant was the agent or employee of every other Defendant, that each

9  Defendant was at all times acting within the course and scope of said agency or employment, and

10  that each Defendant ratified and approved the acts of each other Defendant as its agent or employee

11  in the course of conduct hereinafter set forth.

12                          **FACTUAL ALLEGATIONS**

13       **A.     Perchlorate is a Harmful, Toxic Chemical**

14       17.     Perchlorate is a highly toxic chemical and is widely known to produce adverse health

15  effects, including an increased risk of cancer. Perchlorate binds weakly to soil particles and is not

16  significantly broken down in the environment. It is extremely soluble in water and highly mobile,

17  migrating faster and further than many other water contaminants. These characteristics make

18  perchlorate a particularly persistent and problematic contaminant once it is allowed to enter a

19  groundwater system.

20       18.     Perchlorate impairs normal thyroid function because it is taken up preferentially by

21  the thyroid gland in place of iodide. The thyroid gland is therefore deprived of iodide, a necessary

22  nutrient which it is designed to concentrate. Without iodide the thyroid hormone is inactive. As a

23  result, perchlorate can disrupt the delicate balance of hormone levels in the body which are crucial

24  for healthy metabolism, growth and development.

25       19.     Perchlorate's effect on the thyroid has been known for decades. It was discovered in

26  1952 and has been confirmed by a series of studies since then. The scientific community has been

27  aware of the hazardous and harmful effects of perchlorate for decades. Scientists have been

28

examining the potential negative health effects of perchlorate at low doses since the early 1990s. Studies have shown that perchlorate's effect on the thyroid may lead to thyroid cancer.

20. The EPA issued its first provisional reference dose for perchlorate in 1992 at four parts per billion (ppb) based upon an adult body weight. In 1995, the EPA found that laboratory animals developed thyroid disorders after only two weeks of drinking perchlorate laced water. Studies in 1998 confirmed this at even lower dose levels. In 1998, perchlorate was placed on the contaminant candidate list for National Primary Drinking Water Regulation.

21. Perchlorate is now a known health risk, even at low levels. The EPA has proposed a standard of one ppb as a maximum tolerance level for contamination. Children are at a far greater risk for the effects of thyroid hormone disruption. Children not only drink more water, but their developing brains and bodies are more susceptible to hormone disruption.

22. Pregnant women and their fetuses are at the greatest risk. Developing fetuses rely upon the mother's thyroid during the first trimester of pregnancy. Fluctuation in or disruption of the mother's thyroid can cause serious health problems, including devastating birth defects.

**B.      Defendants Caused the Release and Discharge of Perchlorate**

23. The characteristics and the nature of perchlorate have been known to Defendants for decades. By their conduct, Defendants caused hazardous substances and toxic chemicals, including potassium perchlorate, to be dumped into the soil around the Site, and into unlined evaporation ponds on the Site, and otherwise improperly stored, disposed of and collected the hazardous substances. This in turn allowed these substances to seep into and be released into the local water supply and soil in, around, and underneath the Site.

24. Defendants knew that the Site is located above the large groundwater aquifer that serves as the sole drinking water supply for a large portion of the population in the San Martin area and the City of Morgan Hill, and Defendants further knew that the hazardous substances and chemicals, including potassium perchlorate, that Defendants were intentionally and negligently releasing and discharging would contaminate this water supply and cause related damages to individuals in the community.

25.     Beginning in 1956, Defendants owned and operated a manufacturing facility at the Site. Defendants manufactured and warehoused "clay pigeons," or skeet targets and flares. Potassium perchlorate was used in the manufacture of flares as an explosive propellant. The manufacturing materials were mixed on site and packed into tubes, then randomly tested and timed.

26.     Defendants were careless in their operations, and on several occasions local fire officials were called to the Site because of explosions at the Site. Defendants often left chemicals, including perchlorate, lying around without taking proper measures to secure them or arrange for proper disposal. Defendants used perchlorate continuously for over forty years, from 1956 to 1997.

