1  BURTON F. BOLTUCH (SBN 070211)
   LAW OFFICES OF BURTON F. BOLTUCH
   555 12th Street, Suite 1440
2  Oakland, CA 94607-4046
   Telephone: (510) 844-3415
3  Facsimile: (510) 444-3401
   E-mail: bboltuch@workplacelaw.biz
4
   Attorneys for Defendants APPLIED FUSION,
5  INC.; JEFF MUSGROVE; MOHAMMED ANSARI
   and GREGORY GEDDIS
6

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

12  GUANG-KUI DONG,                      Case No.: C-03-3698 SI

13            Plaintiff,

14       vs.                             MEMORANDUM IN SUPPORT OF MOTION
                                         OF DEFENDANTS APPLIED FUSION, INC.;
15                                       JEFF MUSGROVE; MOHAMMED ANSARI
    APPLIED FUSION, INC., JEFF           AND GREG GEDDIS FOR SUMMARY
16  MUSGROVE, PATRICK DAVIS,             JUDGMENT, OR IN THE ALTERNATIVE,
    MOHAMMED ANSARI, GEORGE              FOR SUMMARY ADJUDICATION OF THE
17  SILVA, GREGORY GEDDIS, CITY OF       ISSUES
18  SAN LEANDRO, OFFICER R LOPEZ and
    DOES 1 through 5, inclusive,         Hearing Date:  June 10, 2005
19                                       Hearing Time:  9:00 a.m.
              Defendants.                Courtroom:     10 (19th Floor)
20                                       Trial:         August 8, 2005

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................... 1

II.   STATEMENT OF THE ISSUES................................................................................ 4

III.  STATEMENT OF THE FACTS .............................................................................. 7

      A.    AFI.......................................................................................................... 8

      B.    Dong's Employment With AFI........................................................................ 10

            1.    Dong's At-Will Employment Status................................................. 10

            2.    Dong's Relationship With His Fellow Employees ............................. 11

      C.    The Events In October, 2002 ........................................................................ 15

            1.    Dong's Testimony.............................................................................. 15

                  a.    Dong's Errors On October 1 and 4 ........................................ 15

                  b.    Dong Admits He Threatened To Kill
                        Himself On October 4................................................................ 15

                  c.    The Events Of October 7 ........................................................ 17

            2.    Testimony Of Ansari, Geddis and Davis ............................................ 21

      D.    AFI Summons The Police.............................................................................. 21

      E.    The Termination Of Dong .............................................................................. 24

IV.   LEGAL ARGUMENT:  DONG CANNOT ESTABLISH ANY
      LIABILITY BY AFI OR BY ANY OF THE INDIVIDUAL AFI
      EMPLOYEE DEFENDANTS...................................................................................... 25

      A.    The Legal Standard For Summary Judgment ................................................. 25

      B.    Summary Of Legal Argument ........................................................................ 26

      C.    Dong Cannot Sustain His Allegations Of A Termination
            In Violation Of Public Policy ........................................................................ 28

Page

D.  As A Matter Of Law, Dong Cannot Sustain His Claim That
    His Discharge Was In Retaliation For His Alleged Protected
    Complaints......................................................................................................  30

E.  Defendant AFI And The AFI Employee Defendants Did Not
    Violate The Lanterman-Petris-Short Act.......................................................  36

F.  Summary Judgment Should Be Granted As To The Sixth,
    Seventh, Eighth, Ninth And Twelfth Causes Of Action................................  37

G.  Some of Dong's Damage Claims And The Seventh And
    Ninth Causes of Action Are Preempted By The Exclusivity
    Provisions Of The California Workers' Compensation Statute.....................  40

V.  CONCLUSION.…….........................................................................................  41

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)..................................................................................... 26

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)..................................................................................... 26

*Crain v. Burroughs Corp.,*
560 F.Supp. 849 (C.D.Cal. 1983) ............................................................... 38

*Folkerson v. Circus Circus Enterprises,*
107 F.3d 754 (9th Cir. 1997) ...................................................................... 32

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,*
475 U.S. 574 (1986)..................................................................................... 26

*McDonald v. Sante Fe Trail  Transportation Co.,*
427 U.S. 273 (1976)..................................................................................... 34

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973)..................................................................................... 31, 34

*Merrick v. Farmers Ins. Group,*
892 F.2d 1434 (9th Cir. 1990) .................................................................... 31

*Nesbit v. Pepsico,*
994 F.2d 703 (9th Cir. 1993) ...................................................................... 31

*Trent v. Valley Elec. Ass'n,*
41 F.3d 524 (9th Cir. 1994) ........................................................................ 31, 34

*Vasquez v. County of Los Angeles,*
349 F.3d 634 (9th Cir. 2003) ...................................................................... 34

*Wallis v. J.R. Simplot Co.,*
26 F.3d 885 (9th Cir. 1994) ........................................................................ 34

**California Cases**

*Addy v. Bliss & Glennon*
(1996) 44 Cal.App.4th 205 ......................................................................... 34, 35

|  | Page(s) |
|---|---|
| *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 | 36 |
| *Carter v. CB Richard Ellis, Inc.* 122 Cal.App.4th 1313 | 35 |
| *Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639 | 34, 35 |
| *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148 | 40 |
| *Cotran v. Rolling Hudig Hall Int'l* (1998) 17 C4th 93 | 28 |
| *Davaris v. Cubaleski* (1993) 12 Cal.App.4th 1583 | 41 |
| *Ewing v. Gill Industries, Inc.* (1992) 3 Cal.App.4th 601 | 34, 35 |
| *Fermino v. Fedco, Inc.* (1994) 7C4th 701 | 38, 40 |
| *Fowler v. Varian Assoc.* (1987) 196 Cal.App.3d 34 | 38 |
| *Gantt v. Sentry Ins.* (1992) 1 C4th 1083 | 29 |
| *Green v. Ralee Engineering Company* (1998) 19 Cal.4th 66 | 28, 29 |
| *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317 | 31, 34 |
| *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997 | 31, 34 |
| *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798 | 31, 34 |

|  |  | Page(s) |
|---|---|---|
| *Kuhn v. Department of General Services*<br>(1994) 22 Cal.App.4[th] 1627 ........................................................................ | | 35 |
| *Livitsanos v. Superior Court*<br>(1992) 2 C4th 744 ........................................................................................... | | 40 |
| *Morgan v. The Regents of the University of California*<br>(2000) 88 Cal.App.4[th] 52 ............................................................................. | | 31, 34 |
| *Sequoia Ins. Co. v. Superior Court*<br>(1993) 13 CA4th 1472 .................................................................................... | | 29 |
| *Tameny v. Atlantic Richfield Co.*<br>(1980) 27 Cal.3d 167 ..................................................................................... | | 28 |
| *Turner v. Anheuser-Busch, Inc.*<br>(1994) 7 C4th 1238 ........................................................................................ | | 29 |

**Federal Statutes and Rules**

| 42 U.S.C. § 1981,<br>Civil Rights Act of 1866, as amended ............................................................ | | 30 |
| 42 U.S.C. §§2000e-2000e-17,<br>Title VII of the Civil Rights Act of 1964, as amended in 1991 ..................... | | *passim* |
| Federal Rules of Civil Procedure<br>Rule 56 ........................................................................................................... | | 26 |

**California Statutes**

| Government Code §§ 12900-12996,<br>Fair Employment and Housing Act ................................................................. | | 1 |
| Labor Code, §§ 3600, *et seq.*,<br>Workers' Compensation Act............................................................................ | | 41 |
| Labor Code §§6300, *et seq.*,<br>Occupational Safety and Health Act of 1973 ................................................. | | 30 |
| Welfare and Institutions Code, §§5150, *et seq.*,<br>Lanterman-Petris-Short Act........................................................................... | | *passim* |

| | | Page(s) |
|---|---|---|
| **Treatises** | | |
| *Prosser & Keeton on the Law of Torts,*<br>§11 (5th Ed. 1984) .......................................................................................... | | 38 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I. **INTRODUCTION**

Defendants Applied Fusion, Inc. ("AFI"); Jeff Musgrove ("J. Musgrove"); Mohammed Ansari ("Ansari") and Greg Geddis ("Geddis") (J. Musgrove, Ansari and Geddis are hereinafter sometimes collectively referred to as the "AFI Employee Defendants") move this Court for summary judgment or, in the alternative, for summary adjudication of the issues, and for dismissal with prejudice of any and all remaining causes of action against them.

In the Second Amended Complaint ("Complaint"), Plaintiff Guang-Kui Dong ("Dong" or "Plaintiff") alleges, *inter alia*, that his discharge by AFI on October 10, 2002[1] was in retaliation for his exercise of his rights under Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. §§2000e-2000e-17 ("Title VII"); the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981 ("Section 1981"); and the Fair Employment and Housing Act, CA Gov't Code §§12900-12996 ("FEHA") (Fourth Cause of Action – AFI only).  Various pendent state law causes are also alleged, including termination in violation of public policy based on Section 5150 of the California Welfare and Institutions Code ("Section 5150") (Third Cause of Action – AFI only); violation of the Lanterman-Petris-Short Act, California Welfare and Institutions Code §5150, *et seq.* (the "LPS Act") (Fifth Cause of Action); invasion of privacy; intentional infliction of emotional distress; false imprisonment; assault and battery; and negligence (Sixth, Seventh, Eighth, Ninth and Twelfth Causes of Action, respectively).  (Declaration of Burton F. Boltuch in Support of Motion for Summary Judgment or, in the Alternative, for Summary Adjudication of

/ / /

/ / /

/ / /

---

[1]  All further references are to 2002 unless otherwise noted.

the Issues (hereinafter referred to as "Boltuch Dec."), at ¶4 and Ex. A thereto.)[2]

This is precisely the kind of case that summary judgment is designed to eradicate. The undisputed relevant evidence confirms both that the actions of AFI and of the AFI Employee Defendants did not violate any federal or state statutes and that none of the pendent state law causes of action are meritorious. Dong's allegations – that his detention pursuant to Section 5150 in two different psychiatric institutions from October 7-11, and that his discharge on October 10, were based on "trumped up" charges – are both outrageous and contradicted by the undisputed facts, including Dong's own admissions. As set forth below in this Memorandum, it is undisputed that:

- On October 4, Dong told George Silva, AFI's Vice President of Manufacturing, that Dong would kill himself if he could not learn how to operate a certain machine.

- On October 7, Jeff Musgrove, AFI's President, and George Silva were both informed by Defendants Ansari and Geddis that Dong had threatened to shoot fellow employees, including Frank Levering and former defendant Pat Davis, and to shoot himself. On October 7, Jeff Musgrove was also informed by George Silva of the October 4 threat of Dong to commit suicide.

