# Exhibit A

Dockets.Justia.com

1　　　　　IN THE UNITED STATES DISTRICT COURT

2　　　　　　NORTHERN DISTRICT OF CALIFORNIA

3　　　　　　　　　　---oOo---

4　ALLIED NORTH AMERICA　　　　　　)

　　INSURANCE BROKERAGE CORP. OF　)

5　CALIFORNIA,　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　)

6　　　　　　　Plaintiff,　　　　　)

　　　　　　　　　　　　　　　　　　)

7　vs.　　　　　　　　　　　　　　) 　No. C-04-2527 MJJ

　　　　　　　　　　　　　　　　　　)

8　WOODRUFF-SAWYER, a California　)

　　corporation; DERMOD HOUWELING,)

9　an individual,　　　　　　　　　)

　　　　　　　　　　　　　　　　　　)

10　　　　　　Defendants.　　　　　)

　　_____)

11

12　　　　　　　　CERTIFIED COPY

13

14　　　　　　　　DEPOSITION OF

15　　　　　　　WILLIAM STRONCK

16　　　　　　　August 6, 2004

17

18

19

20

21

22

23

24　REPORTED BY:　LEIGH REGAN, CSR No. 4971　　(01-354434)

25


**LEGALINK**®
A **WORDWAVE** COMPANY

LegaLink San Francisco
601 Van Ness Ave, Suite 2052
San Francisco, CA 94102

tel (415) 359-2040
tel (800) 869-9132
fax (415) 359-2050

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

1     Q.   So prior to the time that Derm joined --

2     A.   All documents received from -- the only

3  document I believe we received from Woodruff-Sawyer was

4  a fax announcing that Derm was with them.

5     Q.   How about --

6     A.   I just thought of that.  That's the only piece

7  of paper that I believe has the letterhead, you know, on

8  it.

9     Q.   Did you receive broker-of-record transfer

10  letters from Woodruff-Sawyer?

11     A.   Yes.

12     Q.   Do you have those with you?

13     A.   They got crumpled here.

14     Q.   I'll have these marked as Exhibit 2, but you

15  have three broker-of-record transfer letters.

16     Were these letters that were drafted by

17  Woodruff-Sawyer?

18     A.   I believe they're a form letter that we were

19  supplied with, and then we put them on our letterhead.

20     Q.   Did Gonsalves & Stronck add anything to the

21  letters, or did you leave them just as you received

22  them?

23     A.   I didn't handle that.  Staff handled that.  I

24  believe they just retyped them.

25     Q.   Do you know on what date you signed any

11

1   letters that are in Exhibit 2?

2       A.   I believe the date that's -- I guess June

3   15th.

4       Q.   On the two that aren't signed on your

5   versions, do you know if you actually signed them on

6   June 15th?

7       A.   Yeah, I signed them.  They must have -- I

8   think what she did was, when I asked for these, she just

9   copied them out of the computer.

10          Do you want me to sign them?

11      Q.   No.

12          I'm just wondering, for example, Zurich is an

13  insurance carrier that doesn't appear to have gotten

14  anything until July.

15          Do you know what reason there would have been

16  to have a delay between June 15th and July?

17      A.   No idea.

18      Q.   Did your company mail out these letters that

19  are Exhibit 2?

20      A.   I assume so, but I can't speak to that

21  exactly.

22      Q.   Who would know?

23      A.   Jeannine or Phyllis.

24      Q.   After the first time you signed any letters

25  that are similar to Exhibit 2, did there come a time

12

1      A.    I think the only documents are these.

2      Q.    "These" is Exhibit 2, the broker-of-record

3   letters?

4      A.    Right.

5      Q.    Have you or anybody else at your company

6   talked to anybody about whether or not you should go

7   from Allied to Woodruff-Sawyer, other than

8   Mr. Houweling?

9      A.    Can you restate that?

10      Q.    Sure.  Feel free any time the question is not

11   clear.  Lawyers aren't always the model of clarity.

12            Have you talked to anybody other than

13   Mr. Houweling about whether or not Gonsalves & Stronck

14   should switch brokers from Allied to Woodruff-Sawyer?

15      A.    Other than my partner, no.

16      Q.    And do you know if your partner -- that's

17   Mr. Gonsalves?

18      A.    Keith Gonsalves.

19            It's Gonsalves.  It's Portuguese.

20      Q.    I'm terrible at pronunciations.

21      A.    We're used to having our names butchered.

22      Q.    Do you know if your partner, Mr. Gonsalves,

23   had any discussions with anybody other than you about

24   whether or not your firm should switch from Allied to

25   Woodruff-Sawyer?

1    A.    I spoke to nobody.

2    Q.    Request number 6 is, "All documents received

3    from Dermod Houweling from January 2004 through the

4    present."

