1  DAVID A. WIMMER (State Bar No. 155792)
   MELISSA G. TURAI (State Bar No. 224470)
2  **SWERDLOW FLORENCE**
     **SANCHEZ SWERDLOW & WIMMER**
3  A Law Corporation
   9401 Wilshire Blvd., Suite 828
4  Beverly Hills, California 90212
   Telephone: (310) 288-3980
5  Facsimile:  (310) 273-8680

6  Attorneys for Defendant
   JETBLUE AIRWAYS CORPORATION

7

8              **UNITED STATES DISTRICT COURT**

9     **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

10

11  SHAWN GRANBERRY,                    CASE NO. C 04 0845 JSW (EMC)

12           Plaintiff,                 Date:      September 30, 2005
                                        Time:      9:00 a.m.
13      vs.                             Courtroom.: 17

14  JETBLUE AIRWAYS,                    **DECLARATION OF MELISSA G. TURAI**
                                        **IN SUPPORT OF DEFENDANT JETBLUE**
15           Defendant.                 **AIRWAYS CORPORATION'S MOTION**
                                        **FOR SUMMARY JUDGMENT, OR IN**
16                                      **THE ALTERNATIVE FOR SUMMARY**
                                        **ADJUDICATION**
17

18                                      The Hon. Jeffrey S. White, Dept. 2
                                        Action Filed:  March 1, 2004
19
                                        Discovery Cutoff:   June 30, 2005
20                                      Motion Cutoff:      September 9, 2005
                                        Trial Date:         November 28, 2005
21

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  88327.1

                        1                         C 04 0845 JSW
                                   DECLARATION OF MELISSA G. TURAI IN
                                   SUPPORT OF MOTION FOR SUMMARY
                                   JUDGMENT

*(Left margin vertical text:)* SWERDLOW FLORENCE SANCHEZ SWERDLOW & WIMMER · 9401 WILSHIRE BLVD., SUITE 828 · BEVERLY HILLS, CALIFORNIA 90212 · TEL (310) 288-3980 · FAX (310) 273-8680

## DECLARATION OF MELISSA G. TURAI

I, Melissa G. Turai, declare as follows:

1.    I am an attorney duly admitted to practice before this Court.  I am an associate with Swerdlow Florence Sanchez Swerdlow & Wimmer, attorneys of record for JetBlue Airways Corporation.  If called as a witness, I could and would competently testify to all facts within my personal knowledge except where stated upon information and belief.  This declaration is submitted in support of Defendant JetBlue Airways Corporation's Motion for Summary Judgment, or in the Alternative for Summary Adjudication.

2.    As one of the primary attorneys representing JetBlue in this action, I know that Granberry produced the Crewmember Route Map in response to Defendant's First Request for Production of Documents.

3.    On October 15, 2004, I attended the deposition of Plaintiff Shawn Granberry in this action.  Attached hereto as Attachment "A" are true and correct copies of the pages from the transcript of the deposition of Mr. Granberry, and exhibits thereto that are cited in the Memorandum of Points and Authorities of Defendant's Motion for Summary Judgment, or in the Alternative for Summary Adjudication filed concurrently herewith.

4.    On November 22, 2004, I attended the deposition of Rajeev Singh in this action.  Attached hereto as Attachment "B" are true and correct copies of the pages from the transcript of the deposition of Mr. Singh that are cited in the Memorandum of Points and Authorities of Defendant's Motion for Summary Judgment, or in the Alternative for Summary Adjudication filed concurrently herewith.

SWERDLOW FLORENCE
SANCHEZ SWERDLOW & WIMMER
9401 WILSHIRE BLVD., SUITE 828
BEVERLY HILLS, CALIFORNIA 90212
TEL (310) 288-3980 • FAX (310) 273-8680

C 04 0845 JSW
DECLARATION OF MELISSA G. TURAI IN
SUPPORT OF MOTION FOR SUMMARY
JUDGMENT

1      5.      On June 9, 2005, I attended the deposition of Kevin Hoover in this action.

2  Attached hereto as Attachment "C" are true and correct copies of the pages from the transcript of

3  the deposition of Mr. Hoover that are cited in the Memorandum of Points and Authorities of

4  Defendant's Motion for Summary Judgment, or in the Alternative for Summary Adjudication filed

5  concurrently herewith.

6

7      6.      As one of the primary attorneys representing JetBlue in this action, I received

8  Granberry's Notice of Charge of Discrimination dated December 8, 2003.  Attached hereto as

9  Attachment "D" is a true and correct copy of this Notice of Charge of Discrimination.

10

11      I declare under penalty of perjury under the laws of the United States of America that the

12  foregoing is true and correct.

13

14      EXECUTED this 25th day of August 2005, at Beverly Hills, California.

15

16                      Melissa G. Turai

17

18

19

20

21

22

23

24

25

26

27

28

*SWERDLOW FLORENCE*
*SANCHEZ SWERDLOW & WIMMER*
9401 WILSHIRE BLVD., SUITE 828
BEVERLY HILLS, CALIFORNIA 90212
TEL. (310) 288-3980 • FAX (310) 273-8680

88327.1

3

# ATTACHMENT A

1              UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

3

4

5

6   SHAWN GRANBERRY,              )
                                  )

7              Plaintiff,  )
                                  )

8   vs.                       )     No. C 04 0845 JSW
                                  )

9   JETBLUE AIRWAYS,            )
                                  )    **CERTIFIED**

10           Defendant.  )    **COPY**
    _____)

11

12

13            VIDEOTAPED DEPOSITION OF

               SHAWN DaMAR GRANBERRY

14            Emeryville, California

               October 15, 2004

15

16

17            MARTIN M. HOROWITZ

          CERTIFIED SHORTHAND REPORTERS

18     1937 SOUTH BEVERLY GLEN BOULEVARD

                  SUITE 47

19      LOS ANGELES, CALIFORNIA 90025

              (310) 475-0209

20

21

22

                 REPORTED BY:

23           Sybil Susan Garcia

         Certified Shorthand Reporter

24        License Number 5668

25

1    Q.   Did you ever discuss your marital problems with

2  any of your JetBlue colleagues?

3    A.   Maybe in casual conversation; you know, you

4  talk about the wives and the boyfriend, et cetera.

5    Q.   But do you remember having any substantive

6  conversation about your marital problems with any

7  JetBlue colleagues?

8    A.   I think I may have talked to Michele about my

9  marital problems.

10    Q.   What did you and Michele discuss about your

11  marital problems?