27.     As early as 1986, Defendants knew that potassium perchlorate had contaminated the soil in the ground below and around the Site. Soil borings drilled along the Site property line indicated the presence of perchlorate in the soil up to one hundred ppb.

28.     In 1987, Olin closed the evaporation pond into which perchlorate had been dumped. The evaporation pond was drained and the perchlorate contaminated soil was spread out onto the property, creating a perchlorate leach field.

29.     In 1997, Defendants began to demolish and remove the buildings and structures at the Site. Between 1997 and 1998, Defendants razed the structures, and removed underground storage tanks. Defendants disposed of over one thousand tons of waste, and in the process Defendants indicated they would evaluate the soil and the groundwater at the Site. By this time, perchlorate was not only a known toxic chemical, but several perchlorate contamination problems had become public in the United States.

30.     By 1997, several groundwater contamination sites involving perchlorate were specifically known throughout California. Certainly Olin, a chemical manufacturer, knew or should have known by this time that perchlorate was a dangerous chemical if ingested and that it created health risks if allowed to seep into groundwater.

31.     Indeed, as an industrial company founded in 1892, Olin has owned sites where contamination occurred and chemicals needed to be cleaned out of soil and groundwater. Some of these waste sites were located at other Olin manufacturing locations.

32.     Notwithstanding their specialized knowledge of chemicals like perchlorate, and notwithstanding their experience in the remediation of toxic waste sites, Defendants were negligent and careless in their handling of perchlorate, in violation of state and federal laws, and did nothing to remove the perchlorate contamination from the Site after demolishing the structures and closing the facility. In fact, the contamination at the Site remains there today.

### C.     Notice and Discovery of Contamination

33.     Defendants did not disclose any possible contamination problems to the public or their neighbors before or after they abandoned the Site. It was not until due diligence was performed by a potential purchaser of the Site in late 2000 that Olin notified the County of Santa Clara and the State of California that perchlorate existed in soil and groundwater at the Site. Further investigation by regulatory agencies led to the detection of perchlorate at three on site monitoring wells in October, 2000.

34.     After notifying the Central Coast Regional Water Quality Control Board ("RWQCB") of the existence of perchlorate in the groundwater, the RWQCB ordered Olin to conduct further site testing and to test a nearby municipal well used by the City of Morgan Hill. Tests of this Morgan Hill well were conducted in July, October and December, 2001, and again in March, 2002. The current California "action level" for perchlorate is four ppb. Once perchlorate is detected in quantities at or above four ppb, a well sampled with this quantity must be closed.

35.     The March, 2002 test of the Morgan Hill well, located 250 feet southwest of the Site, revealed the presence of perchlorate in excess of the four ppb action level, and Morgan Hill was accordingly forced to close the municipal well. That well provided drinking water to a large portion of the residents of Morgan Hill.

36.     Further investigation and analysis by the RWQCB, the California Department of Health and the Santa Clara Valley Water District ("SCVWD") led these agencies to conduct further testing of wells around the Site. Additional off-site residential wells in San Martin were tested in the fall of 2002. By the end of 2002, the regulatory agencies and health officials became increasingly concerned about the extent of the contamination in the community and the potential health effects of the perchlorate contamination.

37. In January, 2003, the SCVWD and the RWQCB selected three dozen additional wells in the Morgan Hill and San Martin communities to test for perchlorate contamination. At that time the SCVWD began to notify affected San Martin residents of the contamination in the local drinking water supply.

38. On January 15, 2003, Olin admitted to the public, for the first time, that there was a widespread contamination problem. A news conference was held the following day, at which the SCVWD announced the existence of significant plume of perchlorate under the San Martin community resulting from the Site. The SCVWD immediately began to offer free testing of well water to residents of San Martin.

39. Testing of the San Martin area continues at present. The plume, as now characterized, extends seven miles in the groundwater basin. Water is no longer available for drinking at public schools. Fountains in local parks have been shut down. Families throughout San Martin are forced to drink water from a cooler or bottles. Homeowners and residents have to avoid brushing their teeth with water from their sinks. Cooking or boiling perchlorate only intensifies its concentration, so residents cannot use their water for cooking or making coffee or tea.