- On October 7, Jeff Musgrove immediately conducted an investigation, speaking with Ansari, Geddis and Dong.

- On October 7, AFI made a prudent and responsible decision to summon the San Leandro police to investigate the report that Dong had made threats to shoot Pat Davis, Frank Levering, others and then himself.

- On October 7, the police independently determined that probable cause existed to detain Dong, pursuant to Section 5150.

- Based on the probable cause determination of the police that Dong was a threat to himself and/or to others, Dong was transported by ambulance to John George

---

[2]    The Second Amended Complaint is attached as Ex. A to Boltuch Dec. On April 12, 2005, the Court approved an Order dismissing in its entirety the First Cause of Action (Discrimination), and the Second Cause of Action (Breach of Contract of Continued Employment), and an Order dismissing any claims and causes of action against Pat Davis and George Silva, who were employed by AFI in October, 2002. (Boltuch Dec. at ¶¶5-6 and Ex. B and Ex. C, respectively, thereto.)

Psychiatric Pavilion. Medical professionals at John George Psychiatric Pavilion independently determined that Dong was a threat to himself and/or to others and, pursuant to Section 5150, detained him until October 8.

- On October 8, Dong was then transferred to Fremont Hospital and was evaluated by a medical team including a psychiatrist who independently determined that Dong was a sufficient danger to himself and/or to others to be detained, pursuant to Section 5150, until October 11.

- On October 10, AFI terminated Dong based on the admitted threat of Dong on October 4 to commit suicide and on AFI's good faith belief that Dong had made various threats on October 7 to kill others and himself.

Dong does not dispute that he made the comments about suicide to Silva on October 4, but alleges he was "misunderstood." Dong denies he made any threats on October 7. Dong disagrees with the determination of medical professionals at John George Psychiatric Pavilion and at Fremont Hospital to detain him, pursuant to Section 5150, until October 11. Dong disagrees with AFI's decision to terminate him. Dong alleges that these denials and disagreements somehow establish liability and entitle him to damages. As shown below, Dong is wrong.

Dong initially alleged that AFI discriminated against him because of his race and/or ethnicity, but Dong recently dismissed these allegations. (See above at page 2 in footnote 2.) Dong now incorrectly asserts that AFI's actions were in retaliation for the alleged exercise of his protected rights under Title VII, Section 1981 and FEHA. However, AFI treated Dong no differently than it would have treated any other employee about whom it received information that the employee was threatening to kill others and/or kill himself/herself. The actions of AFI, both on October 7, when it summoned the police, and on October 10, when it terminated Dong, were not in retaliation for any protected complaints Dong allegedly made about AFI's racial policies. (Declaration of Jeff Musgrove in Support of Motion for Summary Judgment or, in the

Alternative, for Summary Adjudication of the Issues (hereinafter "J. Musgrove Dec."), at ¶¶6, 7, 8, 10, 14, 16 and 18.)

Discovery is closed. Dong has not produced any admissible evidence that the actions of AFI and/or of the AFI Employee Defendants, in whole or in part, were in retaliation for Dong's alleged complaints about racial harassment or discrimination. In fact, during his deposition, Dong admitted that his complaints on October 7 were not even about racial harassment. Dong also has not produced any admissible evidence sufficient to establish that his discharge was in violation of public policy or to establish any of the other pendent state law causes of action.[3]

## II.  **STATEMENT OF THE ISSUES**

The key issue before the Court is whether AFI's summoning of the police on October 7, based on reports AFI received from employees that Dong threatened to shoot others and himself, despite Dong's denial that he made the threats, violates any statute or common law theory. Since the decision to call the police was justified, prudent and reasonable, and since on April 29, 2005, Dong finally acknowledged that AFI did not fabricate the story about the threats (Boltuch Dec. at ¶17 and Exhibit M thereto), the basis of Dong's case collapses. Summary judgment must be granted. More particularly, the issues for this motion are:

/ / /

/ / /

/ / /

---

[3]   On or about April 21, 2005, AFI, Ansari, Geddis and J. Musgrove filed a discovery motion with the Court because of Dong's refusal to provide any responses to three different sets of written discovery and because of Dong's providing non-compliant, unverified responses to three other sets of written discovery. In the discovery motion, Defendants seek, *inter alia,* an Order precluding further litigation by Dong of various claims that are the subject of this Motion for Summary Judgment. The Court has not yet ruled on the discovery motion. (Boltuch Decl. at ¶16.)

1.     Whether AFI's good faith belief,[4] based on the reports on October 7 from Defendant Ansari, Defendant Geddis and former Defendant George Silva, that Dong possibly had made threats to kill others and himself, legally mandates the dismissal of the Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth and Twelfth Causes of Action?

2.     Whether AFI's discharge of at-will employee Dong, which did not involve any information protected from disclosure by Section 5150, but was solely based on AFI's knowledge of Dong's admitted threat on October 4 to commit suicide and on AFI's good faith belief that Dong on October 7 threatened to shoot himself and others, constitutes a discharge in violation of public policy (Third Cause of Action)?

3.     Whether AFI's discharge of at-will employee Dong was in retaliation for Dong's passing comments on October 4, to former defendant George Silva, that Dong believed that Frank Levering was harassing Dong on the basis of his race/ethnicity, when Levering and Silva were not involved in the decision to terminate Dong and when Silva immediately investigated the complaints, pursuant to AFI's Policy of Zero Tolerance, and found no merit to Dong's belief (Fourth Cause of Action)?

4.     Whether AFI's discharge of at-will employee Dong was in retaliation for Dong's passing comments on October 7, to Defendants Ansari and Geddis, that Dong believed that former defendant Pat Davis had improperly required him to work in January or February on a machine when Dong was still injured, when AFI immediately acquiesced in January or February to Dong's request to not work on the machine (solving the problem) and when Ansari, Geddis

---

[4]  Dong now admits, contrary to the allegations in the Complaint, that AFI did not fabricate the story about Dong threatening to kill employees and himself. Thus, Dong cannot contest that AFI's summoning of the police was in good faith, prudent and reasonable. Dong's interrogatory answers merely assert that Dong *"believes"* that employees of Applied Fusion were not truthful when each spoke to the police." (emphasis added) (Boltuch Dec. at ¶17 and Ex. M thereto.)

and Davis were not involved in the decision to terminate Dong (Fourth Cause of Action)?

5. Whether AFI's discharge of at-will employee Dong, based on AFI's good faith belief that Dong had made threats on October 7 to kill others and himself, is a sufficient business justification to overcome any inference of a retaliatory discharge (Fourth Cause of Action)?

6. Whether AFI and the AFI Employee Defendants, by merely contacting the San Leandro police department to independently investigate if Dong had threatened to kill others and himself, violated the Lanterman-Petris-Short Act (Fifth Cause of Action)?

7. Whether AFI's mere summoning of the San Leandro police on October 7, based on AFI's good faith belief that Dong was a possible danger to himself or others, after which the police independently determined that probable cause existed to transport Dong to a psychiatric hospital for evaluation, pursuant to Section 5150, and after which two psychiatric institutions independently determined, pursuant to Section 5150, that Dong should be further detained until October 11, constitutes an invasion of privacy (Sixth Cause of Action)?

8. Whether AFI's mere summoning of the San Leandro Police on October 7, based on AFI's good faith belief that Dong was a possible danger to himself or others, after which the police independently determined that probable cause existed to transport Dong to a psychiatric hospital for evaluation, and after which two psychiatric institutions independently determined, pursuant to Section 5150, that Dong should be detained until October 11, constitutes conduct sufficient to establish intentional infliction of emotional distress (Seventh Cause of Action)?

9. Whether AFI's mere summoning of the San Leandro Police on October 7, based on AFI's good faith belief that Dong was a possible danger to himself or others, after which the police independently determined that probable cause existed to transport Dong to a psychiatric hospital for evaluation, and after which two psychiatric institutions independently determined,

pursuant to Section 5150, that Dong should be detained until October 11, constitutes false imprisonment (Eighth Cause of Action)?

10. Whether AFI's mere summoning of the San Leandro Police on October 7, based on AFI's good faith belief that Dong was a possible danger to himself or others, after which the police independently determined that probable cause existed to transport Dong to a psychiatric hospital for evaluation, and after which two psychiatric institutions independently determined, pursuant to Section 5150, that Dong should be detained until October 11, constitutes an assault and battery (Ninth Cause of Action)?

11. Whether AFI's mere summoning of the San Leandro Police on October 7, based on AFI's good faith belief that Dong was a possible danger to himself or others, after which the police independently determined that probable cause existed to transport Dong to a psychiatric hospital for evaluation, and after which two psychiatric institutions independently determined, pursuant to Section 5150, that Dong should be detained until October 11, constitutes negligent conduct (Twelfth Cause of Action)?

### III. STATEMENT OF THE FACTS

AFI and the AFI Employee Defendants dispute most of the assertions made by Dong in the Complaint, in his deposition testimony, and in his responses to interrogatories, particularly Dong's denial that he made threats on October 7. *For the purposes of this motion only,* Defendants proceed as if Dong's assertions, particularly his denial that he made threats on

/ / /

/ / /

/ / /

October 7, are true.   In support of the pending motion, Defendants solely rely on the undisputed facts and on Dong's admissions.[5]

## A.   **AFI**.

In 1972, Ron Musgrove founded Emcee Enterprises, which was incorporated in late 1973. In 1979, the name was changed to Applied Fusion, Inc.   At all times since 1972, Ron Musgrove has been the owner and hands-on CEO, joined in 1973 by his son, Jeff Musgrove, who has been AFI's President for about twelve (12) years.   (J. Musgrove Dec. at ¶¶2, 4 and 5, and Ex. A and Ex. B thereto;[6] J. Musgrove Depo at 8:12-17 – Ex. A to J. Musgrove Dec; Declaration of Ron Musgrove in Support of Motion for Summary Judgment or, in the Alternative, for Summary Adjudication of the Issues (hereinafter "R. Musgrove Dec.") at ¶¶3 and 6 and Ex. A thereto;[7] R. Musgrove Depo at 4:11-21 – Ex. A to R. Musgrove Dec.)

AFI started as a machining and fabrication shop with its primary customers being Physics International, Lawrence Livermore Laboratory, G.E. Nuclear Energy and a few start-up companies in what is now known as the Silicon Valley.   (R. Musgrove Dec. at ¶3.)

In 1978, AFI purchased its first Electron Beam Welding System and then one year later heavily invested in laser technology. At that time, AFI had to aggressively sell and promote these new options, since most engineers and designers knew little of these manufacturing and welding advancements.   In fact, AFI was a pioneer in the United States with respect to both

---

[5]   As noted above at page four in footnote 3, Dong has refused to provide responses to some, and has provided inadequate responses to other, written discovery.