5          Is there anything else you brought with you

6    responsive to that?

7    A.    Yeah, the only thing -- again, characterizing

8    our communication, you know -- you know, in person or on

9    the phone, I did check my e-mail, and that went back to

10   January, right?  So I copied out what was in the --

11   Q.    Can I take a look at that?

12         MR. SCHNEIDER:  Maybe we could get Exhibit 2

13   marked.

14         (Whereupon, a recess was taken.)

15               (Whereupon, Exhibit Nos. 2 and 3 were

16               marked for identification.)

17         MS. WIRTH:  Q.  Do you have a copy of

18   Exhibit 3 before you?

19   A.    Yes.

20   Q.    The first line of -- of the first page of

21   Exhibit 3 says, "The restrictions placed on my

22   activities has been lifted by the court."

23         Did you ever ask Mr. Houweling what that

24   meant?

25         MR. URDAN:  Are you asking him did he ask

21

1   leaving between the time you got the fax and the time

2   Derm walked in the door?

3       A.   I believe so.

4       Q.   And what did you talk about?

5       A.   I think when the fax came in they made copies,

6   put them in both of our boxes, and Keith came into my

7   office, kind of going, "What's this?"  I didn't know

8   what he was shaking around.  He says, "Look in your

9   box."

10      I pulled it out and said wow, so we had a

11  short discussion, saying, well, you know, "Wherever he

12  goes, we go."

13      Q.   Who said that?

14      A.   I said that.

15      And then, later in the day, Derm showed up,

16  unannounced.

17      Q.   Had you ever told Mr. Houweling before that,

18  wherever he goes, you go?

19      A.   Probably.  It's been a long relationship.

20      Q.   Do you know when?

21      A.   Specifically, no.  I mean, I may have -- I

22  mean, it's a long relationship, and, you know, sometimes

23  you discuss it and talk about it and celebrate the

24  relationship, and -- but -- and at times we'd share with

25  Derm, you know, other rivals, you know, pitching us or

32

1  calling us, and -- and us reassuring Derm that, you

2  know, we'd always be with him.

3      Q.   Had you heard from any source that

4  Mr. Houweling was thinking of leaving Allied prior to

5  the time you got the fax?

6      A.   No.  It was an absolute, utter surprise.

7      Q.   Had you heard from any source Mr. Houweling

8  was unhappy at Allied prior to the time you got the fax?

9      A.   No.

10     Q.   If Mr. Houweling had come and said

11  Woodruff-Sawyer doesn't have a good workers'

12  compensation department, would you have gone with

13  Woodruff-Sawyer anyway?

14     A.   Probably.

15     Q.   Have you ever discussed at all with

16  Mr. Houweling or Mr. Shoemaker or anybody else at

17  Woodruff-Sawyer what services their workers'

18  compensation people provide?

19     A.   What services?

20     Q.   Yes.

21     A.   Like their staff provides?

22     Q.   Yes.

23     A.   No.  I've heard of Woodruff-Sawyer.  They've

24  been around for years.  I would trust they know what

25  they're doing.  I think most major brokerage houses

1    home-computer files to Allied?

2        A.    No.

3        Q.    Did he tell you there was any allegation that

4    he'd e-mailed company documents to his home computer?

5        A.    No.

6        Q.    Did he tell you that there were allegations

7    that he failed to return the documents he'd e-mailed to

8    himself?

9        A.    No.

10       Q.    Did he tell you there were allegations that

11   he'd erased computer data from Allied's files?

12       A.    No.

13       Q.    Did he tell you that he gave no notice before

14   he resigned?

15       A.    No.

16       Q.    Did he ever tell you that he'd made any

17   promises with respect to whether or not he would do

18   business with your firm at any time?

19       A.    Come again.

20       Q.    Did he ever tell you about any promises he

21   made about whether or not he would do business for your

22   firm if he left Allied?

23       A.    No.

24       Q.    Did he ever tell you he'd entered into any

25   non-competes that affected doing business with your

40

1    because they're nearby, he'd drop in just to check and

2    see if there was anything we need.  A lot of times I

3    wouldn't be there and he'd talk to staff, talk to

4    Phyllis.

5         MS. WIRTH:  Let me have your declaration

6    marked as Exhibit 5.

7              (Whereupon, Exhibit No. 5 was

8              marked for identification.)