12    A.   I think I did tell her on one of our training

13  trips what I was going through in terms of my marriage

14  and pending divorce.

15    Q.   When was this discussion?

16    A.   I don't recall the exact date.

17    Q.   2003, 2002, 2001?

18    A.   We went to a training one time to New York.   I

19  think we talked about it during the whole trip.   We took

20  a whole trip together.

21    Q.   Just the two of you?

22    A.   Yeah, we both (unintelligible), for the same

23  training session.

24    Q.   What did you tell Michele about the marital

25  problems that you were experiencing?

1    A.   I can't remember the exact conversation, I mean

2  talked about --

3    Q.   As best --

4    A.   (Overlapping voices)

5    Q.   As best you can recall.

6        MR. COLE:  Counsel, you're cutting -- you're

7  talking over his response and he was trying to get out

8  his words.

9  BY MR. WIMMER:

10    Q.   As best you can recall, tell me what you said

11  to Michele Steiner about your marital troubles.

12    A.   I believe I told her how long I had been

13  married and that -- I had talked about my son and I

14  talked about the decision for a divorce.  And that was

15  pretty much the gist of the conversation.

16    Q.   And what was Ms. Steiner's response?

17    A.   She was very comforting and, you know, said

18  sometimes those things happen.

19    Q.   Would you agree that she was concerned about

20  your situation?

21        MR. COLE:  Objection, the question calls for

22  speculation.

23        You can respond.

24        THE WITNESS:  I would say at the time, yes.

25  /////                                    /////

1      A.    Okay.

2      Q.    Your first date of employment was 9-11-2001;

3   correct?

4      A.    Yes, September 11th, 2001, yes.

5      Q.    Your last date of employment was July 28th,

6   2003; correct?

7      A.    I thought it was the 27th but two thousand --

8   July -- I thought it was July 27, 2003 but ...

9      Q.    You were told by Michele Steiner that you were

10   being terminated on July 27th, 2003?

11      A.    I don't have a calendar in front of me.  That's

12   the date I recall.  I'm not sure of the exact date.

13          MR. COLE:  Counsel, before we get into this new

14   area, can we go off the record for a second?

15          MR. WIMMER:  Sure, let's go off the record.

16          THE VIDEOGRAPHER:  Off the record at 12:05 p.m.

17          (Off-the-record discussion)

18          THE VIDEOGRAPHER:  Back on the record at 12:06

19   p.m.

20          MR. WIMMER:  Would you please mark that.

21          (WHEREUPON, Defendant's Exhibit E

22          was marked for identification.)

23   BY MR. WIMMER:

24      Q.    Showing you, sir, what's been marked as Exhibit

25   E, is Exhibit E the employment application that you

1  submitted to JetBlue Airways?

2       A.    (Examining document)   It looks like it, yes.

3       Q.    And is all the handwriting on Page 1 your

4  handwriting?

5       A.    Yes.

6       Q.    Is all the handwriting on Page 2 your

7  handwriting?

8       A.    Yes.

9       Q.    Is all the handwriting and check marks on Page

10  3 your handwriting and check marks?

11      A.    Yes.

12      Q.    And is all the handwriting on Page 4 your

13  handwriting?

14      A.    Yes.

15      Q.    Is all the handwriting on Page 5 --

16            MR. COLE:  Is there a Page 5?

17            THE WITNESS:  I don't see a Page 5.

18            MS. TURAI:  Is the last page missing?

19            MR. COLE:  I only have Page 4 -- four pages

20  also.

21  BY MR. WIMMER:

22      Q.    The final page that you're looking at before

23  you, sir, that's the page that has a signature block on

24  the lower third of the page underneath Terms of

25  Employment?

1    A.    Yes.

2    Q.    And is that your signature underneath Terms of

3  Employment?

4    A.    Yes, it is.

5    Q.    And is your Social Security number 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?

6    A.    Yes.

7    Q.    And did you write that Social Security number

8  in your handwriting?

9    A.    Yes, I did.

10    Q.    And did you sign this document applying for

11  employment with JetBlue on August 5th, 2001?

12    A.    I believe that was the day.

13    Q.    Who is Hilda Dockery?

14    A.    I mentioned it earlier, a part of the Oakland

15  Black Chamber of Commerce at the time.

16    Q.    And she was one of your references?

17    A.    Yes.

18    Q.    And Omar Krashna was also a member of the

19  Oakland Black Chamber of Commerce?

20    A.    Yes.

21    Q.    This shows that you worked for Southwest

22  Airlines from January 1992 through December 1999?

23    A.    Yes.

24    Q.    Why did you leave Southwest Airlines?

25    A.    I left Southwest Airlines to work on the OMV

1    Q.   With whom did you interview at the Plaza Hotel

2    in Oakland?

3    A.   I believe my interview was with Elizabeth.

4    Q.   Just the two of you one-on-one?

5    A.   There was more than Elizabeth there.  I can't

6    recall who was all there.  I do remember Elizabeth.

7    Q.   Do you have any notes of that interview?

8    A.   No, I do not.

9    Q.   Were you given any documents at that interview?

10   A.   I can't recall.

11   Q.   What were you told about JetBlue during that

12   interview?

13   A.   I was told it was a company -- a new airline, a

14   going airline, somewhere where you would be treated

15   fairly and -- and if you lived up to your end of the

16   bargain and worked, you know, to a satisfactory level,

17   you would always have a job.

18   Q.   Were you told anything else about JetBlue?

19   A.   A little bit of historical information, when

20   they were started, who it was started by, about the air

21   bus, the new planes; just general information like that.

22   Q.   Do you remember asking any questions of

23   Elizabeth?

24   A.   I believe I asked her if I make it through the

25   hiring process, what time were the shifts so I'd know if

1   it was morning or night.

2        Q.   Did you ask her anything else?

3        A.   I don't recall.

4        Q.   Have you now told me everything you remember

5   about the interview with Elizabeth at the Plaza Hotel in

6   Oakland?

7        A.   That's all I can remember at this time, yes.

8        Q.   Was your next -- was it Elizabeth who told you

9   that if you worked to a satisfactory level, you would

10  always have a job?

11       A.   I can't recall exactly.  She emphasized the

12  family environment at JetBlue and -- and then basically

13  said, yeah, you work, you know, there's going to be a

14  job here for you.

15       Q.   What specifically did she say?

16       A.   I can't remember the specifics.

17       Q.   Was your next contact with JetBlue after your

18  interview at the Plaza Hotel when you received your

19  offer letter?