40. Various agencies and officials have confirmed that the perchlorate dumped by Defendants has migrated South and North of the Site, and has contaminated hundreds of wells in San Martin and Morgan Hill. Perchlorate has been allowed to continue to migrate into and contaminate the aquifer below San Martin, and specifically the water and soil on which the Dallas' property is located.

41. In or about January, 2003, the Dallas first discovered that the sole drinking water supply for their property was contaminated with potassium perchlorate which had migrated to their property, through the underground aquifer, from the Site. The Dallas did not and could not have discovered the improper and illegal conduct of Defendants, and the damage to their property, until January, 2003, when they learned from the SCVWD that the district was investigating the possible contamination of their property. Prior to that date the Dallas did not and could not have known of the damage to their property and the accrual of their claims against the Defendants, as set forth herein.

42.     As soon as the Dallas became aware of the contamination, in or about January, 2003, the Dallas were required, under California law, to disclose the existence of the plume and the presence of perchlorate on their property and/or in their community to potential buyers of their property, real estate lenders, mortgage companies and the like.

43.     Were it not for the presence of contaminants in the property, the Dallas' real property would have increased in its fair market value. The Dallas made substantial investments in their property, which they made in good faith reliance that the property was free from contamination.

44.     As a proximate result of Defendants' acts and omissions, the Dallas have suffered damages, including, but not limited to, an interference with the Dallas' use of their residential property, a diminution in the value of their property, damages due to the stigma caused by the contamination of the groundwater basin, and substantial consequential costs and expenses.

45.     As a further proximate result of Defendants' acts and omissions, the Dallas have suffered emotional distress as a result of concerns over their exposure to perchlorate. The Dallas fear for the safety and health of themselves and their family. As a result of such injuries, the Dallas have suffered general damages in an amount according to proof.

46.     In engaging in the acts set forth above, Defendants each were guilty of malice, fraud, and oppression as defined in California Civil Code § 3294, and the Dallas should recover, in addition to actual damages, damages to make an example of and punish Defendants, in an amount to be determined.

## FIRST CAUSE OF ACTION
### (Negligence)

47.     The Dallas reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 46 of this complaint.

48.     As owners, operators and managers of the Site, and while owning, occupying and conducting operations at the Site, Defendants owed a duty at all times to the Dallas, the public, and neighboring land owners to exercise due care in controlling, monitoring, maintaining and operating the Site, and in collecting, using, storing, disposing of, and causing to be disposed of chemicals, contaminants and hazardous substances, including potassium perchlorate, used in or produced by the

manufacturing process. At all times relevant herein, Defendants specifically had a duty to prevent and avoid the discharge and release of potassium perchlorate into the environment.

49.     Defendants negligently failed to exercise their duty of due care in controlling, monitoring, maintaining and operating the Site, and in collecting, using, storing, disposing of, and causing to be disposed of chemicals, contaminants and hazardous substances, including potassium perchlorate, used in or produced by the manufacturing process at the Site by disposing of, discharging, depositing, releasing and allowing the release of such chemicals, contaminants and hazardous substances into the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Dallas' property, by improperly and negligently using, storing and disposing of chemicals, contaminants and hazardous substances, including potassium perchlorate.

50.     Defendants knew or should have known that that their failure to use reasonable care in controlling, monitoring, maintaining and operating the Site, and in collecting, using, storing, disposing of, and causing to be disposed of chemicals, contaminants and hazardous substances, including potassium perchlorate, did cause and continues to cause the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Dallas' property, to be contaminated with chemicals, contaminants and hazardous substances, including potassium perchlorate. Defendants never warned the Dallas about any of their tortious conduct.

51.     As a direct and proximate result of Defendants' negligence and breach of duty, the Dallas have suffered and will continue to suffer consequential, incidental and general damages, in amounts to be proven at trial. Such damages include, but are not limited to, physical, mental, emotional and nervous distress and pain and suffering, including fear of cancer, as a result of the Dallas' exposure to chemicals, contaminants and hazardous substances, including potassium perchlorate.