[6]   Exhibit A to the Jeff Musgrove Declaration contains true and correct copies of the pages of the transcript of the deposition of Jeff Musgrove taken on March 9, 2005, and cited in this Memorandum, and is hereinafter referred to as "J. Musgrove Depo."

[7]   Exhibit A to the Ron Musgrove Declaration contains true and correct copies of the pages of the transcript of the deposition of Ron Musgrove taken on February 15, 2005, and cited in this Memorandum, and is hereinafter referred to as "R. Musgrove Depo."

welding technologies. Since 1978, AFI has continued to invest in this technology. For AFI to be a leader in the field, AFI had to have Computer Numeric Control ("CNC") welding (laser and electron beam) and other machinery to give it sufficient control to allow welding to often be a final operation. Hence, AFI's ongoing investment in people and state-of-the-art machinery. AFI is now a national leader in the manufacturing and welding of complex assemblies of vacuum chambers for wafer processing, surgical tools and implants, satellite components and a wide variety of proprietary hardware and components for high tech industries. (R. Musgrove Dec. at ¶4.)

AFI has consistently recognized that its employees are its greatest asset. The safety of the employees has been and continues to be AFI's highest priority. In fact, the AFI Employee Handbook lists AFI's goals in order of priority as follows:

1.     A safe workplace and safety-minded employees.

2.     Product quality.

3.     On time delivery of product.

4.     Continuous investment in machinery and technology.

5.     Training of employees and the sharing of knowledge and expertise.

6.     Being profitable and sharing those profits with employees.

7.     Paying top wages with good benefits.

8.     Creating a working environment that employees will look forward to each work day.

(R. Musgrove Dec. at ¶5 and Ex. B thereto – excerpts from Handbook.)

Ron Musgrove and Jeff Musgrove have always been committed to a workplace free of harassment, discrimination and retaliation. AFI does not allow any abusive or threatening

conduct at the work place. The current workforce is multi-national and multi-ethnic, including Caucasian, African-American, Chinese, Mexican, Filipino, Fijian, Dutch, Indonesian, Portuguese, Spanish and Italian. (R. Musgrove Dec. at ¶8 and R. Musgrove Depo at 17:22-18:3 – Ex. A to R. Musgrove Dec.; J. Musgrove Dec. at ¶10.) The AFI Employee Handbook contains an explicit Policy of Zero Tolerance for Harassment, Discrimination and Retaliation. (R. Musgrove Dec. at ¶9 and Ex. B thereto.) On July 14, 1997, AFI issued a policy statement prohibiting harassment and discrimination. (R. Musgrove Dec. at ¶9 and Ex. C thereto.)

## B. Dong's Employment With AFI.

### 1. Dong's At-Will Employment Status.

On April 18, 2000, Dong applied for a job and was then hired as a machinist with AFI. As noted on the last page of Dong's job application, Dong acknowledged that, if he was hired, he would be an at-will employee. Upon his hire, Dong again acknowledged his at-will employment status. Dong was provided and acknowledged receipt of the Employee Handbook which included AFI's Policy of Zero Tolerance for Harassment, Discrimination and Retaliation. (R. Musgrove Dec. at ¶¶10 and 11 and Ex. D and Ex. E thereto, respectively; Boltuch Dec. at ¶7 and Ex. D thereto.)[8] (Dong Depo at 42-45 and 58:15-23 – Ex. D to Boltuch Dec.).

Dong admits that he was aware of AFI's Policy of Zero Tolerance (Dong Depo at 58:15-59:24 – Ex. D to Boltuch Dec.). Dong admits that, if he ever had a problem or concern at AFI, he knew to and did report it to George Silva. *Dong further admits that Silva consistently addressed and resolved all of Dong's concerns.* (Dong Depo at 58:24-62:12; 65:4-13; 67:7-

---

[8] Exhibit D to the Boltuch Declaration contains true and correct copies of the pages of the transcript of the deposition of Dong taken on January 6 and 7, 2004, and on February 14, 2005, and cited in this Memorandum, and is hereinafter referred to herein as the "Dong Depo."

69:15 and 92:15-95:14 – Ex. D to Boltuch Dec.) According to Dong, from the day he was hired until the day he was fired, George Silva was the only management person to whom Dong complained about alleged workplace concerns, including harassment or discrimination. (Dong Depo at 92:15-24 – Ex. D to Boltuch Dec.). Dong has no credible basis to allege that AFI would not expeditiously address any workplace-related complaints.

Throughout his at-will employment with AFI, Dong periodically made mistakes, but he was not disciplined. Rather, the mistake was pointed out, if possible the error was corrected, and Dong's employment continued. (J. Musgrove Dec. at ¶3.) Dong does not assert that AFI imposed any adverse employment action against him before October 7.

### 2. **Dong's Relationship With His Fellow Employees.**

• **Frank Levering.**

Dong testified that he did not get along with fellow employee Frank Levering and that he thought Levering did not like him because Dong was Chinese. (*See, e.g.*, Dong Depo at 68-78 – Ex. D to Boltuch Dec.) However, Dong admits that he did not speak to Levering for at least the last three months of Dong's employment. Dong admits that Levering was not involved in any way in the incidents of October that led to Dong's termination. Dong admits that AFI's decision on October 7 to summon the San Leandro police was not based on any reports from Levering and/or on Levering's interactions with Dong. (Dong Depo at 147:22-148:8; 160:4-161:10 and 246:12-24 – Ex. D to Boltuch Dec. and J. Musgrove Dec. at ¶¶6-7.)[9]

More telling, however, are Dong's admissions regarding his relationships with the AFI Employee Defendants and with former defendants Silva and Davis.

---

[9]   Dong's admission defeats his assertion, in the Fourth Cause of Action, that the termination was in retaliation for Dong's complaints on October 4 about Levering. There is no causal connection between the October 4 complaints and the summoning of the police (or the termination).

- **George Silva.**[10]

Dong admits that former defendant George Silva never discriminated against or harassed him (Dong Depo at 59:17-24 – Ex. D to Boltuch Dec.):

> Q.  During the entire time you worked for Applied Fusion, isn't it correct that Mr. Silva never harassed you?
>
> A.  George Silva never harassed me.
>
> Q.  And isn't it correct during the entire time that you worked for Applied Fusion, Mr. Silva never discriminated against you?
>
> A.  I did not feel any.

(See also Declaration of George Silva in Support of Motion for Summary Judgment or, in the Alternative, for Summary Adjudication of the Issues (hereinafter "Silva Dec.") at ¶18.)

- **Pat Davis.**[11]

Dong admits that former defendant Pat Davis did not discriminate against or harass him based on Dong's race or ethnicity. Dong admits that from the day he was hired in April, 2000 until he was taken to the hospital in October, Davis never said or did anything that made Dong believe that Davis' actions or statements were based on Dong's race or ethnicity. (See Dong Depo at 95:15-96:6 – Ex. D to Boltuch Dec.).[12]

---

[10]  As noted above at page two in footnote 2, George Silva has been dismissed as a defendant. However, Dong's admissions that Silva had no animus toward Dong, and did not discriminate against or harass Dong, are relevant to this Court's determination of the pending motion for summary judgment, especially for the Fourth Cause of Action (Retaliation).

[11]  As noted above at page two in footnote 2, Pat Davis has been dismissed as a defendant. However, Dong's admissions that Davis had no animus toward Dong, and did not discriminate against or harass Dong, are relevant to the Court's determination of the pending motion for summary judgment.

[12]  This admission alone defeats the remaining portion of the claim of retaliation. (Fourth Cause of Action.) Dong's alleged complaints on October 7 about Davis were unrelated to Dong's race or ethnicity. At most, the complaints could be characterized as "disability related." See below at page fourteen in footnote 13. The retaliation claim in the Complaint, however, is not based on disability discrimination.

Dong admits that Davis really did not do anything wrong with respect to, and was not involved in, the "detention" or the termination (Dong Depo at 318:10-21 – Ex. D to Boltuch Dec.):

> Q. Limiting it to Mr. Davis, what if anything in your opinion or belief did Mr. Davis do wrong if anything with respect to your termination, the calling of the police or your being sent to John George Hospital or Fremont Hospital?
>
> A. I am not sure if he had done anything wrong.
>
> Q. Do you have any information that he did anything?
>
> A. For the time being I do not have that kind of information or didn't receive any such information.
>
> . . .
>
> A. From what I think and what I believe it is true, he has nothing to do with that.

In describing Davis, Dong further testified (Dong Depo at 323:5 – Ex. D to Boltuch Dec.):

> . . . I believe that personally he does not have any racial discrimination towards me . . . .

(Dong Depo at 323:3-5. *See also* Dong Depo at 323:18-324:8 – Ex. D to Boltuch Dec.)

Dong admits that he has no facts to support an allegation that Davis was involved with

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

AFI's decision to summon the police. (Dong Depo at 318:10-21 - Ex. D to Boltuch Dec.)[13]

•   **AFI Management.**

There is absolutely no evidence that the actions of AFI or of any of its employees in October were motivated in any way on the ethnicity or race of Dong, or were in retaliation for Dong engaging in any protected conduct. Dong's deposition testimony contradicts the allegations in his Complaint (Dong Depo at 201:2-16 – Ex. D to Boltuch Dec.):

> Q.   Do you have any information, Mr. Dong that Applied Fusion called the police because you are Chinese?
>
> A.   I don't know what they said when they called the police.
>
> Q.   That is not what I asked you, Mr. Dong.
>
> A.   Would you ask him to ask the question again?
>
> Q.   I will. Mr. Dong, do you have any information that one of the reasons that Applied Fusion called the police on October 7, 2002 was because you were Chinese?
>
> A.   I am unsure.
>
> Q.   You have no information?
>
> A.   I don't have any at this time.

---

[13]   Dong repeatedly asserted at his deposition that, on October 7, he was angry with Davis because earlier that year, in January or February, when Dong returned from a workers' compensation injury, Davis asked him to work on the Bullard machine and Dong felt that this assignment was inconsistent with his medical restrictions. However, Dong admits that, upon being instructed by Davis to do this work, Dong went to Silva, and that Silva immediately solved the problem. As soon as Dong complained to Silva, Dong was no longer asked to perform any work inconsistent with his medical restrictions. (Dong Depo at 124-126 and 245:20-246:1 – Ex. D to Boltuch Dec.) In his deposition testimony, Dong asserts that on October 7, rather than threatening other employees, Dong merely repeatedly complained to Mohammed Ansari about Davis' actions the prior January or February. While this testimony is illogical, AFI and the AFI Employee Defendants acknowledge that, for this motion, the Court must accept as true Dong's testimony that, on October 7, he complained about events the prior January or February. However, Dong admits that Davis had nothing to do with the decision to summon the police and was not involved in the discharge. Davis, at most, was a target on October 7 of Dong's anger, but Davis had no role in any matter relevant to the disposition of the pending motion for summary judgment.