9         MS. WIRTH:  Q.  We don't have a copy of your

10   signature, but you actually signed Exhibit 5, you

11   believe?

12        A.   Yes.

13             Do you want me to sign it?

14        Q.   That's okay.  I just have a couple of

15   questions about it.

16        MR. SCHNEIDER:  This is just electronically

17   filed with the Court.

18        MS. WIRTH:  So they insert a slash-signed

19   mark.

20        Q.   In paragraph 4, you mention that, on one

21   occasion, when Derm Houweling was on vacation, he needed

22   to get information -- you needed to get information

23   regarding insurance coverage from Mr. Untiedt for a

24   construction contract.

25             Do you see that?

51

1      A.    Uh-huh.

2      Q.    About what date was that?

3      A.    I don't know, but I can easily find out

4  because it's related to a bid, so I can look it up in

5  our bid book.

6      Q.    What bid?

7      A.    The Corte Madera School in Portola Valley.

8      Q.    Do you know what year?  This year?  Last year?

9  Four years ago?

10      A.    Three years, maybe.

11      Q.    Did you tell Mr. Houweling you were unhappy

12  with what had happened with respect to the Corte Madera

13  School bid?

14      A.    Absolutely.

15      Q.    Tell me what happened.

16      A.    Besides some apologizing profusely.

17      Q.    With respect to the event itself, you called

18  Mr. Untiedt, I take it.

19      A.    Yeah.  It was a desperation call.  We had to

20  bid a job.  We were the apparent low bidder, and when

21  the owner checked the State license Web site, it said

22  that our license was suspended, and they needed to move

23  quickly on the award here, and this was a problem.

24      Q.    Where was Mr. Houweling?

25      A.    On vacation, I think, a regular, you know,

1  like, gone for a week or two weeks type of vacation.

2      Q.   So when Mr. Houweling was on vacation, he

3  wasn't available to you?

4      A.   Right.

5      Q.   And had Mr. Houweling told you to talk to

6  Mr. Untiedt if you couldn't get ahold of him?

7      A.   Probably, but I kind of understood, you know,

8  go to the top, you know, if there's a problem.

9      Q.   But Mr. Untiedt wasn't a regular member on the

10  service team; correct?

11      A.   Right.  I think that's been my only contact

12  with Jim in our relationship with Allied.

13      Q.   Had you tried anybody else at Allied before

14  calling Mr. Untiedt?

15      A.   Yes.

16      Q.   Who had you tried to get ahold of?

17      A.   Staff, whoever.  I can't recall the names,

18  but, you know, I said I needed this handled now,

19  quickly.  I need to get to somebody, you know.  When I

20  heard Derm wasn't there, "Okay.  Get me to Jim.  Is he

21  around?"

22          "Yes, he is.  He's on the phone."

23          "Get me to him.  It's very important.  Walk

24  over to him and tell him I'm holding," and he was still

25  on the phone, so I said, "I will just hold here because

1    I have a ticked-off owner on the other line," and I

2    waited and I waited and I waited, and it was, "What's

3    going on?"

4         "It's a very important call that he's on,"

5    which I understand, but time is going by.  I then hung

6    up, called back again.  He's on the phone.  I go -- I

7    called back.  They say, "He'll call you back."

8         Basically, I didn't talk -- I mean, it was

9    quite a bit of time before Jim called back, and at the

10   time what I wanted Jim to do was actually communicate

11   directly to the owner and tell them why the database was

12   saying we're suspended.

13        Q.   Was this your contractor's license was

14   suspended?

15        A.   Yes, which shocked us.  It's crazy.  So I

16   wanted there to be a communication directly so that, you

17   know, a broker could say this is the problem, it's a

18   minor glitch, it will be resolved shortly, no problem,

19   feel free to award.

20        That -- when I finally talked to Jim he said

21   he'd look into it, and nothing happened, and the next

22   morning they moved on without us, the owner moved on.

23        Q.   Basically, you had one day to get back to

24   them?

25        A.   Right.

54

1     Q.   Did you ever find out why the State was

2  showing your contractor's license as suspended?

3     A.   After, I think, the State corrected it, only,

4  like, two days later they updated the Web site, but I

5  think it was -- had to do with a certificate not being

6  in their hands showing our workers' compensation had

7  been renewed.

8     I think when an owner goes to the Web site it

9  won't tell you the nature; it just says suspended, so it

10  can look ominous.

11     Q.   And you had ongoing concerns about Allied's

12  high turnover of staff in the office; is that correct?