20       A.   I can't remember exactly.  It seems like I

21  remember a two-phased interview, a first interview --

22  like two interviews.

23       Q.   On the same day?

24       A.   I can't remember whether it was the same day or

25  a callback, I can't recall exactly.

1      Q.   Did she tell you the salary or a wage rate?

2      A.   I believe the wage rate was talked about during

3   the actual interview.

4      Q.   Do you remember what you were told about the

5   wage rate?

6      A.   I believe the starting salary was $12 an hour

7   and part-time 20 hours a week.

8      Q.   Were you offered any benefits when you began

9   your employment with JetBlue as a part-time customer

10   service agent?

11      A.   Flight benefits.  And I wasn't sure about the

12   medical coverage, I believe it may -- she said that

13   would be talked about later.  There is medical coverage

14   but it would be talked about in detail later, at a later

15   time.

16      Q.   In the second interview you mentioned that

17   JetBlue values were discussed.  What do you remember

18   about that discussion of JetBlue's values?

19      A.   I can't remember the details of the discussion.

20      Q.   What's your understanding as you sit here today

21   based on your complete employment with JetBlue about

22   what JetBlue's values are?

23      A.   I believe that the values stand for that if you

24   work to a satisfactory level and do your job, you'll

25   have a job with JetBlue.  And while being at JetBlue or

```
1    working for JetBlue, you will be treated fairly and

2    provided a healthy atmosphere to work in; and if

3    everyone lived up to this, then the airline would be

4    successful.

5        Q.   What else do you understand to be JetBlue's

6    values?

7        A.   I can't recall the exact -- the exact values at

8    this time.

9             (WHEREUPON, Defendant's Exhibit G

10            was marked for identification.)

11            MS. TURAI:  Do you have two copies?

12            THE WITNESS:  Yes (handing).  (Examining

13   document)

14   BY MR. WIMMER:

15       Q.   Showing you what's been marked as Exhibit G, is

16   Exhibit G a true and correct copy of the August 21, 2001

17   offer letter sent to you from JetBlue?

18       A.   Yes, this does look like it.

19       Q.   And if you turn to the last page underneath the

20   signature block that says "I hereby accept employment as

21   a Ground Customer Service Crewmember and agree to the

22   terms and conditions contained in this letter," is that

23   your signature?

24       A.   Yes, it is.

25       Q.   In the first paragraph on the first page in
```

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1   bold it refers to training that will begin the day after

2   September 11th and will continue for two weeks in

3   Oakland.  Did you train -- excuse me.  Did you attend

4   that new employee training in September 2001?

5        A.   It didn't -- it didn't happen that week.  What

6   happened was that during our orientation when we were in

7   New York before we came back for training, September

8   11th happened.  So we were actually -- we couldn't leave

9   New York, we were literally trapped in New York for

10  about I would say four, at the most five days.  So the

11  whole training schedule was rescheduled whenever we

12  could return.

13       Q.   When you first reported to work, you started on

14  Monday, September 10th?

15       A.   Yeah, the flight left I believe the evening of

16  Monday, September 10th.

17       Q.   A flight from Oakland to JFK?

18       A.   Yeah, for orientation the following morning.

19       Q.   And did you in fact undergo orientation in New

20  York City?

21       A.   The orientation was interrupted, in the middle

22  of the orientation September 11th happened, the

23  (unintelligible) and the buildings started to fall.

24       Q.   Was that orientation ever rescheduled?

25       A.   I believe it was rescheduled sometime later.

1    Q.   Did you attend the rescheduled orientation?

2    A.   Yes.

3    Q.   Was that held in JFK?

4    A.   No.   I can't remember exactly -- I think they

5    rescheduled it for Oakland at a later date because we

6    didn't get our orientation completed that day.

7    Q.   The first orientation that occurred in New

8    York --

9    A.   Yes.

10   Q.   -- that was interrupted by the terrorist

11   attacks on 9-11, what do you remember being told about

12   your employment at that orientation?

13   A.   Basically what was said in the interviews, you

14   know, reiterated that JetBlue was a great place to work,

15   we were very fortunate to be there, that we were

16   selected from a high number of applications; and went

17   over a little history of the company, how it was started

18   and how long it had been in business; and then, once

19   again, if you work satisfactory and live up to your end

20   of the bargain, that you would always have a job with

21   JetBlue and, you know, reiterated you'll always be

22   treated fairly because the company believes in treating,

23   you know, its crew members fairly.

24        It talked about certain things like there's no

25   name badges for anyone, so everyone is seen, you know,

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1    Q.   What do you remember being said to you during

2    your orientation here in Oakland?

3    A.   I don't remember all the detail.  It was a

4    broad overview of the company but it went over a lot of

5    details, a lot of details.  I can't remember the

6    specifics but it was, once again, the history of the

7    company, how the company made money, the per-mile

8    procedures, all those type of things, a lot of detailed

9    information.

10   Q.   Do you remember anything else being said to you

11   about your employment during this orientation here in

12   Oakland?

13   A.   Well, the same thing was reiterated --

14   Q.   What's that?

15   A.   -- the same thing was reiterated, that, you

16   know, if you work satisfactory, you will always have a

17   job at JetBlue, it's a family environment, wants you to

18   feel comfortable here, and if we -- if we work at this

19   level, the company will be successful, that you will be

20   treated fairly; and JetBlue firmly believes in treating

21   people fairly and having an atmosphere that includes

22   everyone; and a big congratulations, you know,

23   congratulations on actually making it.

24   Q.   Who specifically said here in Oakland at the

25   orientation that if you work to a satisfactory level,

1    you would remain employed with the company?

2         A.   I can't remember who exactly.

3         Q.   Did anyone throughout any of your orientation

4    settings say what it meant to work to a satisfactory

5    level?

6         A.   No, that was --

7         Q.   No one went into detail about what a

8    satisfactory level meant?

9         A.   No.

10        Q.   You -- you knew that throughout your

11   employment, you were free to quit at any time; right?

12        A.   Yes, I mean -- yes.  That's true with all jobs,

13   isn't it?  Okay.

14        Q.   Did Michele Steiner speak during this

15   orientation in Oakland?

16        A.   I can't recall, I can't recall.

17        Q.   Do you remember Michele Steiner telling the new

18   employees at this orientation in Oakland that she as the

19   station manager required all incidents to be reported to

20   her?