52.     Defendants' actions in failing to disclose, fraudulently misrepresenting and deceiving the Dallas and the public about the existence of potassium perchlorate and other chemicals, contaminants and hazardous substances in the groundwater basin, the local water supply, surface and

1  subsurface soil and the environment in and around the Site, and ultimately the Dallas' property, were
2  willful, malicious, and intentional, from which the Dallas have suffered great harm. Moreover,
3  Defendants consistently failed to disclose to the Dallas and the public, although required to do so,
4  that ingestion of potassium perchlorate and other toxic substances was harmful to their health.
5  Defendants' wrongful conduct was knowing and deliberate, and Defendants acted with conscious
6  and reckless disregard of the hazards and threats to the Dallas and the public.

7      53.    Defendants' conduct was outrageous, willful, malicious and intentional, causing the
8  Dallas' great and irreversible harm, and thus entitling the Dallas to recover punitive and exemplary
9  damages from Defendants.

## SECOND CAUSE OF ACTION
### (Negligence *Per Se*)

12     54.    The Dallas reallege and incorporate, as though fully set forth herein, each and every
13  allegation in paragraphs 1 through 53 of this complaint.

14     55.    Defendants' conduct, including their failure to exercise due care and improperly and
15  negligently collecting, using, storing, disposing of, and causing to be disposed of chemicals,
16  contaminants and hazardous substances, including potassium perchlorate, and by disposing of,
17  discharging, depositing, releasing and allowing the release of potassium perchlorate into the
18  groundwater basin, the local water supply, surface and subsurface soil and the environment in and
19  around the Site, and ultimately the Dallas' property, violated various state and federal statutes, rules
20  and regulations which set a standard of care and conduct intended to protect the Dallas, their
21  property and others similarly situated, and the local environment, from the type of improper
22  activities engaged in by Defendants. Therefore, such improper activities and violations of law
23  constitute negligence *per se.*

24     56.    As owners, operators and managers of the Site, Defendants specifically violated the
25  provisions of California Health and Safety Code § 5411, which provides that "no person shall
26  discharge sewage or other waste, or the effluent of treated sewage or other waste, in any manner
27  which will result in contamination, pollution or a nuisance." Defendants further violated the
28  provisions of California Water Code §§ 13000 et seq., and in particular Section 13350, which statute

provides that "Any person who, without regard to intent or negligence, causes or permits any hazardous substance to be discharged in or on any of the waters of the state where it creates a condition of pollution or nuisance, . . . shall be strictly liable civilly . . ." As defined by California Water Code § 13050(k), Defendants have contaminated the quality of water in the area through their improper disposal of potassium perchlorate and other toxic substances.

57. The violation of California Health and Safety Code § 5411 and California Water Code §§ 13000 et. seq. by Defendants proximately caused trespass and nuisance to the Dallas' property, including diminution in value to the property, and caused further consequential, incidental and general damages to the Dallas.

58. California Water Code §§ 13000 et. seq., including Section 13241, and California Health and Safety Code § 5411 were intended to prevent this type of injury to the Dallas and to their property, and the Dallas are members of the class of persons for whose protection these statutes were adopted.

59. As a proximate result of Defendants' violations of the statutes set forth herein, and negligence *per se*, the Dallas have suffered and will continue to suffer consequential, incidental and general damages, in amounts to be proven at trial. Such damages include, but are not limited to, physical, mental, emotional and nervous distress and pain and suffering, including fear of cancer, as a result of the Dallas' exposure to chemicals, contaminants and hazardous substances, including potassium perchlorate.

60. Defendants' actions in failing to disclose, fraudulently misrepresenting and deceiving the Dallas and the public about the existence of potassium perchlorate and other chemicals, contaminants and hazardous substances in the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Dallas' property, were willful, malicious, and intentional, from which the Dallas have suffered great harm. Moreover, Defendants consistently failed to disclose to the Dallas and the public, although required to do so, that ingestion of potassium perchlorate and other chemicals, contaminants and hazardous substances was harmful to their health. Defendants' wrongful conduct was knowing and deliberate, and

Defendants acted with conscious and reckless disregard of the hazards and threats to the Dallas and the public.