(*See also* Dong Depo at 312:2-315:8 – Ex. D to Boltuch Dec., and Dong's recent admission that AFI did not fabricate any story – footnote 4 at page 5 above.)

## C.    The Events In October, 2002.

### 1.    Dong's Testimony.

#### a.    Dong's Errors On October 1 and 4

On October 1, contrary to the instructions of Davis, Dong "reset" a job the way Dong wanted to do it, not the way AFI requested. Dong was not disciplined. (Silva Dec. at ¶7; J. Musgrove Dec. at ¶3.) On October 4, Dong again failed to follow instructions, drilling holes in the wrong position. Dong admits: "When I was doing that job, I did make some mistakes." (Dong Depo at 105:13-14 – Ex. D to Boltuch Dec.) Dong alleges Davis threw a small tool to the ground to express Davis' dissatisfaction, but Dong does not allege that Davis verbally expressed any anger. (Dong Depo at 98-102; 104:2-105:18 and 115:9-116:2 - Ex. D to Boltuch Dec.) AFI did not discipline Dong. Instead, AFI re-plugged the holes and then drilled the part at the correct positions. (Dong Depo at 109-110, 112:12-114:10 and 115:9-116:2l – Ex. D to Boltuch Dec.)

#### b.    Dong Admits He Threatened To Kill Himself On October 4

On October 4, Dong spoke with his supervisor, Silva, the VP of Manufacturing, and complained about Frank Levering. (Boltuch Dec. at ¶8 and Ex. E thereto;[14] Silva Depo at 14:16-15:9 – Ex. E to Boltuch Dec.; Silva Dec. at ¶8 and Ex. C (Document No. AFI 415) thereto.)[15]

---

[14]    Exhibit E to the Boltuch Declaration contains true and correct copies of the pages of the transcript of the deposition of George Silva taken on February 15, 2005, and cited in this Memorandum, and is hereinafter referred to as "Silva Depo." Ex. F to the Boltuch Declaration is a true and correct copy of the timely corrections of Silva to his deposition testimony.

[15]    Ex. C to the Silva Declaration is a true and correct copy of the notes Silva contemporaneously made in October. In his deposition testimony, Silva verified the accuracy of the notes. (Silva Dec. at ¶7.)

Dong admits that, on October 4, he made the following statements to Silva, concerning Levering and himself (Dong Depo at 173:8-17 – Ex. D to Boltuch Dec.) (emphasis added):

A.    I said he's been here seven years, he still couldn't do the 3-D. Right now I still need help on the 3-D but I have only been here for a short time.

       If in seven years I was so dumb that I still couldn't learn this program *I would go and see the ghost*.

Q.    Go and see the ghost is what you said?

A.    Yeah. It was in Chinese, in Chinese that is what I meant, like if I can't even do this simple thing, I might as well go and see the ghost.

Q.    Meaning be dead?

When further questioned, Dong acknowledged his threat to commit suicide (Dong Depo at 174:6-11, 174:19-175:3 – Ex. D to Boltuch Dec):

A.    Originally as I remember what I said is that if I couldn't learn it in seven years, so stupid, *so I would rather die*.

Q.    And that's what you said to George on October 4?

A.    Yes.

. . .

(A.)  You know, Chinese people how they say it, if he is so stupid, if he is as stupid as that, *might as well be dead*.

Q.    Talking about Frank?

A.    No, me.

Q.    But that's what you said to George?

A.    I told George that in seven years he still needed someone to teach him. *If I had seven years and I still need someone to teach me I would rather* die.

Thus, Dong unequivocally admits that, on October 4, Dong made statements to Silva which a reasonable individual could interpret as a threat to commit suicide. Dong admits that

when he spoke to various medical professionals during his detention at Fremont Hospital, he confirmed he had threatened to commit suicide on October 4, but Dong asserts that Silva "misunderstood" (Dong Depo at 298:1-9 and 302:9-306:12 – Ex. D to Boltuch Dec.). Dr. Kahlon, the psychiatrist who evaluated and treated Dong at Fremont Hospital, was deposed on April 12, 2005. (Boltuch Dec. at ¶10 and Ex. H thereto.) Dr. Kahlon, who has evaluated over one thousand Section 5150 cases, evaluated Dong on October 9, 10 and 11. Dr. Kahlon confirmed that, during Dong's detention, Dong admitted making the above threat to kill himself on October 4, including admitting: "I said if I did not learn the computer package, I would kill myself." (Dr. Kahlon Depo at 64:15-18; see also Dr. Kahlon Depo at 13:19-14:10; 47:4-11 and 52:24-53:5 – Ex. H to Boltuch Dec.)[16]

### c. The Events Of October 7

It is undisputed that, on the following Monday, October 7, Gregory Geddis and Mohammed Ansari, AFI employees and defendants herein, reported to Silva and then Silva reported to Jeff Musgrove that on October 7 Dong had threatened to kill Pat Davis, Frank Levering, and others, and then kill himself. (Declaration of Mohammed Ansari in Support of Motion for Summary Judgment ("Ansari Dec.") at ¶¶4-5, 7, 9 and 10 and Ex. A and Ex. B thereto;[17] Ansari Depo at 57:9-58:5 and 66:9 - Ex. A to Ansari Dec.; Declaration of Gregory Geddis in Support of Motion for Summary Judgment or, in the Alternative, for Summary Adjudication of the Issues ("Geddis Dec.") at ¶¶3, 4, 5, 6, 7, and 8, and Ex. A and Ex. B

---

[16]   Exhibit H to the Boltuch Declaration contains true and correct copies of the pages of the transcript of the deposition of Dr. Kahlon, and cited in this Memorandum, and as is hereinafter referred to as the "Dr. Kahlon Depo."

[17]   Exhibit A to the Ansari Declaration contains true and correct copies of the pages of the transcript of the deposition of Mohammed Ansari taken on February 6, 2004, and cited in this Memorandum, and is referred to hereinafter as the "Ansari Depo." Ex. B to the Ansari Declaration is a true and correct copy of Ansari's notes summarizing the events of October 7, 2002. See Ansari Dec. at ¶¶4-5.

thereto;[18] Geddis Dec. at ¶3 and Geddis Depo at 24:17-19; 25:5-13 and 29:17-25 - Ex. A to

Geddis Dec.; Silva Depo at 23:10-20; 25:7-22; 28:7-18; and 29:6-9 - Ex. E and Ex. F,

respectively, to Boltuch Dec.; and J. Musgrove Dec. at ¶¶6, 7, and 8 and J. Musgrove Depo at

10:5-13:7 - Ex. A to J. Musgrove Dec.). Dong strenuously denies making these statements to

Ansari and Geddis on October 7 and asserts, without any proof, that Ansari and Geddis

"fabricated" the story about the October 7 threats. (See Boltuch Dec. at ¶17 and Exhibit M

thereto – Dong merely "believes" Ansari and Geddis were not truthful.) Nevertheless, Dong

does not contest that, on October 7, Geddis and Ansari reported these comments to Silva.[19]

Upon hearing the comments of Dong from Silva, Jeff Musgrove immediately conducted an

investigation. Jeff Musgrove spoke with Ansari, Geddis and Dong. Jeff Musgrove then

contacted the San Leandro police. (J. Musgrove Depo at 10:5-15; 11:2-10; 14:18-15:7; 15:24-

16:25; 19:15-23; 23:1-11 and 74:6-76:9 – Ex. A to J. Musgrove Dec.; Silva Depo at 5:23-10:20;

25:7-22; 28:7-18 and 29:6-9 - Ex. E and Ex. F to Boltuch Dec.; Silva's notes - ¶7 and Ex. C to

Silva Dec.; Ansari Dec. at ¶¶7, 9 ad 10 and Ansari Depo at 57:9-58:5 and 66:9-14 - Ex. A to

Ansari Dec.; Ansari's notes – Ex. B to Ansari Dec.; Geddis Depo at 24:17-19; 25:5-13 and

29:17-25 - Ex. A to Geddis Dec.)

---

[18] Exhibit A to the Geddis Declaration contains true and correct copies of the pages of the transcript of the deposition of Gregory Geddis taken on February 6, 2004, and cited in this Memorandum, and is hereinafter referred to as "Geddis Depo.," Ex. B to the Geddis Declaration is a true and correct copy of the timely corrections made by Geddis to his deposition testimony. See Geddis Dec. at ¶3.

[19] Exhibit G to the Boltuch Declaration contains true and correct copies of the pages of the transcript of the deposition of Pat Davis taken on February 15, 2005 and cited in the Memorandum, and is hereinafter referred to as "Davis Depo." See Boltuch Dec. at ¶9. On October 7, Silva told Davis about Dong's threat to kill Davis. (Davis Depo at 52:15-23; 63:15-23; 66:15-19 – Ex. G to Boltuch Dec.)

## 2.    Testimony Of Ansari, Geddis And Davis[20].

Ansari has worked for AFI since approximately February, 1993. Throughout Dong's employment at AFI, Ansari worked with Dong. Ansari testified that on the morning of October 7, Dong, in an agitated state, complained about supervisor Davis. Despite Ansari's efforts, Dong did not calm down. Ansari suggested that Dong express his concerns to management. Dong refused. Ansari suggested that Dong bring fellow employee Henry Leung, who spoke Cantonese, if Dong was concerned about Dong's ability to express himself in English. Dong refused. Ansari offered to go with Dong to see Ron Musgrove and Jeff Musgrove, the CEO and President of AFI, respectively. Dong refused. After Ansari had made these good faith suggestions to Dong on how to address Dong's concerns, Dong's response was (Ansari Depo at 57:9-12 – Ex. A to Ansari Dec.) (emphasis added):

> *He said, "No, I take care of my own problem. I bring a gun and shoot them all and I shoot myself," and he pointed like that with – made a gesture like a gun with his hand.*

Ansari asserts that while making the threat, Dong made a gesture of a gun, holding three fingers towards his palm with the index finger pointing out and the thumb pointed up, saying he would shoot them all and shoot himself. Dong then moved his hand in the form of the gun toward his head. (Ansari Depo at 57 – Ex. A to Ansari Dec.; Ansari's notes - ¶5 and Ex. B to Ansari Dec.; Geddis Depo at 25:11-13 – Ex. A to Geddis Decl.)