13     A.   Uh-huh.

14     Q.   And did you ever find out who hired the staff

15  that left?

16     A.   No.  I mean, Derm -- we'd get introduced to

17  somebody new and Derm always had a sunny face in regards

18  to here's a new person, they really know their stuff,

19  and, you know, sing their praises, and then, you know,

20  down the road the person would just go away, and it

21  would be here's a new person, they're really great, and

22  after you see a trend like that, it gets -- and I

23  understand that happens a bit, especially in the

24  insurance business, I think it's a pretty fluid

25  environment, but it gets a little disconcerting to our

55

1   staff who are trying to deal with somebody and have a

2   relationship, you know, dealing with day-to-day things,

3   to have people changing.

4       Q.   What has Derm told you about the turnover at

5   Woodruff-Sawyer?

6       A.   Nothing, other than they left, you know,

7   here's a new person.

8       Q.   Do you know anything about what the

9   turnover --

10      A.   Anything about the turnover at

11  Woodruff-Sawyer?   Nothing.

12      Q.   Did you work with Raquel Balauro at all at

13  Allied?

14      A.   Raquel?

15      Q.   Yes.

16      A.   From time to time, but that was really Phyllis

17  and Jeannine, day-to-day kind of thing.

18      Q.   How long has Raquel been servicing your

19  company?

20      A.   I couldn't tell you.

21      Q.   How about Lynne O'Connell?   Did you deal with

22  her at all?

23      A.   No.

24      Q.   Bonnie Atnip?

25      A.   Yes.

1    Q.   How long has she been working with you?

2    A.   She's been there for a while.  I couldn't tell

3  you exactly.

4    Q.   She was your relationship for surety work?

5    A.   If Derm wasn't around, she would be the

6  contact for anything.  I'd use her as a clearinghouse.

7  She seemed to be pretty sharp.

8    Q.   So you used her for more than just the surety

9  work?

10   A.   Right, but, I mean, for me personally, you

11  know, 99 percent of my communication is with Derm.

12   Q.   Did Derm ever explain to you why the workers'

13  comp certificate hadn't been filed with the State?

14   A.   He may have.  I can't recall.

15   Q.   Did he take the blame himself, or did he blame

16  it on someone else?

17        MR. URDAN:  Or none of the above?

18        MS. WIRTH:  Q.  Or none of the above.

19        That's a good point.

20   A.   I think he, like a good soldier, fell on the

21  sword and said that it was a glitch at Allied, and

22  sorry, and won't happen again.

23   Q.   Is that something you expect him to stay on

24  top of?

25   A.   Absolutely.

1  should have done?

2      A.   Yes.

3      Q.   Phyllis doesn't have a checklist, that she's

4  supposed to make sure that that happens timely?

5      A.   Right.   There should be a tickler file on

6  Allied's side or whoever, maintaining these things.

7      Q.   Other than that instance, was there any other

8  situation where you felt Allied wasn't being serviced

9  properly?

10     A.   That Allied wasn't --

11          MR. URDAN:   Sorry.   Could you read --

12          THE WITNESS:   That Allied wasn't servicing us?

13          MS. WIRTH:   Q.   Was there any other situation

14  where you felt that Allied wasn't servicing your firm

15  correctly?

16     A.   From time to time we'd complain because

17  certificates would be wrong.   We'd give specific

18  information, but they'd come through and they were

19  wrong, you know, misspellings of owners' names, not

20  including all the information required, that kind of

21  thing, so we'd have to redo the certificates, which

22  happens -- it happened a lot with ABD, but it was

23  particularly annoying at times because we have a client

24  we do a lot of work for, private side, who is tough, and

25  they want it right the first time.   We can't step on

62

1     their property unless everything is perfect, and then

2     they'd go through a certificate and reject it.

3          Q.   Someone like me, the name is misspelled --

4          A.   We'd -- we'd ask for it again, it would be

5     wrong, and we'd say hello, can we get it again?

6               The frustration would trickle up to me from my

7     staff, but that's probably it.

8          Q.   Anything else you can think of where Allied

9     wasn't servicing the account correctly?

10         A.   No.

11         Q.   Did you ever tell Mr. Houweling he needed to

12    start proofing the certificates before he dropped them

13    off?

14         A.   Most of those times the certificates would be

15    faxed, and the complaints came from the gals in our

16    office to their counterparts at Allied.  If they were

17    mad enough, they'd tell me, and I'd pass it to Derm, and

18    he'd take care of it and for a while it would get

19    better, but I think things would change over there and

20    new people would come in and -- I mean, our own name

21    would be misspelled, our name on a certificate.  That's

22    a major faux pas.  If I misspell my clients' names,

23    it's...