21        A.   No, I don't recall.

22        Q.   Do you remember Michele Steiner saying during

23   the orientation in Oakland that as the general manager

24   of Oakland she needed to know everything that happened

25   at her station?

1    BY MR. WIMMER:

2        Q.    Do you remember what was said about safety

3    during your orientation here in Oakland?

4        A.    I don't remember the exact words, no.

5        Q.    Generally do you remember what was said about

6    safety during your orientation at Oakland?

7        A.    I remember the phrase:  Always work safe.   I

8    remember that being used.

9        Q.    What did that -- strike that.

10       What were you told always work safe meant to

11   JetBlue?

12       A.    I remember when they said always work safe

13   that, remember, safety is the first priority; that

14   unlike some other airlines it was brought up that even

15   if the plane doesn't leave on time, the importance is

16   always to work safe.  That's basically what I remember

17   from that conversation.

18       Q.    In fact, you were told during orientation that

19   safety was the number one value to this airline;

20   correct?

21       A.    I don't recall it being said it was the number

22   one value, they were just all the five values; it wasn't

23   no priority to them.

24       Q.    Were you ever told during your employment at

25   JetBlue that safety was JetBlue's number one value?

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1     A.   Yes.

2     Q.   Who told you during your employment that safety

3 was the number one value at this airline?

4     A.   My first supervisor.

5     Q.   Who was that?

6     A.   Andrew Schweibert.

7     Q.   Did you ever tell your employees that safety

8 was the number one value for this airline?

9     A.   Yes.

10     Q.   How many times did you tell your employees that

11 safety was this airline's number one value?

12     A.   Actually quite a few times during the

13 briefings.

14     Q.   And did you ever tell your employees that if

15 there was a safety incident, you needed to know about

16 it?

17     A.   Yes.

18     Q.   And did you tell your employees that if there

19 was any type of accident that occurred, you needed to

20 know about it?

21     A.   Yes.

22     Q.   Why did you tell them that?

23     A.   Because it was my job at that time -- as

24 supervisor, it was my responsibility to follow up on all

25 accidents.

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1    Q.   Did you also know that it was, as part of your

2    job as supervisor, your duty to let Michele Steiner, the

3    general manager, know of any incidents that occurred?

4    A.   You said accident first, now you said

5    incidents, so --

6    Q.   Let me --

7    A.   -- are you referring to one and the same?

8    Q.   Let me break it down.  Did you know while you

9    were a supervisor that part of your job was to tell

10   Michele Steiner of any accidents that occurred?

11   A.   I realize -- you know, it was my job to make

12   sure that she found out.  I didn't actually have to tell

13   her, it was to make sure that she found out about

14   accidents that occurred, yes.

15   Q.   Well, let me be very clear.

16   A.   Okay.

17   Q.   Was it your job to tell Michele Steiner of any

18   accidents that occurred under your watch?

19   A.   It was my job to make sure she found out.  I

20   didn't actually -- it was my job to make sure she found

21   out about the incidents, yes.

22   Q.   Did Michele Steiner ever tell you that she

23   needed to know from you personally of any accidents that

24   occurred under your watch?

25   A.   Yes.

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1    Q.   And did Michele Steiner also tell you that she

2    needed to know personally from you any safety-related

3    incidents that occurred under your watch?

4    A.   Yes.

5    Q.   And did Michele Steiner also tell you that she

6    needed to learn personally from you of any incidents

7    involving ground support equipment that occurred under

8    your watch?

9    A.   You're saying personally from me.  It doesn't

10   always mean personally from me.

11   Q.   I'm asking --

12   A.   There were several supervisors there that could

13   have let Michele know about it.  So I don't agree with

14   the personal from me.

15   Q.   My question was:  Did Michele Steiner ever tell

16   you that she needed to learn personally from you any

17   incidents that occurred involving ground support

18   equipment during your watch?

19       MR. COLE:  And, Mr. Granberry, you're acting as

20   though you're having some confusion with his question --

21       MR. WIMMER:  Well, let's not clarify and let's

22   not -- if you have an objection, Mr. Cole, please state

23   your objection --

24       MR. COLE:  The witness has indicated --

25       MR. WIMMER:  -- please state your objection and

1    do not have a speaking objection.

2              MR. COLE:  He has indicated he has some

3    confusion --

4              MR. WIMMER:  I'm not aware of any confusion.

5              MR. COLE:  I'm just cautioning the witness to

6    make sure you understand the question before

7    responding --

8              MR. WIMMER:  He's a UC Berkeley attendee.  I'm

9    sure he has the intelligence to tell me when he doesn't

10   understand a question.

11   BY MR. WIMMER:

12        Q.   So let me ask you the question, sir.  Did

13   Michele Steiner ever tell you that you have to

14   personally report to her any incident involving ground

15   support equipment that occurred on your watch?

16        A.   Ask the question one more time.

17             MR. WIMMER:  Read it back, please.

18             (Record read, as follows:

19             Did Michele Steiner ever tell you that you have

20             to personally report to her any incident

21             involving ground support equipment that

22             occurred on your watch?)

23             THE WITNESS:  In that form of the question, I'm

24   going to have to say no.

25   /////                                    /////

BY MR. WIMMER:

Q.   Were you ever told by Michele Steiner that you needed to personally report to her any damage to ground support equipment that occurred on your watch?

A.   Yes.

Q.   When did she tell you that?

A.   I'm not sure when she told me that.

Q.   Was it in 2001?

A.   No, it would have been in 2003.

Q.   When in 2003 did Michele Steiner tell you that you needed to personally report to her any damage to ground service equipment that occurred during your watch?

A.   Once again, you're using the word personal, so I need to clarify that.  Report to her -- reask the question, I'm sorry.

Q.   When did Ms. Steiner tell you that you needed to personally inform her of any damage to ground service equipment that occurred during your watch?

A.   I can't recall the exact date.

Q.   Was it in 2003, 2002, 2001?

A.   Somewhere in 2003.

Q.   How many months before you were terminated did she tell you that?

A.   I can't recall the exact month, can't recall

1    the exact month.

2         Q.    Was it --

3         A.    Within a three-month period.

4         Q.    Were you told at orientation at Oakland that it

5    was negligence not to report any accident to the

6    company?

7         A.    Ask the question one more time.

8         Q.    Were you told during your orientation in

9    Oakland -- strike that.

10             Were you told during your training in Oakland

11   that it was negligence not to report to the company an

12   accident that occurred?

13        A.    Just so I can clarify, you switched from

14   orientation to training; correct?  To training, not

15   orientation?