61.     Defendants' conduct was outrageous, willful, malicious and intentional, causing the Dallas great and irrefutable harm, and thus entitling the Dallas to recover punitive and exemplary damages from Defendants.

## THIRD CAUSE OF ACTION
### (Strict Liability for Ultra Hazardous Activity)

62.     The Dallas reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 61 of this complaint.

63.     Defendants knew or should have known that that their failure to use reasonable care in controlling, monitoring, maintaining and operating the Site and in collecting, using, storing, disposing of, and causing to be disposed of chemicals, contaminants and hazardous substances, including potassium perchlorate, would create and has created actual harm to the persons, animals and land of others, including the Dallas, from the resulting contamination of the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Dallas' property. Defendants knew or should have known that there existed, and still exists, a certainty of harm to others, including the Dallas, that would result from the disposing of, discharging, depositing, releasing and allowing the release of these chemicals, contaminants and hazardous substances, including potassium perchlorate, into the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Dallas' property.

64.     Defendants' disposal, discharge, depositing and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, onto and into the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Dallas' property, constitutes and is an ultra hazardous activity.

65.     As a direct and proximate result of the disposal, discharge, depositing, storage and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, the Dallas have suffered and will continue to suffer consequential, incidental and general damages to be

proven at trial, for which Defendants are strictly liable. Such damages include, but are not limited to, physical, mental, emotional and nervous distress and pain and suffering, including fear of cancer, as a result of the Dallas' exposure to chemicals, contaminants and hazardous substances, including potassium perchlorate.

66. Defendants' actions in failing to disclose, fraudulently misrepresenting and deceiving the Dallas and the public about the existence of potassium perchlorate and other chemicals, contaminants and hazardous substances in the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Dallas' property, were willful, malicious, and intentional, from which the Dallas have suffered great harm. Moreover, Defendants consistently failed to disclose to the Dallas and the public, although required to do so, that ingestion of potassium perchlorate and other chemicals, contaminants and hazardous substances was harmful to their health. Defendants' wrongful conduct was knowing and deliberate, and Defendants acted with conscious and reckless disregard of the hazards and threats to the Dallas and the public.

67. Defendants' conduct was outrageous, willful, malicious and intentional, causing the Dallas great and irrefutable harm, and thus entitling the Dallas to recover punitive and exemplary damages from Defendants.

### FOURTH CAUSE OF ACTION
### (Trespass)

68. The Dallas reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 67 of this complaint.

69. Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, has intruded upon the property of the Dallas in such a manner as to cause a physical invasion of the Dallas' property and to interfere with the Dallas' possession, use and enjoyment of their property, thereby constituting a trespass.

70. Defendants intentionally collected, used, stored, released, abandoned, disposed of, and caused to be disposed of chemicals, contaminants and hazardous substances, including

potassium perchlorate, into the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Dallas' property, without the authority or permission of the Dallas. Defendants' conduct has been and continues to be carried out with a conscious disregard of the Dallas' right to the use and enjoyment of their property.

71. The contamination in the soil and groundwater in the area in, under and around the Dallas' property is migrating and will continue to migrate. As the contaminants migrate, the damage to the property worsens and will continue to worsen into the future. Accordingly, as a result of Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, the contamination currently existing in the soil and groundwater under the Dallas' property cannot be reasonably abated, remediated or cleaned up by Defendants or other entities, and constitutes a permanent trespass to the Dallas' property.

72. As a direct and proximate result of the intentional disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, by Defendants onto the Dallas' property, the Dallas have suffered and will continue to suffer consequential, incidental and general damages, in amounts to be proven at trial. Such damages include, but are not limited to, physical, mental, emotional and nervous distress and pain and suffering, including fear of cancer, as a result of the Dallas' exposure to chemicals, contaminants and hazardous substances, including potassium perchlorate.