Almost instantaneously, Geddis came up to Ansari and said "What happened?" Geddis asked Ansari if Dong had threatened to shoot somebody. Ansari said "yes," and asked Geddis

---

[20]    Dong denies making the threats on October 7, but does not deny that AFI employees told Jeff Musgrove that threats were made. Whether Dong believes the employees "fabricated" the story, it is not disputed that AFI did not fabricate any story, but received the reports and investigated. Not knowing for sure what occurred, AFI in good faith, summoned the police (see above at page 5 in footnote 4).

how he knew? Geddis said that Dong had made almost the same kind of threat to him. (Ansari Depo at 59:7-60:16 – Ex. A to Ansari Dec.; Ansari Dec. at ¶7 and Ex. B and Ex. C thereto; Geddis Depo at 24:13-19; 25:5-13 and 29:7-25 – Ex. A to Geddis Dec.) Being concerned, both Ansari and Geddis immediately went to see Silva in his office. (Ansari Depo at 58:24-59:19; 59:23-60:17; 66:9-23 – Ex. A to Ansari Dec.; Silva Depo at 23:10-25:19 – Ex. E to Boltuch Dec.; Geddis Depo at 24:13-25:13, 30:10-24 and 47-48 – Ex. A to Geddis Dec.).

The notes of Ansari and Silva of the October events confirm that, on October 7, Ansari and Geddis, in good faith, believing that Dong had threatened to kill Davis, Levering, others and himself, reported these statements to Silva and then Silva reported them to Jeff Musgrove. (Silva Depo at 28:7-18; 28:23-29:9; 33:25-36:9 and 53:15-55:4 - Ex. E and Ex. F to Boltuch Dec.; Silva's notes – Ex. C to Silva Dec.; J. Musgrove Depo at 10:5-11:17 – Ex. A to J. Musgrove Dec.; Ansari's notes - Ansari Dec. at ¶5 and Ex. B thereto.) Jeff Musgrove immediately spoke with Geddis and Ansari, who confirmed what Silva had reported. Jeff Musgrove then spoke with Dong. (J. Musgrove Depo at 14:16-16:22; 19:15-23; and 74:6-9 – Ex. A to J. Musgrove Dec.).

AFI acknowledges that Dong strenuously denies making the threats on October 7. Yet, Dr. Kahlon testified that Dong admitted that: "[I] made a statement that [I] want to kill a few people and kill [myself]." (Dr. Kahlon Depo at 16:14-19; 18:4-5; 33:17-25; 61:4-9; 62:10-63:11; 77:12-22; 82:16-23 - Ex. H to Boltuch Dec.; and Boltuch Dec. at ¶¶10-11 and Ex. H and Ex. I thereto.)[21] Nevertheless, for the purposes of this motion, Dong's denial of the October 7 threats is accepted. But Dong does not dispute that Ansari and Geddis told Silva and Jeff Musgrove on October 7 that Dong had made threats on October 7, leading to the police being called.

---

[21]    Dr. Kahlon confirmed that the medical records involving Dong are "business records" of Fremont Hospital. Dr. Kahlon Depo at 7-10 – Ex. H to Boltuch Dec.

## D. AFI Summons The Police.

When Jeff Musgrove received the reports from Silva, Geddis and Ansari, Jeff Musgrove acted. As noted above, he investigated and then telephoned his father, Ron Musgrove. Ron Musgrove and Jeff Musgrove concurred that AFI could not take a chance and that, despite Dong's denials, the prudent action was to call the San Leandro police.[22] (J. Musgrove Depo at 22:23-23:5 and 81:22-24 – Ex. A to J. Musgrove Dec; R. Musgrove Depo at 12:9-20 and 14:3 – Ex. A to R. Musgrove Dec.)

Officer Lopez of the San Leandro police responded to the call. (Boltuch Dec. at ¶12 and Ex. J thereto.[23] (Lopez Depo at 27:11-28:2 – Ex. J to Boltuch Dec.) Officer Lopez spoke with Jeff Musgrove. Officer Lopez then spoke with employees Ansari and Geddis, both of whom confirmed to Lopez that Dong had made threats. (Lopez Depo 28:3-19 and 29:17-32:8 – Ex. J to Boltuch Dec.; *see also* Ansari Depo at 71:6-72:8 and 82:15-21 – Ex. A to Ansari Dec.; and Geddis Depo at 33:18-34:23 – Ex. A to Geddis Dec.) Officer Lopez then spoke with Dong, who denied making the threats. (Lopez Depo 32:7-21; 34:17-24; 37:2-17; and Dong Depo at 403:11-404:1 – Ex. J and Ex. D, respectively, to Boltuch Dec.; Application for Emergency Psychiatric Detention, Boltuch Dec. at ¶13 and Ex. K thereto.) Officer Lopez testified that based on his experience and training it is not at all unusual for a Section 5150 suspect to deny the accusation.

---

[22]    Both Ron Musgrove and Jeff Musgrove were friends of the father of Stewart Alexander. In fact, Stewart Alexander's father was one of Ron's best friends. As is commonly known in the Bay Area, Stuart Alexander was just convicted of killing three meat inspectors. Both Ron Musgrove and Jeff Musgrove, because of their personal knowledge of the Alexander murders, were especially cautious about protecting their workforce and about not taking any chances if there was a *possibility* of workplace violence. (R. Musgrove Dec. at ¶12; J. Musgrove Dec. at ¶10.)

[23]    Exhibit J to the Boltuch Declaration contains true and correct copies of the pages of the transcript of the deposition of Officer Lopez taken on February 16, 2005, and cited in this Memorandum, and is hereafter referred to as "Lopez Depo."

After speaking with Dong and based on his training and experience of over twenty years with the police department (including having participated in 75-100 such emergency psychiatric detentions), Officer Lopez acted. Officer Lopez concluded that, despite Dong's denials, Dong's mental state was not something he could take a chance on, that probable cause existed to detain Dong, and that Dong needed to be evaluated by psychiatric professionals. (Lopez Depo at 5:21-25, 16:20-17:1; 46:22-47:24; 49:10-20; 50:25-51:2; 53:10-19 – Ex. J to Boltuch Dec.) Officer Lopez filled out an Application for Emergency Psychiatric Detention Form, stating that, although Dong denied making the threats, it was "safer for all parties to have subject evaluated." (Lopez Depo at 49:10-20; 65:24-66:11; Application for Emergency Psychiatric Detention – Ex. J and Ex. K, respectively, to Boltuch Dec.)

Officer Lopez independently made the determination to detain Dong, without the input of AFI. (Lopez Depo 68:8-13 – Ex. J to Boltuch Dec.) In fact, upon being questioned by Dong's attorney, Officer Lopez testified:

> Q. . . . Did you think that you had probable cause to believe that he was suffering from a mental disorder?
>
> A. Yes.
>
> Q. Did you think that Mr. Dong was dangerous to himself?
>
> A. Yes.
>
> Q. Did you think that he was dangerous to others?
>
> A. Yes.

(Lopez Depo. at 52:10-17 – Ex. J to Boltuch Dec.) Jeff Musgrove never asked the police to detain or arrest Dong. (J. Musgrove Dec. at ¶18 and J. Musgrove Depo at 48:13-49:1 – Ex. A to J. Musgrove Dec.)

Officer Lopez also knew that trained medical personnel would evaluate Dong and, depending on their evaluation of his mental state, would detain or release Dong. (Lopez Depo at 46:22-49:20 and 51:17-22 - Ex. J to Boltuch Dec.) Dong was taken by ambulance to the John George Psychiatric Pavilion (Alameda County Medical Center) and was evaluated by Dr. Arthur Weisberg. Dr. Weisberg determined Dong was a "*continuing danger to self and danger to others*" (Boltuch Dec. at Ex. L - Alameda County Medical Center Intake Evaluation.) On October 8, Dong was transferred to Fremont Psychiatric Hospital. At Fremont Hospital, a medical team, including Dr. Kahlon, evaluated Dong and independently determined that a detention, pursuant to Section 5150, was warranted until October 11. (Fremont Hospital Discharge Summary, Boltuch Dec. at ¶11 and Ex. I thereto; Dong Depo at 416:14-16; 417:23-25 and 418:2-3; and Dr. Kahlon Depo at 14:9-18; 20:5-17; 23:3-24:9 and 55:4-56:27 - Ex. D and Ex. H, respectively, to Boltuch Dec.)

Dong's account varies only slightly and only varies in the events that transpired before Officer Lopez arrived on the scene. None of the differences are material for this motion. Dong alleges that earlier on October 7, Jeff Musgrove "aggressively approached plaintiff" and asked him whether he had threatened employees. (Complaint at page 4, ¶18, lines 21-23 - Ex. A to Boltuch Dec.) Whether Jeff Musgrove was "aggressive" or not, Dong acknowledges that Jeff Musgrove did solicit Dong's version. Dong claims he did not make any threats on October 7. (*Id.*) Dong agrees that after lunch he was approached by Officer Lopez and taken into custody for a psychiatric detention. (Complaint at page 4, ¶18, line 19, to page 5, line 5, and ¶19 – Ex. A to Boltuch Dec.) Officer Lopez questioned Dong regarding threats to himself and his co-workers. Dong was detained by Officer Lopez and transported to John George Psychiatric Pavilion. (Complaint at page 5, ¶18, lines 2-5 and ¶19 – Ex. A to Boltuch Dec.) Dong does not

deny that AFI called the police based on the reports of Ansari and Geddis; Dong does not dispute what Ansari and Geddis told Officer Lopez; and Dong does not deny that Officer Lopez questioned him and requested he get into the ambulance.

During his detention at the two psychiatric facilities, Dong acknowledged making the comments on October 4 to George Silva concerning Levering and about killing himself – becoming a "ghost." Dr. Kahlon testified that Dong also admitted making threats on October 7. (Dong Depo at 298:1-9; Dr. Kahlon Depo at 13:19-14; 16:14-19; 18:4-5; 33:17-25; 47:4-11; 52:24-53:5; 61:4-9; 62:16-63:11; 77:12-22 and 82:16-23 - Ex. D and Ex. H, respectively, to Boltuch Dec.; *see also* Section III.C.1.a. and b. at pages 15-17 of this Memorandum).

## E.    The Termination Of Dong.

On October 11, AFI sent Dong a termination letter, his final check, and various other cessation of employment documents. (J. Musgrove Dec. at ¶14.) AFI made this decision, in good faith, based on what the Musgroves believed was credible evidence that Dong had made threats. (J. Musgrove Dec. at ¶¶14, 16 and 17.) It is undisputed that Dong made the statement on October 4 about possibly committing suicide. It is also undisputed that Ansari and Geddis reported to Silva, to Jeff Musgrove and to the police what Dong said to each of them separately on October 7. Dong asserts that he did not make any threats on October 7 when speaking with Ansari or with Geddis, and that Jeff Musgrove was wrong to call the police. However, Dong has failed to produce any evidence that the decision to terminate his at-will employment was based, in whole or in part, in retaliation for the alleged workplace complaints by Dong.