24         Q.   Anything else you can think about where

25    Allied -- where you felt Allied wasn't servicing you

1      A.    Is there a situation of turnover at...

2      Q.    In your declaration -- I'm going to

3  paraphrase -- you talked about, at various points,

4  moving your company's business from Allied to Woodruff.

5         Are you familiar with that generally?

6      A.    Yes.

7      Q.    My question is:  When you and your partner

8  decided to move upon hearing that Mr. Houweling was --

9  was leaving Allied and joining Woodruff-Sawyer, and you

10  decided along with your partner to move your company's

11  business with Mr. Houweling, was it your decision to

12  move -- when you made that decision, did you decide to

13  move all of your business from Allied to

14  Woodruff-Sawyer, or just part of it?

15         MS. WIRTH:  Objection.  Leading and compound.

16         MR. SCHNEIDER:  You can answer.

17         MS. WIRTH:  Those are just for the record.

18  Ignore them.

19         THE WITNESS:  Okay.

20         All of it.  I've never split our business.

21         MR. URDAN:  Q.  Okay.

22      A.    When you say "decision," there wasn't much of

23  a decision.

24      Q.    Can you explain what you mean by that?

25      A.    Because it's -- between Keith and myself, it's

70

1  pretty well known that our loyalty is with Derm, his

2  loyalty is with us, and wherever he goes we go, so when

3  I say there wasn't much of a decision, when he came in

4  and waved the fax sheet, it was me just saying, "Well, I

5  guess we're going over there," so that's not much of a

6  decision process going on; it's just stating, okay...

7      Q.   So you said to your partner, once you became

8  aware of what was on the fax sheet, that we're moving

9  our business from Allied to Woodruff-Sawyer?  Is that

10 it?

11     A.   Right.

12     Q.   Did Mr. -- your partner agree with that?

13     A.   Absolutely.

14     Q.   About how long did this conversation between

15 you and your partner about moving the business from

16 Allied to Woodruff-Sawyer, how long did that

17 conversation or your comments to each other last?

18     A.   Two minutes.

19     Q.   Just so I'm clear, it was your intent then,

20 and it has been your intent all the way to as we sit

21 here today, to have all of your business, whatever was

22 with Allied, your company's business, transferred over

23 to Woodruff; is that correct?

24     A.   Correct.

25     Q.   And to the extent that hasn't happened, if

1  that hasn't happened, that's contrary to your desire;

2  correct?

3      A.   Correct.

4      Q.   When -- you touched upon briefly, prior to

5  Mr. Houweling being at Allied, he was with a company

6  called ABD.

7          Is that your understanding?

8      A.   Right.

9      Q.   And at that time, he was handling your

10  company, G&S's, business; is that correct?

11     A.   Yes.

12     Q.   At some point in time you learned that

13  Mr. Houweling would be leaving ABD, going to another

14  firm, Allied; is that correct?

15     A.   Yes.

16     Q.   When you learned that shortly -- at some point

17  after learning that, you made a decision, along with

18  your partner, perhaps, to have your business that was at

19  ABD moved over to Allied; is that correct?

20     A.   Correct.

21     Q.   Fair to say that -- that the time it took to

22  move the -- to make the decision to move your business

23  from ABD to Allied was immediately upon learning Derm

24  was moving to Allied?

25     A.   Absolutely.

72

1      Q.    And --

2      A.    Just for the record, and I mentioned Derm was

3   at my wedding, I go back when I was with SJ Amoroso to

4   when Derm had his own office in Redwood City, and I

5   remember going over to your office and dropping things

6   off, and from there, you know, he moved on, so I've been

7   associated and known him for, like I say, since 1984.

8      Q.    And your decision that was made with your

9   partner to move your company's business from Allied to

10  Woodruff-Sawyer was so that Mr. Houweling could

11  personally be involved in servicing your work, as

12  opposed to someone else at Woodruff-Sawyer; is that

13  correct?

14     A.    Correct.

15     Q.    And does that continue to be your desire on

16  behalf of your company, that Mr. Houweling be allowed to

17  service your account, as opposed to someone else at

18  Woodruff-Sawyer?

19     A.    Absolutely.

20     Q.    And do you believe that it's important for the

21  well-being of your company that Mr. Houweling be allowed

22  to personally service your account, as opposed to other

23  folks at Woodruff-Sawyer, no matter how qualified and

24  competent they are?

25     A.    Yes.

73