16        Q.    Correct.

17        A.    They're two separate things.

18        Q.    Correct.

19        A.    Okay.  During training, yes.

20        Q.    What specifically were you told?

21        A.    I can't remember the exact words.

22        Q.    Were you also told during your training that it

23   was negligence not to report incidents to the general

24   manager?

25        A.    I don't recall that.

1      Q.    Were you told that it was negligence not to

2   report safety-related incidents to the station general

3   manager?

4      A.    No.

5      Q.    Were you told it was negligence not to report

6   damage -- equipment damage to the general manager?

7      A.    No.

8      Q.    Were you ever told at any time that your

9   employment with JetBlue was guaranteed for life, no

10  conditions attached?

11     A.    No.

12     Q.    Were you ever told that you could never ever be

13  fired?

14     A.    No.

15     Q.    Were you ever told that JetBlue would always be

16  in business and you would always have a job?

17     A.    No.

18     Q.    Were you ever made any promise that you'll have

19  a job for at least X number of years?

20     A.    No.

21     Q.    When you first began your employment with

22  JetBlue, you started as a part-time ramp agent at $12

23  per hour; correct?

24     A.    I believe it's ground customer service agent is

25  the proper title but -- ground customer service agent,

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1          MR. COLE:  Before we go on with Exhibit I, this

2     appears to be a partial document and it says THE BLUE

3     BOOK, looks like Page 13.  If you're going to add this

4     as an exhibit, I'd like to see the entire document.

5          MR. WIMMER:  You will.

6          MR. COLE:  Well --

7     BY MR. WIMMER:

8          Q.   Let's focus on this exhibit, Exhibit I, Mr.

9     Granberry.  Is that your handwriting of the word Shawn

10    Granberry?

11         A.   Yes.

12         Q.   And is that your signature?

13         A.   Yes.

14         Q.   And above date, is that your handwriting,

15    9/28/01?

16         A.   I'm not sure about the date handwriting.

17              (WHEREUPON, Defendant's Exhibit J

18              was marked for identification.)

19    BY MR. WIMMER:

20         Q.   When you received the employee handbook for

21    which you signed as indicated by Exhibit I, did you have

22    any discussion with anybody at the company about that

23    employee handbook?

24         MR. COLE:  Objection to the question; it

25    assumes facts not in evidence, mischaracterizes the

1    either had in front of you or were sharing at this

2    meeting with Mr. Schweibert?

3        A.    I believe it was the handbook.

4        Q.    Do you remember what version of the handbook it

5    was?

6        A.    No, I don't.

7        Q.    Do you remember when this meeting occurred:

8    2001, 2002, 2003?

9        A.    2001.

10              (WHEREUPON, Defendant's Exhibit K

11              was marked for identification.)

12              THE WITNESS:   (Examining document)

13   BY MR. WIMMER:

14       Q.    Showing you what's been marked as Exhibit K,

15   the title of which is "The Blue Book CREW HANDBOOK

16   Effective January 2003," have you ever seen this

17   document before?

18       A.    Yes.

19       Q.    When was the first time you saw this document?

20       A.    I don't recall the first time I saw it.

21       Q.    Was it in 2003?

22       A.    I don't recall the exact year I saw this

23   document.

24       Q.    You received this document during your

25   employment; correct?

1      A.    I don't know if I received it directly or -- I

2  know there was one at the station.

3      Q.    This Blue Book crew handbook, effective January

4  2003, where at the station was this document maintained?

5      A.    It was -- one was kept in the supervisor's

6  office.  I believe one was also kept in both

7  supervisors' office, so the ground and the customer

8  service office.

9      Q.    And at the time you were the ground supervisor?

10     A.    Yes.

11     Q.    So this was kept in your office?

12     A.    Yes.

13     Q.    And was this also available online?

14     A.    Yes, most of these documents were available

15 online.

16     Q.    Did you ever present this crew handbook to your

17 subordinate crew members; in other words, those crew

18 members who worked for you?

19          MR. COLE:  Are you asking him whether he ever

20 presented this effective January 2003 handbook to his

21 crew members?

22          MR. WIMMER:  Thank you.

23 BY MR. WIMMER:

24     Q.    Did you ever present what's before you as

25 Exhibit K, the 2003 -- January 2003 crew handbook, to

1   company?

2       A.   Yes.

3       Q.   Were there any other benefits that you

4   received?

5       A.   Those are the benefits I recall.  There may

6   have been more, those are the ones I recall.

7       Q.   How is it that you changed from part-time

8   status to full-time status, how did that come about as

9   you understand it?

10      A.   If I recall correctly, the flights increased,

11  which called for longer hours to be worked.  So most of

12  the part-time employees there were offered a full-time

13  position, meaning 40 hours a week, and I was one of the

14  ones that accepted.  So I believe it was because of

15  flight increases.

16      Q.   So you were given the same offer to increase to

17  part-time as -- excuse me.

18           You were given the same offer to increase to

19  full-time as were the other part-time employees?

20      A.   That was my understanding, that it was offered

21  to everybody.

22      Q.   How then did you become a supervisor?

23      A.   A job posting opened up and I was one of the

24  individuals that applied for the supervisor position.

25  So it becomes a job posting and then you apply for the

1   position.

2       Q.   And was that the first job posting to which you

3   applied?

4       A.   Clarify the question, please.

5       Q.   Had you ever applied for any other jobs at

6   JetBlue prior to this job posting for the supervisor?

7       A.   That was the only job I applied for besides my

8   initial position as a customer service agent.

9       Q.   So, in other words, once you started your

10  employment at JetBlue, the first job posting to which

11  you applied was the supervisor position which you

12  received?

13      A.   Yes.

14      Q.   What was the job process for getting that

15  supervisor position?  You applied for the job posting,

16  and then take me through the rest of the sequence.

17          MR. COLE:  Again, you're asking him the

18  sequence that he went through?

19          MR. WIMMER:  Absolutely, yes.

20          MR. COLE:  Okay.

21          THE WITNESS:  The sequence I went through was

22  you fill out the application, at some point you receive

23  a e-mail from the HR department saying your application

24  has been accepted; sometime after that you're given an

25  interview date and you interview for the position, and

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1    there are -- I believe I had two interviews.

2    BY MR. WIMMER:

3        Q.    With whom?

4        A.    Elizabeth McCune and Michele Steiner.    I

5    believe the first one was with Elizabeth McCune and the

6    second one was with Michele Steiner and Elizabeth

7    McCune.

8        Q.    And then what happens?

9        A.    And then once the two interviews take place,

10   you wait to hear whether you received the job or didn't

11   get the job.