73. Defendants' conduct was outrageous, willful, malicious and intentional, causing the Dallas great and irrefutable harm, and thus entitling the Dallas to recover punitive and exemplary damages from Defendants.

### FIFTH CAUSE OF ACTION
#### (Private Nuisance)

74. The Dallas reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 73 of this complaint.

75. The Dallas are informed and believe, and on that basis allege, that as a direct and proximate result of Defendants' disposal, discharge, depositing, dumping, abandonment and release

of chemicals, contaminants and hazardous substances, including potassium perchlorate, into the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Dallas' property, Defendants are interfering with and precluding the Dallas' free use and enjoyment of their property, and are threatening to impair and injure the health of the Dallas and other individuals who would conduct business, visit or otherwise utilize the property.

76.     Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, onto the Dallas' property has caused and is causing injury to the property and to the Dallas. The Dallas did not ever authorize, sanction or agree to Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate.

77.     The contamination in the soil and groundwater in the area in, under and around the Dallas' property is migrating and will continue to migrate. As the contaminants migrate, the damage to the property worsens and will continue to worsen into the future. Accordingly, as a result of Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, the contamination currently existing in the soil and groundwater under the Dallas' property cannot be reasonably abated, remediated or cleaned up by Defendants or other entities, and constitutes a permanent, private nuisance.

78.     Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, into the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Dallas' property, and the resultant permanent nuisance, has directly and proximately caused damages to the Dallas, including, but not limited to, a decrease and diminution in the value of the Dallas' property as a result of the contaminated water supply for the property, and undetermined damages due to the stigma caused by the contamination of the groundwater basin, the local water supply, surface and subsurface soil, the environment in and around the Site, and the Dallas' property, which condition has impaired the Dallas' ability to sell or

secure a loan against their property, and the uncertainty regarding future contamination and damages, as well as other damages set forth above, including other consequential, incidental and general damages to be proven at trial.

79.     Defendants' conduct was outrageous, willful, malicious and intentional, causing the Dallas great and irrefutable harm, and thus entitling the Dallas to recover punitive and exemplary damages from Defendants.

### SIXTH CAUSE OF ACTION
### (Public Nuisance)

80.     The Dallas reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 79 of this complaint.

81.     Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, into the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site, and ultimately the Dallas' property, gives rise to a public nuisance that affects not only the Dallas but the entire communities of San Martin, Morgan Hill and the surrounding area. Because the chemicals, contaminants and hazardous substances, including potassium perchlorate, have spread and threaten to continue to spread from the Site to adjacent properties, including under public streets and sidewalks, and have polluted the groundwaters of the State of California, it is of great public concern. The chemicals, contaminants and hazardous substances, including potassium perchlorate in, under and around the Dallas' property substantially devalues the property, and have caused the Dallas monetary damages, and the Dallas have therefore suffered injuries different in kind from those suffered by the general public.

82.     The Dallas, in their capacity as Private Attorney Generals, allege that as a proximate result of the chemicals, contaminants and hazardous substances, including potassium perchlorate, having been released and discharged onto their property, the property has been permanently damaged. Defendants' disposal, discharge, depositing, dumping, abandonment and release of chemicals, contaminants and hazardous substances, including potassium perchlorate, into the groundwater basin, the local water supply, surface and subsurface soil and the environment in and

around the Site, and ultimately the Dallas' property, and the resultant permanent nuisance, has directly and proximately caused damages to the Dallas, including, but not limited to, a decrease and diminution in the value of the Dallas' property as a result of the contaminated water supply for the property, and undetermined damages due to the stigma caused by the contamination of the groundwater basin, the local water supply, surface and subsurface soil, the environment in and around the Site, and the Dallas' property, which condition has impaired the Dallas' ability to sell or secure a loan against their property. At the same time, the releases and discharges of chemicals, contaminants and hazardous substances, including potassium perchlorate, by Defendants has affected the entire community and the comfort, convenience and health of a considerable number of persons, although the extent of the annoyance, danger, and damage inflicted upon the residents of the surrounding communities may be unequal.