The evidence before the Court is that the termination, a decision made solely and jointly by Ron Musgrove and Jeff Musgrove, was based on (a) the undisputed comments of Dong to

Silva on October 4 that he might as well be dead and that he would rather die if it took him as long as it took Levering to learn parts of the job, and (b) the good faith belief of the Musgroves that Dong had made the threats on October 7. (J. Musgrove Depo at 49:17-23; 63:2-17; 73:22-74:5, and 79:14-80:15 – Ex. A to J. Musgrove Dec.; and pages 15-18 above of this Memorandum.)

The factual dispute as to whether Dong made the threats on October 7 is irrelevant to the pending motion. Dong does not contest that Ansari and Geddis reported to Ron Musgrove that they believed Dong had made threats. Dong believes, but has no facts to support, that Ansari and Geddis "fabricated" the story of the threats. Nevertheless, Dong does not dispute that, based on the reports of Geddis and Ansari, AFI in *good faith* could not determine if Dong was a *possible* danger to himself or to others. Jeff Musgrove conducted an investigation. Still being uncertain, even in light of Dong's denials, Jeff Musgrove and Ron Musgrove logically concluded that the matter was beyond their competence. The San Leandro Police were summoned. Contrary to Dong's assertions, this decision to call the police, a decision with which Dong disagrees, does not establish any liability or that the termination on October 11 violated any statutes.

## IV. LEGAL ARGUMENT

### DONG CANNOT ESTABLISH ANY LIABILITY BY AFI OR BY ANY OF THE INDIVIDUAL AFI EMPLOYEE DEFENDANTS.

**A.** **The Legal Standard For Summary Judgment**.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed.R.Civ.P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient. There must be evidence on which the jury could reasonably find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ruling on a motion for summary judgment." *Id.* at 255.

## B. Summary Of Legal Argument.

AFI does not dispute that, up to the events of October, 2002, Dong was a competent machinist, and received the normal incremental wage increases and bonuses afforded other AFI employees. (J. Musgrove Dec. at ¶15.) However, it also not disputed that, on October 7, Jeff Musgrove received reports from Ansari and Geddis about Dong's threats on October 7; that on

October 7 Jeff Musgrove first learned of Dong's comments on October 4 threatening to commit suicide; and that Jeff Musgrove and Ron Musgrove were both personally aware of the drastic increase of workplace violence and of the murders by Stewart Alexander. (J. Musgrove Dec. at ¶10; R. Musgrove Dec. at ¶12.) Dong believes that the reports of Ansari and Geddis were false. Even accepting Dong's denial of making the threats on October 7, this only establishes that Jeff Musgrove was provided information that was either erroneous or that was based upon misinterpretations by Ansari and Geddis. Yet, Dong admits that he has absolutely no knowledge and absolutely no facts to support the allegation that Ansari or Geddis made up such accusations. Dong has no knowledge and absolutely no facts to establish that, even if the allegations were false, the motivation of Ansari and/or Geddis was to retaliate against Dong.[24] Dong has no facts that AFI's actions in calling the San Leandro police were anything other than a good faith reaction to the information presented to Jeff Musgrove. Dong has no facts to support, and cannot establish, that Jeff Musgrove's actions were in any way motivated by a desire to retaliate. Again, at most, Jeff Musgrove was mistaken. However, any prudent employer would summon the police to ascertain whether there was in fact a legitimate threat of workplace violence, rather than not call the police and have an employee wound or kill himself or others.

It is also undisputed that the involvement of AFI ceased after Officer Lopez arrived at AFI. Officer Lopez independently determined that probable cause existed and had Dong transported to John George Psychiatric Pavilion to be evaluated by medical professionals. Based on these evaluations and those at Fremont Hospital, Dong was detained until October 11. AFI's summoning of the police did initiate the above-noted chain of events; however, AFI's

---

[24]    In fact, neither Ansari nor Geddis were aware of Dong's complaints to Silva on October 4 about Frank Levering, nor were Jeff Musgrove or Ron Musgrove aware of the complaints by Dong when AFI terminated Dong on October 9. (J. Musgrove Depo at 79:14-80:15, Ex. A to J. Musgrove Dec.; J. Musgrove Dec. at ¶6; and R. Musgrove Decl. at ¶13.)

summoning of the police was not based in any way on the race or ethnicity of Dong and was not in retaliation for Dong's conduct. AFI did not violate any applicable laws.

Since Dong was an at-will employee, AFI could fire him for any legal reason. If, as is abundantly clear, AFI in good faith believed that there was a legitimate reason to call the San Leandro police, Dong's entire case lacks merit. See *Cotran v. Rolling Hudig Hall Int'l* (1998) 17 C4th 93 (irrelevant if employee did not actually engage in conduct that led to the termination if the employer's action was based on good faith belief that conduct occurred). Further, Dong admits that he threatened to kill himself on October 4. This alone is a basis to end Dong's at-will employment.

## C. Dong Cannot Sustain His Allegations Of A Termination In Violation Of Public Policy.

An employer's right to discharge an at-will employee is limited by public policy. *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170. The California courts have recognized four sources of public policy to support such a claim: "The employee (1) refused to violate a statute; (2) performed a statutory obligation; (3) exercised a constitutional or statutory right of privilege; or (4) reported a statutory violation for the public's benefit." *Green v. Ralee Engineering Company* (1998) 19 Cal.4th 66, 76.

In this case, Dong did not refuse to violate a statute, did not report a statutory violation for the public's benefit, did not perform a statutory obligation, and did not exercise a constitutional or statutory right of privilege.

In the Third Cause of Action of the Complaint, Dong alleges that AFI fabricated a story about Dong threatening employees and threatening to kill himself and used this as an excuse to fire Dong, in violation of Section 5150. Dong has now admitted that AFI did not fabricate the

story. (See above at page 5 in footnote 4, and Boltuch Dec. at ¶17 and Exhibit M thereto.) Dong's recent admission entitles AFI to summary judgment on the Third Cause of Action.

AFI, through Jeff Musgrove, acted in good faith upon what was reported to him by Silva, Ansari and Geddis. Jeff Musgrove in good faith believed the statements of Ansari and Geddis warranted summoning the police, despite Dong's denial. Dong, at most, "believes" Ansari and Geddis were not truthful. This unsubstantiated belief, however, does not establish that AFI violated Section 5150 when it summoned the San Leandro Police Department to determine whether Dong should be detained for further evaluation. As the Court stated in *Green v. Ralee Engineering Corps*, *supra*, 19 Cal.4th at pp.79-80, limiting tortuous discharge claims to those supported by constitutional or statutory provisions "best serves the Legislature's goal to give law-biding employers broad discretion in making managerial decisions. *See Sequoia Ins. Co. v. Superior Court* (1993) 13 CA4th 1472 (court interpreted *Gantt v. Sentry Ins.* (1992) 1 C4th 1083 that the public policy element is satisfied only if the statutory or constitutional provision "sufficiently describe[s] the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law," 13 CA4th at 1480); cited approvingly in *Turner v. Anheuser-Busch, Inc.* (1994) 7 C4th 1238, 1256, n.9.

The Complaint alleges that AFI desired to terminate Dong. There is no such evidence. Dong alleges AFI violated Section 5150. However, AFI had absolutely no role in the decision to detain Dong pursuant to Section 5150. All AFI did was summon the San Leandro police. Officer Lopez independently decided that probable cause existed and had Dong transported to John George Psychiatric Pavilion. Qualified medical personnel at John George Pavilion and at Fremont Hospital made independent decisions to further detain Dong. If Dong disputes the

validity of said medical determinations, his claim is not against AFI, but against the medical personnel and against John George Psychiatric Pavilion and Fremont Hospital.

The mere summoning of the police, and the subsequent termination of an at-will employee, in these circumstances, does not constitute a termination in violation of public policy.[25] AFI acted reasonably in summoning the police, in light of its obligations under the California Occupational Safety and Health Act of 1973, California Labor Code §§6300, *et. seq.* ("Cal-OSHA"). Cal-OSHA, at Section 6400, mandates that California employers must furnish a place of employment that is "safe and healthful." Cal-OSHA, at Section 6402, mandates that AFI "adopt and use methods and safeguards reasonably adequate to render the employment and place of employment safe" and "to do every other thing reasonably necessary to protect the life, safety, and health of employees." Jeff Musgrove's summoning of the police, so that the police could determine if there was a workplace violence threat, is the exact type of measure Cal-OSHA mandates. AFI has always insisted that its workplace be safe. (R. Musgrove Dec. at ¶¶5 and 7, and Ex. B thereto; J. Musgrove Decl. at ¶12; see also pages 9-10 above of this Memorandum.)

**D.     As A Matter Of Law, Dong Cannot Sustain His Claim That His Discharge Was In Retaliation For His Alleged Protected Complaints.**

Section 704 of Title VII prohibits retaliation against an employee for opposing unlawful discrimination. 42 U.S.C. §2000e-3(a). The FEHA contains similar anti-retaliatory provisions. CA Gov't Code §12940(h). Section 1981 of the Civil Rights Act of 1866 also prohibits retaliation. In the Fourth Cause of Action, Dong alleges that his termination was in retaliation

---

[25]     Dong candidly admits he just does know why the police were called. This uncertainty does not establish liability. Dong Depo at 312-315 - Ex. D to Boltuch Dec.

for Dong's "repeated" complaints about practices which he considered to be discriminatory. Dong alleges that, on October 4, he complained to Silva about Levering.[26] Dong asserts that, on October 7, he complained to his fellow employees about being forced by Davis in January-February, 2002, to perform work inconsistent with his then medical restrictions. Dong further alleges that he was terminated because he made these remarks on October 4 and 7. (Complaint at p.9, ¶¶41-42 - Boltuch Dec. at Ex. A.) Like discrimination, retaliation may be established using the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case of retaliation under Title VII (and the FEHA),[27] Dong must establish:

(1) that he acted to protect his statutory rights;

(2) that an adverse employment action was then taken against him; and

(3) that a causal link existed between the two events.

Dong cannot establish the first prong, a *prima facie* case of retaliation. Dong has not come forth with admissible evidence that he was terminated on October 10 because he made protected protests about AFI's racial practices. *See, e.g., Trent v. Valley Elec. Ass'n,* 41 F.3d 524, 527 (9th Cir. 1994).