12       Q.    Do you know who the other candidates were

13   against whom you were competing for this supervisor

14   position?

15       A.    I don't recall.  Applicants applied from all

16   over, all over the country.  So I mean -- I don't even

17   know how many applicants there were.

18       Q.    You don't know who you were up against --

19       A.    Right.

20       Q.    -- for the supervisor job?

21       A.    Correct.

22       Q.    What do you remember from your interview with

23   Michele and Elizabeth for the supervisor position?

24       A.    I don't recall any details about the interview.

25   I remember some of the questions:  What would make you a

1    BY MR. WIMMER:

2        Q.    Other than the training that you've already

3    described, after you attended the POL training in New

4    York City did you have any other supervisory training?

5        A.    So that I understand the question, so after the

6    POL training, after that point did I receive any

7    training after I came back from POL?

8        Q.    Correct.

9        A.    I would say no, no standardized trainings.   But

10   I mean every day was a training, you know, in

11   conversations with my superiors, so -- so I can't say I

12   had any standardized training like the POL.   I was

13   actually due for another training and I was terminated

14   before I went.

15       Q.    How would you describe the relationship that

16   you and Michele Steiner had when you went back to New

17   York?

18       A.    For the POL training?

19       Q.    For the POL.

20       A.    For the POL.   I think we had a healthy

21   relationship, I think we had a healthy relationship.   I

22   felt she respected my work and what I stood for and I

23   respected, you know, her -- the job she was doing.

24       Q.    Why do you think she respected you in your

25   work?

1    A.   I feel I did a good job, I feel I was a very

2  good supervisor, I felt I kept the crew member morale at

3  a high level.  Our numbers were some of the best in the

4  country in what we did in terms of our bag errors and

5  our turn times for the planes, and I felt I was doing a

6  very good job.  I never received a complaint from her

7  until the day I was terminated.

8    Q.   What makes you think that she respected you?

9    A.   Just in the way she dealt with me.  It was a

10 level of respect, you know.

11   Q.   Was she ever pejorative or demeaning toward

12 you?

13   A.   Yes.  It didn't come to well after the POL

14 training, though, well after the POL.  So post-POL,

15 fine; later on things changed drastically.

16   Q.   Towards your termination?

17   A.   No, later on in my employment at JetBlue, pre-

18 termination.

19   Q.   How many months before your termination did

20 your relationship with Michele Steiner change?

21   A.   I'll say within the last two to three months.

22   Q.   How would you characterize the change in your

23 relationship with Ms. Steiner in the last two or three

24 months of your employment with JetBlue?

25   A.   Well, I began to discuss with Ms. Steiner the

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1    the question, go ahead and respond.

2           THE WITNESS:  Could you ask the question one

3    more time and clarify it, please.

4    BY MR. WIMMER:

5       Q.   You said that you discussed with Michele

6    Steiner that other supervisors were receiving other

7    things that you were not receiving.  What did you tell

8    her other supervisors were receiving that you were not

9    receiving?

10      A.   I discussed several station supervisors were

11   able to park up-front parking at the airport.  I was

12   never given up-front parking.

13           I mentioned that I had to use my personal cell

14   phone in JetBlue business and I was never given a

15   company cell phone.

16           I mentioned that decisions were being made

17   about crew members that answered directly to me that I

18   was totally being left out of.  I felt that was unfair,

19   that wasn't going on with other supervisors.  Serious

20   decisions, like terminations.  People that answered

21   directly to me that I didn't even know was terminated,

22   you know, so -- I mean crew members would know before me

23   that the person didn't work there anymore.

24           Seniority, some things happened with our

25   seniority.  I questioned her about I was the first

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1    supervisor in terms of seniority, yet I was given last

2    order of seniority because she decided to change the

3    rules to her own rules that now it's not how long you

4    worked for the company -- not how long you been in your

5    job title, like it's done throughout the system, that

6    now it's decided that it's how long you been with the

7    company.  So I explained to her -- so a supervisor --

8            MR. COLE:   (Inaudible)

9            THE WITNESS:   Okay, all right.

10           MR. COLE:   Is there anything else that you

11   talked to her about?

12           THE WITNESS:   It was a long list, it was a long

13   list.

14   BY MR. WIMMER:

15       Q.   What else was on your list that you discussed

16   with her?

17       A.   Well, in terms of the seniority question, we

18   discussed why was I put last in seniority when I was the

19   supervisor and I had helped, you know, train the

20   other -- other supervisors at the job; yet now when it

21   comes to seniority -- which is your vacation, your days

22   off, all of those things that are pretty important --

23   that now I was last in seniority.  I wanted to know, you

24   know, basically -- basically why.

25       Q.   What did she tell you?

1      A.    That's the way it's going to be.   Tough.

2      Q.    Those were her words?

3      A.    That's the way it's going to be.   Those weren't

4  the exact words but that's what was conveyed to me.

5  Tough.   That's the way it's going to be.   It's going to

6  be -- I decided it's going to be the time you spent with

7  the company.   So my thing was -- so --

8            MR. COLE:   You've answered the question.

9            THE WITNESS:   Okay.

10 BY MR. WIMMER:

11     Q.    Were there any other items that you discussed

12 with Michele Steiner?

13     A.    The parking, the phone -- I'm trying to think

14 out loud so I can remember -- the seniority question.

15           Yes, I also discussed the picking of leads.

16 Leads agents are the ones that help run the ramp.   I was

17 being left out of the decision of the leads.   And I was

18 responsible for their decisions but yet I had no say-so

19 in the choosing of the leads, and I felt that that was

20 wrong and I just wanted to know why.   The other

21 supervisors were able to have input, why don't I get any

22 input.

23     Q.    Anything else that you discussed with Michele

24 Steiner?

25     A.    That's all I can recall at this point.

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1   problems I saw in terms of discrimination at the station

2   as well as the way I felt I was being treated

3   differently and being discriminated against.  There were

4   several things that other supervisors received that I

5   didn't receive.  There were several situations where I

6   felt I was being harassed.

7          And I talked to her about it, and nothing was

8   ever done, you know, and I started to ask questions why.