83. The Dallas, in their capacity as Private Attorney Generals, assert that their action against Defendants (a) raises strong issues of public importance and policy which are in need of vindication by legal action; (b) presents the necessity for private enforcement of said issues and rights, the resulting burden of which falls on the Dallas; and (c) will benefit the health and safety of the community.

84. The Dallas, as Private Attorney Generals, demand that they recover their reasonable attorneys' fees and costs incurred in prosecuting this action.

85. Defendants' conduct was outrageous, willful, malicious and intentional, causing the Dallas great and irrefutable harm, and thus entitling the Dallas to recover punitive and exemplary damages from Defendants.

## SEVENTH CAUSE OF ACTION
### (Intentional and Negligent Infliction of Emotional Distress)

86. The Dallas reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 85 of this complaint.

87. Defendants' conduct in controlling, monitoring, maintaining and operating the Site and in collecting, using, storing, disposing of, and causing to be disposed of chemicals, contaminants and hazardous substances, including potassium perchlorate, used in or produced by the

1  manufacturing process at the Site by disposing of, discharging, depositing, releasing and allowing

2  the release of such chemicals, contaminants and hazardous substances into the groundwater basin,

3  the local water supply, surface and subsurface soil and the environment in and around the Site, and

4  ultimately the Dallas' property, was intentional, malicious and negligent and done with the purpose

5  of causing the Dallas and members of the public mental and emotional anguish, and mental,

6  emotional and physical distress, or, in the alternative, done with reckless disregard for the health and

7  well being of the Dallas and members of the public.

8      88.    As a proximate result of the aforementioned acts, the Dallas suffered mental and

9  emotional anguish and mental, emotional and physical distress, consisting of general illness, loss of

10  sleep and nervous anxiety. Specifically, as a result of Defendants' breach of duty, trespass and

11  improper conduct, the Dallas were exposed to toxic substances, including potassium perchlorate, that

12  threaten cancer, and the Dallas' fear stems from the knowledge, corroborated by reliable medical and

13  scientific opinion, that it is more likely than not that the Dallas will develop diseases, including

14  cancer, in the future due to the exposures caused by Defendants, or that the toxic exposure caused by

15  Defendants has significantly increased the risk of disease and/or cancer to the Dallas.

16     89.    Defendants' conduct was outrageous, willful, malicious and intentional, causing the

17  Dallas great and irreversible harm, and thus entitling the Dallas to recover punitive and exemplary

18  damages from Defendants.

19                    **EIGHTH CAUSE OF ACTION**
                    **(Damages Under CERCLA)**
20

21     90.    The Dallas reallege and incorporate, as though fully set forth herein, each and every

22  allegation in paragraphs 1 through 89 of this complaint.

23     91.    The chemicals which Defendants stored, used, released, and discharged on the Site

24  are classified as hazardous substances under the Comprehensive Environmental Response,

25  Compensation and Liability Act, 42 U.S.C. § 9601, et seq. and specifically 42 U.S.C. § 9601(14),

26  and applicable regulations thereunder.

27     92.    Defendants were "owners" and/or "operators" on the Site, as defined by CERCLA, 42

28  U.S.C. § 9601(20), from 1956 to 1997. While Defendants were owners and/or operators on the Site,

significant quantities of hazardous substances, including potassium perchlorate, were disposed of, discharged, deposited, dumped, abandoned and released into the soil and groundwater in and around the Site, causing these hazardous substances to enter the groundwater basin, the local water supply, surface and subsurface soil and the environment in and around the Site. Defendants' activities on the Site therefore resulted in the "release" and "disposal" of hazardous substances within the meaning of CERCLA, 42 U.S.C. §§ 9601(22) and (29).

93. The Site, including the buildings and structures thereon, constitute a "facility" as defined by CERCLA, 42 U.S.C. § 9601(9). All of the Defendants are "covered persons" within the meaning of that term under CERCLA, 42 U.S.C. § 9607(a).