---

[26]  Dong's testimony that Frank Levering and maybe others made random disparaging comments about Dong being Chinese does not establish pretext. It is well settled that disparaging or discriminatory comments that are unrelated to the challenged employment action are "stray remarks" which are not probative pretext. See *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (stray discriminatory remarks that are not related to challenged employment decisions do not establish pretext); *Nesbit v. Pepsico*, 994 F.2d 703 (9th Cir. 1993). Further, Levering had nothing to do with the report of the threats or Dong's termination. Section III.B.2 above at page 11.

[27]  To avoid summary adjudication on his FEHA retaliation claim, Dong must first establish a *prima facie* case. If a *prima facie* case is established, the burden then shifts to AFI to proffer an alternative explanation for its action. AFI has such a reason. Thus, Dong must then come forth with specific and substantial evidence from which a rational jury could conclude that AFI's stated non-retaliatory reasons for its actions were mere pretext asserted to mask retaliatory intent. *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354-356; *Morgan v. The Regents of the University of California* (2000) 88 Cal.App.4th 52, 68-69; *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 806-807; and *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004-1005.

Taking Dong's testimony as true, as the Court must for purposes of this motion, there is genuine doubt if Dong's fleeting comments to Silva on October 4 even constituted an "exercise of Dong's rights" afforded by Title VII, the FEHA or §1981. Dong's own testimony, as corroborated by Silva and confirmed by Dong during his Section 5150 detention, is that, on October 4, Dong told Silva that Levering had, in the past, acted in a way that Dong subjectively believed was motivated by Dong's race. Silva immediately told Dong that if this had occurred, AFI would not tolerate it. Silva offered to investigate, to meet with Levering (with or without Dong) and, if appropriate, to then discipline Levering. Dong stated that was not necessary. (Silva Dec. at ¶8.) Nevertheless, Silva spoke with Levering and found no evidence of racial animosity by Levering toward Dong. (Silva Depo at 14:16-15:9:18-9-22; 20:13-18 – Ex. E to Boltuch Dec.; Silva's contemporaneous notes of the October 4 events - Ex. C to Silva Dec.; and Silva Dec. at 8)

To establish retaliation for opposing the acts of an individual, such as Dong's complaints herein against Levering, Dong must have credible facts imputing the acts of the individual to AFI. *Folkerson v. Circus Circus Enterprises,* 107 F.3d 754 (9th Cir. 1997) (summary judgment affirmed; no evidence that employer ratified or acquiesced in patron's alleged sexual harassment against which plaintiff protested). Dong cannot impute Levering's alleged conduct to AFI. Dong admits Levering was not involved in the decision to summon the police or the termination. *(See above* at page 11 of this Memorandum.) Further, the termination was decided and implemented solely by Ron Musgrove and Jeff Musgrove. Dong's complaints about Levering to Silva were not related to, nor the cause of, the termination. (Silva Depo at 55:11-21 – Ex. E to Boltuch Dec.; R. Musgrove Dec. at ¶¶13, 14 and 22; and J. Musgrove Dec. at ¶6.) Based on Dong's own admissions, Silva had no motive to retaliate against Dong. Dong admits that Silva had no

animus toward Dong and that Silva was not part of the termination decision. (See Section III.B.2 above at pages 11-12.)

Similarly, there is no evidence of the necessary causal link between the termination and Dong's complaints to Ansari on October 7 about Davis' instructions to have Dong work on a particular machine. Dong admits that Silva corrected the problem in January-February, 2002, when Dong complained to Silva. (Dong Depo at 245:19-246:1 - Ex. D to Boltuch Dec.). Silva confirms Dong's admission that the problem was immediately corrected eight or more months *prior* to October. (Silva Depo at 52:2-53:14 – Ex. E and Ex. F to Boltuch Dec.) Dong admits that Davis' conduct in January-February was not motivated by Dong's race or ethnicity. Dong admits that Davis was not involved in the events on October 7 that led to Dong's termination. (See Section III.B.2 above at pages 12-13.) More damning to Dong's theory is that Dong's "complaints" in October about being requested to work in January-February on a machine, despite a "medical restriction," are complaints asserting rights about an arguable disability – a work injury. This is not an "exercise of rights" based on race, ethnicity or national origin. Yet, Dong's claim is that AFI retaliated due to Dong's complaints about racial discrimination. Even if the comments on October 7 are "protected complaints," there is no evidence of any causal connection between Dong's alleged "exercise of his rights," on the one hand, and the summoning of police or of the termination, on the other hand. Another theory of liability collapses.

Assuming *arguendo* that Dong can meet his initial burden of raising an inference of retaliation, AFI has articulated a legitimate non-retaliatory rationale for the termination. The declarations of Jeff Musgrove and Ron Musgrove set forth the legitimate, non-retaliatory reasons for AFI's decision to summon the police on October 7 and to terminate Dong on October 10. (J. Musgrove Dec. at ¶¶6, 8, 9, 10, 11, 12, 14 and 16; R. Musgrove Dec. at ¶¶12, 13, 15, 19, 20, 21

and 22.) The burden now shifts back to Dong to establish pretext by presenting evidence that is beyond merely raising an inference of retaliation. Dong must now present *specific and substantial* evidence from which a rational trier of fact could conclude that AFI's stated reason for its actions was a mere pretext to mask retaliatory intent. *McDonnell Douglas, supra*, 411 U.S. at 802-803 (burden shifting test); *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2003) (summary judgment affirmed on ground that plaintiff did not show that employer's reason for action was pretextual); *Trent v. Valley Elec. Ass'n, supra*, 195 F.3d 534 (plaintiff failed to produce sufficient evidence of a pretext; and *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) (summary judgment affirmed; "[i]n response to the defendant's offer of non-discriminatory reasons, the plaintiff must produce 'specific, substantial evidence of pretext'"). *See also Guz v. Bechtel National, Inc., supra*, 24 Cal.4th at 354-356; *Morgan v. The Regents of the University of California, supra,* 88 Cal.App.4th at 68-69; *Horn v. Cushman & Wakefield Western, Inc., supra,* 72 Cal.App.4th at 806-807; and *Hersant v. Department of Social Services, supra,* 57 Cal.App.4th at 1004-1005; and *Addy v. Bliss & Glennon*, 44 Cal.App.4th 205, 217 (1996). The standard is a "but for" standard. *McDonald v. Sante Fe Trail Transportation Co.*, 427 U.S. 273, 282 fn. 10 (1976). *See, e.g., Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639, 665 fn. 6 and *Ewing v. Gill Industries, Inc.* (1992) 3 Cal.App.4th 601, 612 (plaintiff must show that discriminatory intent was the "determining factor").

Dong admits that neither former defendants Davis nor Silva were racially motivated or ever discriminated against him. Dong admits there is no evidence that Ansari or Geddis had any improper motive. Dong admits that he has no evidence that Jeff Musgrove summoned the police because of Dong's race or ethnicity. Geddis, Ansari and Silva were not involved in the decision to terminate Dong. In fact, if Jeff Musgrove had received the same information from Ansari and

1 | Geddis about any other employee, Jeff Musgrove would have done the exact same thing –
2 | summon the San Leandro police. (J. Musgrove Dec. at ¶16.)

3 |       Dong was not "singled out." There was no retaliation against Dong. Just because Dong
4 | is Chinese does not raise an inference of retaliation, nor establish that AFI's reason for the
5 | termination is a pretext. Dong has no evidence, let alone substantial evidence, of a "causal
6 | connection" between his comments and AFI's decision to terminate him. See *Addy v. Bliss &*
7 | *Glennon, supra,* 44 Cal.App.4th at 217; *Clark v. Claremont University Center, supra,* 6
8 | Cal.App.4th at 665; and *Ewing v. Gill Industries, Inc., supra,* 3 Cal.App.4th at 612 (plaintiffs
9 | must show that the intent was the "determining factor"). Dong's complaints were not the
10 | "cause" of, or a "determining factor" in, the challenged adverse employment action. The fact
11 | that Jeff Musgrove and Ron Musgrove were aware of the increase of workplace violence, were
12 | personally familiar with the murders committed by Stewart Alexander (R. Musgrove Depo
13 | 31:16-23 – J. Musgrove Dec. at Ex. A), and were desirous of not taking any chances with respect
14 | to workplace safety (R. Musgrove Depo. at 32:9-21 – Ex. A to R. Musgrove Dec.), all belie
15 | Dong's assertion of retaliatory intent.

16 |       Dong believes that AFI violated the law. This belief is neither substantial, nor admissible
17 | evidence. While substantial evidence may consist of inferences, any such inferences must be "a
18 | product of logic and reason" and "must rest on the evidence." Inferences cannot be the result of
19 | mere speculation or conjecture. See *Kuhn v. Department of General Services* (1994) 22
20 | Cal.App.4th 1627, 1633 and *Carter v. CB Richard Ellis, Inc.,* 122 Cal.App.4th 1313, 1328-1329.
21 | Dong cannot establish his claim of a retaliatory discharge violative of the FEHA, Title VII or
22 | Section 1981. The termination of Dong was based solely on the belief of Ron Musgrove and Jeff
23 | Musgrove, wrong or right, that Dong had made threats on October 7 and based on the knowledge

of Ron Musgrove and Jeff Musgrove that Dong had in fact threatened on October 4 to commit

suicide. (R. Musgrove Depo at 33:16-19 and 34:16-19. – Ex. A to R. Musgrove Dec.)

## E.   Defendant AFI And The AFI Employee Defendants Did Not Violate The Lanterman-Petris-Short Act.

Dong alleges that AFI and the AFI Employee Defendants knew Dong did not have a

mental disorder, was not a danger to himself or others, and was not gravely ill, yet AFI

summoned the police, leading to Dong being institutionalized for four days, in violation of the

Lanterman-Petris-Short Act ("LPS Act"). (Complaint, Fifth Cause of Action, at page 10, ¶46 -

Boltuch Dec. Ex. A.) The LPS Act does not provide a basis for Dong's claims.

AFI, Ansari, Geddis and Jeff Musgrove never alleged Dong had a mental disorder or was

gravely ill. As detailed above in this Memorandum, Ansari and Geddis merely reported to Silva,

and confirmed to Jeff Musgrove and Officer Lopez, that each believed that Dong had made

threats. Jeff Musgrove investigated and decided that, despite any denial by Dong, it was prudent

to summon the police. AFI, Geddis, Ansari and Jeff Musgrove never "detained" or caused the

institutionalization of Dong. The detention and subsequent institutionalization were based on the

independent decisions of the police and of the qualified medical professionals at two different

psychiatric institutions. Thus, as a matter of law, AFI and the AFI Employee Defendants did not

violate the Lanterman-Petris-Short Act. See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th

826, 844 (summary judgment is appropriate in the absence of evidence that would permit a

reasonable trier of fact to find for the plaintiff.)