9   And I started questions about the difference that crew

10  members were being treated -- you know, Caucasian crew

11  members were given preference over African-American crew

12  members; I mean some serious differences in the way they

13  were being treated, and especially in terms of -- I

14  don't want to call it punishment but, you know, what

15  happens when your attendance isn't well or something

16  happens, you know, the corrective action for an

17  African-American was greatly different than some of the

18  Caucasian employees, so ...

19     Q.   What supervisors received other things that you

20  think you did not receive?

21          MR. COLE:  Hold on.  I'm just going to object

22  to the vagueness of the question.  When you say received

23  other things, what are you referring to.

24          MR. WIMMER:  I'm using his words.

25          MR. COLE:  Well, go ahead; if you understand

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1    Q.   Who was provided up-front parking?

2    A.   Kevin Hoover, Rudy Lucero, Rhonda Blair.

3    Q.   Anyone else?

4    A.   At the point of our discussion, I don't believe

5    so.

6    Q.   Did Ms. Steiner ever tell you why those three

7    individuals were provided up-front parking but not you?

8    A.   She never gave me an answer.  I asked.  I asked

9    her to rotate, she said no.  That was it.

10   Q.   Do you as you sit here today know why those

11   three individuals were given up-front parking?

12        MR. COLE:  Other than what he's already

13   testified to?

14        THE WITNESS:  At that point I felt it was

15   discrimination.  I felt that because they're Caucasian,

16   they get preferential treatment; and because I'm a black

17   man, I don't get preferential treatment.  And I wanted

18   to know why, that was what the conversation was about.

19   I explained to her my job was being --

20        MR. COLE:  (Gesturing)

21        THE WITNESS:  Okay.

22   BY MR. WIMMER:

23   Q.   Was Kevin Hoover a station supervisor before

24   you were?

25   A.   Yes.

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1    Q.    Was Rudy Lucero a station supervisor before

2  you?

3    A.    Yes.

4    Q.    Was Rhonda Blair a station supervisor before

5  you?

6    A.    Yes.

7    Q.    Did Michele Steiner ever tell you that they had

8  up-front parking because they had their station

9  supervisor position before you did?

10    A.    No.

11    Q.    As you think about it now that these three

12  folks were station supervisors before you, do you still

13  believe it was race discrimination that they receive

14  up-front parking when you did not?

15    A.    Yes.

16    Q.    Which station supervisors, if any, were

17  provided company cell phones?

18    A.    My best recollection is everyone except me.

19    Q.    All other station supervisors other than you

20  were given a company-provided cell phone?

21    A.    To the best of my recollection, I believe

22  everyone else had a company cell phone.

23    Q.    Did you ever ask for a company-provided cell

24  phone?

25    A.    Yes, I did.

1    Q.   Whom did you ask?

2    A.   Michele Steiner.

3    Q.   And what did she tell you?

4    A.   She really never gave me an answer.  It was an

5    e-mail, she never really gave me an answer.

6    Q.   It was an e-mail you sent to her?

7    A.   E-mail and verbal, both, both requested a

8    company cell phone; because my bill was getting --

9         MR. COLE:  (Gesturing)

10        THE WITNESS:  Oh, okay.

11        MR. COLE:  You've answered the question.

12   BY MR. WIMMER:

13   Q.   Why did you want a company-provided cell phone?

14   A.   Because that was part of your -- the things you

15   needed to be a effective supervisor, is to have a phone.

16   I used my -- because you're on call 24 hours a day.  So

17   I wanted to -- I had to use my personal cell phone.  And

18   the crew members call you on your -- they're able to

19   call supervisors on their cell phones, so ...

20   Q.   How do you know that other station supervisors

21   were provided company-provided cell phones?

22   A.   We worked together every day, it was on their

23   hips, it was on their -- they had it, it was right in

24   front of me.  They had it.

25   Q.   But how do you know that that supervisor's cell

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1  phone was a company-provided cell phone?

2      A.   Because I was there when they picked up their

3  cell phones.  They came and they were shipped to the

4  station on the ramp, they came in through my department,

5  and I delivered them upstairs to be handed out.

6      Q.   And every other station supervisor had a

7  company-provided cell phone except for you?

8      A.   To my best --

9           MR. COLE:  The question's been asked and

10 answered.

11          You can answer it again.

12          THE WITNESS:  To the best of my recollection.

13 BY MR. WIMMER:

14     Q.   You discussed with Michele Steiner the change

15 in how seniority was calculated?

16     A.   Yes.

17     Q.   When you first became a station supervisor, how

18 was a station supervisor's seniority calculated?

19     A.   I was told systemwide it's done by how long you

20 are at that position.

21          I didn't have to deal with the issue when I

22 first became a supervisor because the supervisor had

23 been in the position longer than me; so it never really

24 came into effect at all, you know.  Kevin Hoover was the

25 other supervisor.  So it never came into effect, that

1    problem, until other supervisors were hired, that's when

2    it came into -- and it was like that until that change

3    happened.  So I was in higher seniority to that point,

4    then it just changed.

5        Q.   And the change was that Michele, as you

6    understand it, changed from looking at your seniority in

7    position to now looking at company longevity as one's

8    seniority?

9        A.   I wouldn't say longevity, it was your time

10   employed with the company as your seniority as a

11   supervisor.  Even though you're in another position.  So

12   your seniority would transfer into another position,

13   which is not how it's done systemwide.

14       Q.   Just so I'm understanding this --

15       A.   Yeah.

16       Q.   -- once you became a station supervisor,

17   initially you believed that your seniority was based on

18   your time in that specific position?

19       A.   Yes.

20       Q.   And then after becoming a station supervisor,

21   the method of calculating the supervisor's seniority

22   changed; correct?

23       A.   Yes.

24       Q.   And the change was that now one's seniority was

25   based on one's date of hire; correct?

1    A.   We had an understanding that to this point it

2  was done with your time in the position.

3    Q.   I understand that.

4    A.   Okay.

5    Q.   But then it changes?

6    A.   Then it changed.

7    Q.   And the change was instead of looking at your

8  time in position, now Michele looked at your overall

9  total length of employment with the company?

10    A.   Yes.

11    Q.   And Michele's looking at one's overall total

12  length of employment with the company applied to all of

13  the station supervisors; correct?

14    A.   Well,. I was the only one affected because the

15  other supervisors were hired in that order, the customer

16  service supervisors were hired in that order.  I was the

17  only one affected because I was mainly handling the

18  ground area.  And the other supervisors were hired well

19  after I was hired, way after I was hired, so I was

20  really the only one that that rule affected.  It didn't

21  affect the other supervisors because their time with the

22  company reflected their time as supervisors, so ...