94. As a proximate result of Defendants' release of the hazardous substances into the soil and groundwater located beneath the Site, the Dallas have had to incur necessary response costs, including costs to assess and investigate the nature and extent of the contamination, costs related to remedial action, including enforcement activities related thereto, consisting of, among other things, expert and attorneys' fees.

95. The Dallas' response to the contamination, including their investigation and response to the contamination, has, in all respects, been in compliance with the National Contingency Plan ("NCP"), as provided for in 42 U.S.C. §§ 9605 and 9607(a)(4)(B) and 40 C.F.R. § 300, et seq.

96. The Dallas seek reimbursement and/or contribution from Defendants, and each of them, pursuant to 42 U.S.C. §§ 9607(a) and 9613(f), for all response and remedial costs that the Dallas have incurred and will incur related to the hazardous substances that Defendants released onto the Site, and eventually the Dallas' property, and which were released while Defendants were operators and owners on the Site.

97. The Dallas have incurred substantial and necessary response costs, including investigatory expenses, attorneys' fees, consulting fees, oversight costs, interest and other response costs, and will continue to incur costs in the future.

## NINTH CAUSE OF ACTION
### (Declaratory Relief under CERCLA)

98.     The Dallas reallege and incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 97 of this complaint.

99.     Because the extent and magnitude of the contamination at the Site, and the Dallas' property, is not fully known at this time, and because the contamination has not yet begun to be mitigated, and is not capable of being fully mitigated in the future, the Dallas will incur necessary response costs, including, but not limited to, investigatory and remedial expenses, attorneys' fees and interest in the future.

100.    Pursuant to 42 U.S.C. § 9613(g)(2), the Dallas are entitled to a declaratory judgment establishing the liability of the Defendants, and each of them, for such response costs for the purposes of this and any subsequent action or actions to recover further response costs.

## PRAYER FOR RELIEF

**WHEREFORE**, the Dallas pray for relief as follows:

1.     For general, consequential and incidental damages in amounts to be proven at trial for negligence, negligence *per se*, trespass, private nuisance, public nuisance, and intentional and negligent infliction of emotional distress caused by Defendants for harm to the Dallas' property, loss of use and enjoyment of the property, and diminution in value to the property;

2.     For general, consequential and incidental damages, in amounts to be proven at trial, caused by Defendants' ultra hazardous activity;

3.     For contribution, damages and/or restitution under CERCLA, for past and future response costs, including reasonable attorneys' fees, expert witness fees, oversight costs and interest incurred by the Dallas to investigate and respond to the contamination at the Site and on their property, in an amount to be proven at trial;

4.     For a judicial declaration under CERCLA that all Defendants, and each of them, are liable for future response costs, including reasonable attorneys' fees, expert witness fees, oversight costs and interest incurred by the Dallas to investigate and remedy the contamination at the Site and on the Dallas' property;

1     5.     For general, consequential and incidental damages related to emotional and mental

2  pain and distress suffered by the Dallas as a result of the conduct of Defendants;

3     6.     For punitive and exemplary damages;

4     7.     For costs of suit incurred herein, including reasonable attorneys' fees; and

5     8.     For such other and further relief as the Court may deem proper.

DATED: June 10, 2003       RAPAZZINI & GRAHAM, LLP

By: _M. Elizabeth Graham_____
MARK P. RAPAZZINI
M. ELIZABETH GRAHAM

DUANE MORRIS LLP

DATED: June 10, 2003       By: _Colin L. Pearce_____
COLIN L. PEARCE

Attorneys for Plaintiffs
CINDY DALLA and JOSEPH DALLA

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and United States District Court for the Northern District of California Local Rule 3-6, the Dallas hereby demand a jury trial.

DATED: June 10, 2003

RAPAZZINI & GRAHAM, LLP

By: _M. Elizabeth Graham_
MARK P. RAPAZZINI
M. ELIZABETH GRAHAM

DUANE MORRIS LLP

DATED: June 0, 2003

By: _Colin L. Pearce_
COLIN L. PEARCE

Attorneys for Plaintiffs
CINDY DALLA and JOSEPH DALLA

SF39679.1