## F.   Summary Judgment Should Be Granted As To The Sixth, Seventh,

## Eighth, Ninth, Tenth And Twelfth Causes Of Action.

Dong alleges various pendent state law causes of action against AFI and the three remaining AFI Employee Defendants. As a matter of law, Dong cannot sustain any of these causes of action.

The Sixth Cause of Action for Invasion of Privacy is based on the fact that Dong underwent psychotherapy and was given drugs during his hospitalization. (Complaint at p. 11, ¶¶50-54 – Ex. A to Boltuch Dec.) The Seventh Cause of Action for Intentional Infliction of Emotional Distress is based on the allegations that AFI's calling the police was extreme and outrageous and was done with the intent to inflict severe emotional distress. (Complaint, at pp. 12-13, ¶¶55-61 – Ex. A to Boltuch Dec.) The Eighth Cause of Action for False Imprisonment is based on the allegation that summoning the police caused Dong to be institutionalized. (Complaint at pages 13-14, ¶¶62-68 – Ex. A to Boltuch Dec.) The Ninth Cause of Action for Assault and Battery is based on the allegation that AFI's acts (summoning the police, and apparently Ansari, Geddis and Silva reporting the alleged threats) constituted an assault and battery. (Complaint at pp. 14-15, ¶¶69-73 – Ex. A to Boltuch Dec.) The Twelfth Cause of Action for Negligence is based on the allegations that Defendants' conduct was negligent in that AFI, and Jeff Musgrove[28] "should not have contacted the police without first conducting an investigation" and that Defendants had "a duty to conduct at least a preliminary investigation" before subjecting Dong to arrest and incarceration. (Complaint at p. 17, ¶¶85-88 – Ex. A to Boltuch Dec.)

Each of the pendent state law causes of action is entirely dependent on the same premise

---

[28]   Ansari and Geddis are not even specifically named in the Twelfth Cause of Action, except by incorporation of all of the prior paragraphs of the Complaint.

– it was improper for AFI to summon the police. As noted throughout this Memorandum, the actions of AFI on October 7 were responsible and prudent. The mere fact that AFI's owners, based on a good faith evaluation of the circumstances, decided that the police were better trained to evaluate Dong does not establish cognizable wrongdoing. Officer Lopez independently concluded that probable cause existed and had Dong transported for evaluation. The medical professionals, including psychiatrists at John George Psychiatric Pavilion and at Fremont Hospital, independently determined that Dong's demeanor and conduct warranted detention, pursuant to Section 5150, until October 11. These undisputed facts do not establish an invasion of privacy by AFI or by the AFI Employee Defendants. These undisputed facts do not establish "extreme and outrageous conduct done with the intent to inflict severe emotional distress" or conduct done with reckless disregard as to whether such acts would cause Dong severe emotional distress.[29] These undisputed facts do not establish the tort of false imprisonment[30] or of assault and battery.

For additional reasons, summary judgment must be granted as to the Twelfth Cause of Action. On April 15, 2005, Dong's counsel served, albeit untimely, unverified responses to Defendant AFI's "First Set of Contention Interrogatories." One of the contentions sought all of

[29] To be "outrageous," AFI's conduct must be so extreme that it exceeds the bounds of what is usually tolerated in a civilized society. *Fowler v. Varian Assoc.* (1987) 196 Cal.App.3d 34, 44. AFI's conduct does not rise to that extreme level. AFI merely received reports of threats, investigated and summoned the police. *See Crain v. Burroughs Corp.*, 560 F.Supp. 849 (C.D. Cal. 1983) (termination, based on mistaken judgment or failure to investigate further, even without warning or an opportunity to explain, and plaintiff's resulting humiliation, was not sufficiently extreme and outrageous to state claim for intentional infliction of emotional distress).

[30] The tort of false imprisonment in the employment context consists of the non-consensual, intentional confinement of a person, without lawful privilege, for a length of time. *Fermino v. Fedco, Inc.* (1994) 7 C4th 701. To prove false imprisonment, Dong must show intent to confine. *Prosser & Keeton on the Law of Torts*, §11 (5th Ed. 1984). In this case, there was no intention by AFI to confine Mr. Dong. AFI merely summoned the police to independently determine if threats had been made. (J. Musgrove Dec. at ¶18.) This Court should not sanction the theory that false imprisonment occurs when a citizen, in good faith, calls the police, especially when the police independently find probable cause to detain and when two separate psychiatric institutions find cause to detain, pursuant to §5150.

Dong's "facts" in support of his allegation that no investigation was conducted on October 7. Dong's response is that "defendants did not sit down with plaintiff and discuss the matter with him and they did not question Geddis or Ansari before calling the police. In addition defendants did not allow plaintiff to confront Geddis or Ansari regarding any statements he may have made. Defendants failed to use an interpreter to insure that plaintiff was not misunderstood." (Boltuch Dec. at ¶16 and Ex. M thereto.) Dong's assertion in his untimely interrogatory response is not supported by the undisputed facts.

It is undisputed that, after Jeff Musgrove was told by Silva of the observations of Ansari and Geddis, Jeff Musgrove spoke with Ansari, Geddis and Dong. Dong admits he spoke to Jeff Musgrove. (*See, e.g.,* J. Musgrove Depo, 14:18-24; 18:24 and 19:19-20:15 – Ex. A to J. Musgrove Dec.) It is undisputed that Jeff Musgrove concluded he did not have the expertise to determine if Dong was in fact a danger to himself or to others, so he summoned the police. (J. Musgrove Dec. at ¶¶7, 8 and 18; J. Musgrove Depo at 81:22-24 and Ex. A to J. Musgrove Dec.) It is undisputed that Officer Lopez spoke with Jeff Musgrove, interrogated Ansari and Geddis, and observed and questioned Dong. It is undisputed that Officer Lopez, applying his years of police training and experience, independently found probable cause to detain Dong. Assuming there even is a "duty to investigate," and that the failure to do so is a cognizable tort of negligence, the undisputed testimony establishes a sufficient "preliminary investigation" by AFI. Jeff Musgrove did not "sit down" with Dong, but Jeff Musgrove spoke to Dong while both were standing. It is irrelevant that Dong was not asked to speak to Geddis or Ansari. Dong denied making the threats on October 7. Jeff Musgrove knew of Dong's denials with respect to the October 7 threats, and also knew of Dong's admitted October 4 comments. Jeff Musgrove knew there was a disagreement between Dong, on the one hand, and Geddis and Ansari, on the other

hand, as to whether threats were made on October 7. Jeff Musgrove prudently decided to let the

police investigate. There is no cognizable claim of "negligence."

### G. Some of Dong's Damage Claims And The Seventh And Ninth Causes Of Action Are Preempted By The Exclusivity Provisions Of The California Workers' Compensation Statute.

Dong alleges that the actions of AFI in summoning the police, and therefore the chain of

events leading to the detention from October 7 through October 11, resulted in emotional

distress, humiliation, hardship and embarrassment. Dong alleges damages including shock to his

nervous system, mental anguish, mortification, humiliation and loss of good health and sleep.

(Complaint at ¶¶57-59 – Ex. A to Boltuch Dec.)

All such damages, to the extent they exist, commenced on October 7 when Dong was still

an employee of AFI. Thus, these damage claims are governed by the exclusivity provisions of

the California Workers' Compensation statute:

> This characterization of conduct normally occurring in the
> workplace as unfair or outrageous were sufficient to avoid
> the exclusive remedy provisions of the Labor Code, the
> exception would permit the employee to allege a cause of
> action in every case where he suffered mental disability merely
> by alleging an ulterior purpose of causing injury. Such
> exception would be contrary to the compensation bargain and
> unfair to the employer.

*Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160; *see also Fermino v. Fedco,*

*supra*, 7 C4th 701, 712; *Livitsanos v. Superior Court* (1992) 2 C4th 744 (emotional distress

injuries caused by termination are compensable under the Workers' Compensation Act).

AFI received information and called the police. Dong asserts that this action triggered

his damages. To the extent that Dong suffered humiliation, mortification or other emotional

distress, all such damages were caused by AFI's actions on October 7 prior to Dong's

termination on October 10. These damage claims are within the scope of the California Workers' Compensation statute and are preempted. AFI's actions were within its role as an employer – to protect the workforce from a possibility of workplace violence. Further, the California Workers' Compensation statute bars conduct that occurs *after* an employee is terminated to the extent such conduct is part of "a continuing flow of events surrounding the employee's termination." *Davaris v. Cubaleski* (1993) 12 Cal.App.4th 1583, 1586-88 (sustaining dismissal of intentional infliction of emotional distress claim since all of the conduct alleged was within the *"[n]ormal part of the employment relationship*." (emphasis added)). Therefore, the Seventh Cause of Action (Intentional Infliction of Emotional Distress) and the Ninth Cause of Action (Assault and Battery), and all damages alleged in these causes of action, are barred by the exclusivity provisions of the California Workers' Compensation statute. California Labor Code §§ 3600 *et seq.*

## V. CONCLUSION

AFI and the AFI Employee Defendants acknowledge that Dong is upset, that Dong does not agree with AFI's decision to terminate Dong's at-will employment, that Dong asserts that that he did not make any threats on October 7 and that Dong believes that his statement on October 4 about suicide does not justify his discharge. Dong's disagreements and beliefs do not establish liability. The law does not require that frivolous cases like this be tried to a jury.

AFI did not violate any statute or common law theory when it summoned the police. AFI had information from Ansari and Geddis on October 7 that Dong was possibly a danger to himself and to others. Jeff Musgrove investigated by speaking with Ansari, Geddis, Silva and Dong. AFI's decision to summon the police was not in retaliation for any protests by Dong. The

decision to call the police was prudent and complied with AFI's obligations to maintain a safe workplace. Even if Ansari and Geddis misunderstood Dong's comments, Ansari and Geddis were not motivated by Dong's race or ethnicity, nor were they retaliating against Dong.

Dong's termination was not in violation of public policy nor in retaliation for Dong's complaints. AFI terminated Dong because it believed that Dong had made threats on October 7 and because AFI knew that he had threatened to commit suicide on October 4.

For all of the foregoing reasons, it is respectfully submitted that the Court grant, in its entirety, the motion for summary judgment of Defendants AFI, Jeff Musgrove, Mohammed Ansari and Gregory Geddis.

Respectfully submitted,

LAW OFFICE OF BURTON F. BOLTUCH

DATED: May 5, 2005                     By _____

Burton F. Boltuch
Attorneys for Defendants APPLIED FUSION,
INC., JEFF MUSGROVE, MOHAMMED
ANSARI and GREGORY GEDDIS