23    Q.   And since you were hired before these other

24  supervisors, your seniority actually increased by the

25  change Michele implemented --

1    A.    No.

2    Q.    -- correct?

3    A.    No, it decreased; the other way, decreased.  I

4    went to the last -- bottom of the barrel: last days off,

5    last to pick vacations, last in everything.  After I had

6    basically trained the other supervisors how to be

7    supervisors and actually recommended them for their

8    supervisors' job, then I was put the last -- bottom of

9    the barrel.

10   Q.    At the time you became a station supervisor --

11   at the time you became a station supervisor, the other

12   station supervisors at the time were Rhonda Blair;

13   correct?

14   A.    Yes.

15   Q.    Kevin Hoover?

16   A.    Yes.

17   Q.    And Rudy Lucero; correct?

18   A.    Yes.

19   Q.    Who was hired by the company first, you or

20   Rhonda Blair?

21   A.    Rhonda Blair was hired by the company first.

22   Q.    Who was hired by the company first, you or

23   Kevin Hoover?

24   A.    Kevin Hoover was hired by the company first.

25   Q.    And who was hired by the company first, you or

1    Rudy Lucero?

2        A.    Rudy Lucero.

3        Q.    What was the decision-making that you believe

4    you were excluded from by Michele?

5        A.    The decisions I was excluded from was the

6    termination of Willie Green.  That was an agent there

7    that was terminated that I had had a private meeting

8    with Michele about my concerns about Mr. Green and --

9            MR. COLE:  He just asked who --

10           THE WITNESS:  Okay.

11           MR. COLE:  -- what were the decision-makings

12   you felt you were --

13           THE WITNESS:  Okay.

14           MR. COLE:  -- excluded from.

15           THE WITNESS:  Also in lead interviews, the

16   leads that were chosen; I didn't even know there were

17   interviews.  About changing of the leads, that decision.

18           And there were some smaller policy changes at

19   the station that I wasn't kept in the loop about that

20   affected the department that I worked in.

21   BY MR. WIMMER:

22       Q.    Such as?

23       A.    I can't recall, but just the smaller ones.

24       Q.    Did you pick Glenn Harris to be a lead?

25       A.    It was -- leads weren't just picked by myself,

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

187

1    we -- it was all the supervisors came together, we

2    looked at the leads, and we presented them to Michele

3    Steiner.  The final decision was Michele Steiner.  I

4    recommended Glenn as a lead with the other supervisors.

5         Q.   You and the other supervisors recommended Glenn

6    Harris as a lead?

7         A.   Yes.

8         Q.   And did Michele Steiner follow your

9    recommendation?

10        A.   Yes, she did.

11        Q.   What other recommendations did you make to

12   Michele Steiner while you were station supervisor?

13        A.   Michele --

14             MR. COLE:  I'm sorry.  What other

15   recommendations?

16             MR. WIMMER:  Yes, sir.

17             MR. COLE:  For employment or for --

18             MR. WIMMER:  (Gesturing)

19             MR. COLE:  Well, I believe the question is

20   hopelessly vague.

21             If but you can respond --

22             THE WITNESS:  I can't remember all of the

23   recommendations I made to Michele.  We talked on

24   basically a daily basis.  I can't remember all of them.

25   /////                                          /////

1   BY MR. WIMMER:

2       Q.   You have told me you recommended Glenn Harris

3   to be a lead.  Were there any other recommendations that

4   you considered to be key recommendations that you made

5   during your employment to Michele Steiner?

6       A.   Most of the recommendations that were made were

7   made as -- the supervisors met and we discussed it first

8   and then we presented it to Michele, just to make sure

9   it wasn't -- another supervisor didn't disagree with a

10  recommendation or a policy change.  So we'd normally

11  meet as supervisors and then present it to Michele for

12  her final approval or denial, either way.

13      Q.   Who made the decision to terminate Willie

14  Green?

15      A.   I'm not sure.

16      Q.   Do you know why Willy Green was terminated?

17      A.   I'm not sure of the exact reasons why he was

18  terminated.

19      Q.   Do you have any knowledge as to why Willie

20  Green was terminated?

21      A.   I know why he -- they -- a suspicion of -- they

22  sent him on a drug test, that's what I do know.

23      Q.   Those drug test results were not shared with

24  you?

25      A.   No, they were not.

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**

1    Q.   Are you aware of employee privacy reasons why

2    you were not shown a fellow crew member's drug test

3    results?

4    A.   I was a station supervisor; he was a crew

5    member there, reported directly to me.   And it was

6    basically my job to recommend the drug test, because I

7    dealt with him every day, and I had a private meeting

8    with Michele about this issue.

9    Q.   Do you know why Willie Green was sent for a

10   drug test?

11   A.   I was totally kept out of the loop.   And he

12   worked directly for me, that's what my point is.

13   Q.   Who sent Willie Green for the drug test?

14   A.   I do not know.

15   Q.   Were you present at the time that Willie Green

16   was sent for the drug test?

17   A.   I do not know when he was sent.   I didn't work

18   that day, I'm not sure when he was sent.

19   Q.   Do you know what the results of Mr. Green's

20   drug test were?

21   A.   I do not know the results.

22   Q.   Do you know to whom those results were

23   provided?

24   A.   No, I do not.

25             (Off-the-record discussion)

```
 1              THE VIDEOGRAPHER:  Off the record at 3:17 p.m.

 2              (Recess)

 3              THE VIDEOGRAPHER:  Back on the record at 3:27

 4  p.m.

 5  BY MR. WIMMER:

 6      Q.   Mr. Granberry, were you aware that Willie Green

 7  was taking drugs?

 8              MR. COLE:  Objection, assumes facts not in

 9  evidence.

10              You can respond.

11              THE WITNESS:  It was not clear.

12  BY MR. WIMMER:

13      Q.   Did you have some suspicion that he was abusing

14  drugs?

15      A.   I met with Michele about a suspicion and how to

16  deal with that.

17      Q.   And did you tell Michele that you had a

18  suspicion that Willie Green was using drugs?

19      A.   Yes, we had had a discussion about suspicion of

20  Mr. Green using drugs.

21      Q.   And you told her that you personally had a

22  suspicion that he was using drugs; correct?

23              MR. COLE:  Asked and answered.

24              You can respond.

25              THE WITNESS:  Yes, I told her I had a
```

**MARTIN HOROWITZ & ASSOCIATES  (310) 475-0209**