1   R. SCOTT ERLEWINE (State Bar No. 095106)
    PHILLIPS, ERLEWINE & GIVEN LLP
2   One Embarcadero Center, Suite 2350
    San Francisco, California 94111
3   Telephone: (415) 398-0900
    Facsimile: (415) 398-0911
4
    Attorneys for Plaintiff KAREN JAMIOLKOWSKI
5

6

7

8                   UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11

12  KAREN JAMIOLKOWSKI,                )   CASE NO. C 05-00053 MJJ
                                       )
13                  Plaintiff,         )   **PLAINTIFF'S MOTION *IN LIMINE***
                                       )   **NUMBER FIVE TO EXCLUDE**
14  v.                                 )   **EXPERT TESTIMONY REGARDING**
                                       )   **THE REASONABLENESS OF**
15  KRUEGER INTERNATIONAL, INC., a     )   **PLAINTIFF'S CONDUCT**
    Wisconsin corporation; RICHARD J. RESCH, )
16  an individual; and DOES 1 through 20, )
    inclusive,                         )   Date:  April 11, 2006
17                                     )   Time:  3:30 p.m.
                    Defendants.        )   Courtroom:  11
18                                     )
                                       )   Trial Date: April 24, 2006
19                                     )
                                       )
20                                     )
                                       )
21                                     )
22

23

24

25

26

27

28

PHILLIPS, ERLEWINE
& GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MOTION IN LIMINE NO. 5 - USDC Case No. C 05-00053 MJJ
S:\Clients\Jamiolkowski\8235.1\TRIAL\Motions in Limine\MIL-5-EXPERT

Dockets.Justia.com

# I. NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on April 11, 2006, at 3:30 p.m., at the Pretrial Conference in this matter, or as soon thereafter as the matter may be heard before the Honorable Martin J. Jenkins, in Courtroom 11 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, plaintiff Karen Jamiolkowski will move the Court for an order to preclude defendants from introducing at trial any evidence of an "expert opinion" by defendants' human resources expert (Beth Whittenbury) concerning the reasonableness of plaintiff's conduct.

# II. STATEMENT OF RELIEF REQUESTED

Plaintiff moves to prohibit defendants Krueger International, Inc. ("KI") and Richard J. Resch ("Resch") and their counsel and witnesses, in the presence of the jury, from offering or soliciting any evidence, exhibit or testimony, or making any statements or arguments, either directly or indirectly, at trial of expert opinion testimony concerning the reasonableness of plaintiff's conduct.

# III. POINTS AND AUTHORITIES

## A. Background Facts.

Plaintiff Karen Jamiolkowski claims sexual harassment and retaliation under California's FEHA, as well as constructive discharge in violation of public policy, against her former employer (defendant KI) and its CEO, chairman of the board, and majority shareholder (defendant Resch). Defendant KI asserts the doctrine of "avoidable consequences" as an affirmative defense to plaintiff's sexual harassment claim. Under California law (governing in this diversity action), such defense allows for a reduction of damages against an employer, but not an individual, defendant (but does not preclude liability), only if such defendant proves that (1) it took reasonable steps to prevent and correct workplace sexual harassment, (2) plaintiff unreasonably failed to use its harassment complaint procedures; and (3) the reasonable use of its procedures would have prevented some or all of plaintiff's damages. *See*, CACI No. 2526; BAJI No. 12.20.1; *State Dept. of Health Services v. Superior Court (McGinnis)*, 31 Cal.4th 1026, 1045-46 (2003).

PHILLIPS, ERLEWINE
& GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MOTION IN LIMINE NO. 5 - USDC Case No. C 05-00053 MJJ
S:\Clients\Jamiolkowski\8235.1\TRIAL\Motions in Limine\MIL-5-EXPERT

1

1   are capable of drawing their own inferences from the available evidence as to the reasonableness
2   of the conduct of an individual employee. *See, U.S. v. Schatzle*, 901 F.2d 252, 257 (2nd Cir.
3   1990) (Expert opinion properly excluded, where "the jury was capable of assessing the
4   *reasonableness* of [individual peace officer's] *conduct* on its own and... [the proffered] 'expert'
5   opinion on the issue might confuse the jury." [emphasis added]); *see also, Kotla v. Regents of the*
6   *University of California*, 115 Cal.App.4th 283, 291 (purported expert opinion that certain facts
7   were "indicators" of retaliation invaded province of jury). Individual jurors can understand and
8   evaluate the behavior of another individual, under the standard of a "reasonable employee,"
9   without technical assistance, as a result of their common experience as employees.[1]

10          Even if anyone (other than a juror) could be considered an "expert" on the behavior of a
11  "reasonable person," defendants' expert is an employment attorney and human resources
12  consultant, with no claim of expertise in human behavior, sociology, statistics, or psychology.

13          In addition, Ms. Whittenbury's report makes a credibility determination when it
14  concludes that plaintiff would have reported her claims to HR "if she was serious about them."
15  This improper conclusion as to credibility further invades the province of the jury, and no
16  comments or implications to this effect should be allowed at trial.

---

[1] This is in contrast to the reasonableness of a *corporate entity's* HR policies, and its implementation and enforcement thereof – a subject on which Ms. Young may opine and Attorney Whittenbury may rebut. Expertise may be required (and is certainly helpful) to assist a juror who does not happen to have work experience in multiple HR departments to understand the *standards* for what constitutes a typical anti-harassment policy for a company of the size and type of defendant; what steps are normally taken (and by whom) to enforce and implement such policy (for example, if a policy provides that complaints will be investigated, what steps "should" be taken to investigate, and by whom); what investigation results typically dictate counseling or discipline, and what type of training "should" be undertaken. *See, e.g., Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 571 (8th Cir. 1997); *Kotla, supra*, 293 n. 5 (distinguishing expert testimony as to whether "employer had followed proper personnel standards" as admissible).

PHILLIPS, ERLEWINE
& GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

## IV. CONCLUSION

For all of the foregoing reasons, defendants should be precluded from presenting evidence of any purported "expert opinion" of Attorney Whittenbury on the subject of the reasonableness of plaintiff's conduct.

DATED: March 28, 2006

PHILLIPS, ERLEWINE & GIVEN LLP

By: _____
R. Scott Erlewine
Attorneys for Plaintiff KAREN
JAMIOLKOWSKI

## DECLARATION OF COUNSEL

R. SCOTT ERLEWINE declares:

1.     I am an attorney duly licensed to practice in the State of California, and a member of Phillips, Erlewine & Given LLP, attorneys for plaintiff in this action. The matters set forth in this declaration are based upon my personal knowledge.

2.     On or about January 27, 2006, plaintiff designated a Human Resources ("HR") expert, Rhoma Young. On or about February 6, 2006, plaintiff served Ms. Young's expert witness report, a true copy of which is attached hereto as Exhibit A.

3.     On or about February 17, 2006, defendants designated rebuttal experts, which included Beth Whittenbury, a human resources expert, to rebut the testimony of Ms. Young. A true and correct copy of the expert designation is attached hereto as Exhibit B. Defendants'

PHILLIPS, ERLEWINE
& GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MOTION IN LIMINE NO. 5 - USDC Case No. C 05-00053 MJJ
S:\Clients\Jamiolkowski\8235.1\TRIAL\Motions in Limine\MIL-5-EXPERT

4

1  subsequently served a copy of Ms. Whittenbury's report, copy of which is attached hereto as

2  Exhibit C.

3  I declare under penalty of perjury under the laws of the United States of America that the

4  foregoing is true and correct.

7  DATED: March 28, 2006

R. Scott Erlewine

MOTION IN LIMINE NO. 5 - USDC Case No. C 05-00053 MJJ
S:\Clients\Jamiolkowski\8235.1\TRIAL\Motions in Limine\MIL-5-EXPERT

5

PHILLIPS, ERLEWINE
& GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

1

## [PROPOSED] ORDER

2      Upon consideration of Plaintiff's Motion *In Limine* Number Five To Exclude Expert

3  Testimony Regarding The Reasonableness Of Plaintiff's Conduct.

4      IT IS ORDERED that Plaintiff's Motion *In Limine* Number Five To Exclude Expert

5  Testimony Regarding The Reasonableness Of Plaintiff's Conduct. is hereby GRANTED;

6      IT IS FURTHER ORDERED that defendants KI and Richard J. Resch ("Resch") and

7  their counsel and witnesses refrain from, in the presence of the jury or prospective jurors,

8  offering or soliciting any evidence, exhibit or testimony, or making any statements or arguments,

9  either directly or indirectly, at trial of expert opinion testimony concerning the reasonableness of

10  plaintiff's conduct.

11

12  Dated: _____

13  _____
    MARTIN J. JENKINS
    UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PHILLIPS, ERLEWINE
& GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MOTION IN LIMINE NO. 5 - USDC Case No. C 05-00053 MJJ
S:\Clients\Jamiolkowski\8235.1\TRIAL\Motions in Limine\MIL-5-EXPERT

6

To: Randy Erlewine
From Rhoma Young

February 2006

## EXPERT WITNESS REPORT

Over the last 30+ years in HR (HR), I have thoroughly examined the HR policies and practices of many organizations, evaluated their effectiveness and made recommendations for change. The HR and equal employment practices apply to recruiting, hiring, promotions, discipline, training, termination and compensation. . . basically all of the areas in how employees are selected and treated.

My consulting clientele is diverse in size and industry, ranging from Fortune 100 companies to small and mid-sized employers in health care, construction, manufacturing, trucking, sales and distribution, financial services and high tech. I teach Human Resource professionals at San Francisco State University and have taught at UC, Berkeley and Mills. I have worked as an expert witness in many cases. I have testified in court about 50 times and had to minutely examine the step-by-step implementation of HR policies. I have also co-authored two peer reviewed white papers for the Society of Human Resource (SHRM)...one on the standards of care in an investigation and the other one on harassment.

As part of my HR consulting, I also advise organizations on policy content and implementation in a broad array of Human Resource areas. One of my key areas of focus in my consulting practice is the conducting of management practice audits. Originally started as liability audits for a major insurance carrier, the process has expanded to cover a wider set of circumstances. As part of that process, there is always a review of the employee handbook and other key documentation and policies such as EEO, problem resolution, harassment, ethics, harassment, technology and workplace relationships.

Much of my work over the last several years has focus on advising organizations how to prevent and respond to issues and complaints of discrimination. One of the major ways in which this is demonstrated is making sure that an organization has a working complaint investigation process. This is implemented by appropriately placed staff that is objective, that is hopefully perceived as objective, is responsive and accessible, adequately trained and experienced to conduct a reasonable investigation. Working with current clients, I have conducted "internal" investigations. At times, due to factors such as the nature of the complaint, the level/position of the complaining person (or the person being complained about), it is more neutral to have an external investigator conduct the investigation to insure real and perceived objectivity. I have advised

**EXHIBIT A**    1

organizations, and investigated and help resolved highly sensitive situations that have involved allegations of inappropriate conduct/behavior by very senior management. I also conduct "charm school" for highly placed, often highly credentialed management as executive coaching to address issues of inappropriate/ineffective behavior and communication.

My resume is attached, as is a list of all of the material provided to me in this case, and a list of the cases in which I have been deposed/testified in the last four years.

## Scope

In looking at a policy, then subsequent practices used in the implementation, several key areas share a common thread that is useful in establishing a framework to examine and evaluate the effectiveness of the implementation of those policies and practices. In this case, I was asked to look at the policies and policy implementation of Krueger International (KI). Are they consistent with the suggested management practices (HR basics) or the efforts that you would expect a reasonable employer to take in complying with relevant laws and regulations in dealing with and preventing harassment in the workplace? Were KI's actual practices reasonable, effective and consistent with their own policies? I am not looking for perfection. I am looking at whether the policies and practices were appropriate and reasonable, given the industry, size of the organization, etc. I charge $325 per hour for case and document review, analysis and testimony. As I am not an attorney, I will not be offering legal opinions nor will I testify as to the ultimate facts.

I understand that additional depositions are still in process. Should any additional information be disclosed that would significantly alter, change or expand my opinions, I will submit an addendum to this report. Also, should any other expert report disclose an opinion that falls within the anticipated scope of my testimony, and is counter to my opinion, I anticipate that I will have the opportunity to offer a responding or rebuttal opinion.

## Background

There were a series of allegations, situations and complaints about the conduct and behavior of Mr. Richard Resch, the CEO/President of Krueger International (KI). These issues were primarily focused on sexual harassment allegations and spanned several years. In addition to the allegations of inappropriate and sexually harassing behavior by him, Mr. Resch admittedly engaged in a series of what he described as consensual relationships that he had with subordinate females employed at his company (Roberts, Berman, Ray, Stephany and Bruenig) that were sequential and, at times, simultaneous. Mr. Resch also indicated that he was married during this time.

Key management personnel mentioned in this report are Richard Resch, the CEO/President. Ms. Hackbarth-Horn was a Director of Human Resource. Mr. Olsen was the CFO and also periodically had HR reporting to him. Brian Krenke was the

direct supervisor of the plaintiff in this case, Ms. Karen Jamiolkowski at the time of her departure from the company.

A complaint was made against Mr. Resch by Jill Hendricks (DuBois). Ms. Hendricks, who worked on a part-time basis in the travel section of KI, had indicated that she had found a series of memos on her desk, which she ascribed to being left for her by Mr. Resch. The memos were e-mails and other information (that were purportedly humorous) that were truly offensive in their tone and content, finding something to target almost every protected group. Some of them were explicit and extremely pointed in their successful attempts to assault the self respect of the disabled, persons of color, age, gender preference issues etc. One was about a frog and princess relationship in 1998. An additional one is supposedly from "The Onion" about a blues singer woman talking about her personal relationship. There was another detailed memo on the variations on the theme of Viagra with a hand written note to Ms. Dubois that says "Jill...pick your drug....signed D", which she viewed as a sexual invitation from Richard (Dick) Resch. Another one about Bill Clinton with underwear on his sleeve as a sexual "patch", another one about Chinese Ebonics, and an additional memo on Americans with No Abilities Act – as a detailed and demeaning parody on the Americans with Disabilities Act. An additional memo talked about the "outing of the Dallas Cowboys", with a player supposedly quoted calling them all "a bunch of f—kin' faggots". This was in addition to what she described as numerous attempts to get her to go out with him and go on the corporate jet.

After discussing the situation and discomfort with her managers, Ms. Hendricks was away from work for a period of time on a leave of absence. When she returned, she indicated in her deposition that Mr. Resch pointedly avoided her when she returned to work. It was not until she finally approached him and specifically made a repeated request to "put the issues behind them" that he agreed to speak with her. She indicated that he would do so only if she agreed to sign a release. Subsequently, a settlement for $2,000 was made, and she signed a release. The money was to offset her attorney's costs when she had made her original complaint. There was no documented investigation by HR that occurred.

Terri Tatton was an employee of KI in California in the late 1990's. When she attended a training class in Wisconsin, she indicated that Mr. Resch singled her out, would make a point of sitting next to her in sessions and talk to her during the presentation. She said he stood around her for approximately 20 minutes at a reception. She said this made her feel uncomfortable. On the way home, Mr. Resch, as she was in line with some of her colleagues, approached her and asked her to join him in the frequent flyer lounge. She did not do so. When she returned to work in California, she received an orchid at work from Mr. Resch with a not the said "the memory lingers" which she said made her disgusted. Her supervisor saw the note and had her write a note (not missing) to formalize what occurred.

When she was later attending Neo-con west, so was Mr. Resch. If Mr. Resch walked into the same room she was in, she said he was rude and would turn and leave. She

said this made her concerned about her job. She also said that in a company like that it was awkward to make complaints. She did not consider contacting HR. Ms. Tatton was never interviewed as part of an HR investigation.

Jessica Jasper worked in the San Francisco showroom of KI in the late 1990's. Mr. Resch made a visit to the showroom. She greeted him when he arrived and then engaged in a general conversation with him. She said he "smacked her butt". He then linked her arm in his and took a few steps with her. She disengaged herself, saying she needed to get on with her work. She said she was shocked and troubled. She knew that he reputedly was married and was also having a relationship with another women employee in the company (a friend of her manager). She had been told by a co-worker that she "was his type" and that she would know what that meant when she met him.

After the "smack on her butt" she said she went into the back office and called her supervisor, insisting that she never be left alone with Mr. Resch in the future. She said to her supervisor that she was formally reporting him and that if she was left with him, she would take whatever necessary action she needed to. She said that she felt intimidated about saying anything directly to him because of his position as the CEO and the power that position gave him. She also said she did not feel comfortable going to HR. There is no indication in the information I reviewed that this situation had been brought to the attention of or investigated by HR,

An additional complaint was filed by Valerie Legato in Georgia. Initially, Ms. Legato had complained about sexual harassment of two male managers. They were Norman Nance and Gerald Hanley. Through her attorneys, she indicated that when she spoke to Mr. Resch about their behavior, he came down to Georgia to visit her, and she alleged that he had come down to talk to her and investigate her allegations of sexual harassment. She indicated that rather than investigating this situation, he kissed her hand and started grabbing and fondling her breasts. She filed a legal action in 2003. There was no documented, completed investigation on harassment by HR that occurred.

In an additional complaint, a female employee, Allison Bailis, complained in September of 2004 that she felt uncomfortable with Mr. Resch's inquiries about her home address and a dinner invitation by him to her. The matter was reviewed by Daniel Jones in HR. A memo, dated October 1, 2004, (signed by Mr. Resch) to Ms. Bailis, indicated that he was sorry if she had misinterpreted his questions, and stated that it was purely business. He said that she would not be subjected to any adverse action, would be treated fairly, and would be happy to meet with her to discuss the situation if she would like.

In another situation in September of 2004, a supervisor at KI, Marie Smith, wrote a memo about Mr. Resch about the attention he was paying to Sarah Kimps (who reported to Ms. Smith). Ms. Kimps indicated in conversation with her manager that Mr. Resch had asked personal questions about her dating, visited her desk, and, in conversation, looked at her "in specific places". She said she was uncomfortable with his attention. Mr. Olsen talked to Mr. Resch and in memo dated October 1, 2004 Mr.

Resch indicated he did not intend anything sexual towards her. *That memo was a very similarly worded memo to that sent to Ms. Bailis and was dated the same day.* There is no documented indication that HR conducted an investigation.

An additional female employee, Catherine Morris, complained about pregnancy discrimination, Mr. Resch kissing her on the lips and then refusing to wipe away the lipstick so that everyone would think she had kissed him, and sending her unwelcome letters, flowers and "lewd phone calls". She also complained about other KI staff and said that she had complained to HR on several occasions, but nothing had been done. She also claimed retaliation for her prior complaints.

Another employee, Stephanie O'Brien, complained of sexual orientation discrimination by Mr. Resch, overtures by him, and then the company's promotion of another, allegedly less-qualified woman in whom he was sexually interested (Ms. Jamiolkowski), depriving her (Ms. O'Brien) of a promotional opportunity. A legal complaint was filed in that instance in October of 2003. Ms. O'Brien indicated that she did not want to be interviewed by HR as part of an investigation because they had prior opportunities to investigate previous concerns and had not done so.

In another situation, employee, Nineve Gonzales also alleged a sexual harassment complaint about Mr. Resch and her subsequent termination when she rebuffed Mr. Resch's advances. Her attorney sent in a letter to the company dated December 19, 2002. The company had responded to her that there were performance problems, she was underperforming and she was finally terminated for performance-related information. In the information I reviewed, there is no documented indication that HR conducted an investigation in this situation or was aware of it.

This is in addition to Karen Jamiolkowski, who resigned from KI in 2003. She indicated that her performance and reputation had been tarnished by the accusations of Ms. O'Brien. Ms. O'Brien had filed a lawsuit and indicated that she had been denied a promotion based upon preference given to Ms. Jamiolkowski, (who did receive the job). Ms. Jamiolkowski indicated that Ms. O'Brien had said that Ms. Jamiolkowski had received preferential treatment because she was the object of sexual attention by Mr. Resch. Ms. Jamiolkowski indicated that that was not the case, but did indicate that Mr. Resch had made comments and overtures to her that she perceived to be sexually harassing. She said she had frankly discussed and complained about Mr. Resch's behavior with her last manager, Mr. Krenke, and other managers.

She said that he had purposefully tried to sit close to her at meetings, called her frequently, asked her questions about her personal life to show personal his interest in her. She indicated that Mr. Resch also made sexually suggestive comments to her in front of her clients, wanted to meet with her after work hours and said that he would like to be with her romantically. She said she told him as he was the CEO, it was inappropriate for him to date women in the company and it was not fair to her and that he was intimidating. She indicated he used his automatic office door closer when she was alone with him in his office which she found intimidating.

She said he discussed that they would make a great couple and he would be open to having children. He showed her a condominium that he said he had purchased together with Rebecca Stephany, when he was asking her where she would like to live. He invited her to his home and invited himself to her home. Physically, she said he nuzzled her neck and tried to kiss her more that once. When he told her that Ms. O'Brien was filing a law suit that would say Ms. Jamiolkowski only obtained her promotion because she was being given preference because of a personal relationship with Mr. Resch, he told her to lie. He told her to never say that he had made advances to her (Ms. Jamiolkowski) or sexually harassed her. She said that she had no option but to resign from the company and alleged that it was a constructive discharge.

In September 2005, a detailed letter was sent to Mr. Resch from an attorney representing Kimberly Christman. It said that Ms. Christman had been the very successful President of one of the divisions of KI for several years and had been diagnosed with bacterial meningitis. She was away from work for a time due to her illness and alleged that the company became hostile to her after her illness was disclosed. She said the Company had been giving her problems and presenting difficulties in her in returning to work and the Company was resistant to her use of FMLA. In that letter and in another December letter, she alleged the Company was discriminating against her on the basis of age, gender and disability. She also indicated that she had been the recipient of numerous unwanted sexual advances over the years from Mr. Resch and had been asked by Mr. Resch to be his alibi for his sexual dalliances with female employees.

Opinion

In reviewing and analyzing the information provided to me in this case, it is my opinion that while the more recent policies of KI were straight forward and had the required components, the actual practices were not consistent with and dramatically contradicted the effective implementation of their own policies, especially if the company was sincerely committed to providing a workplace free of harassment. The behavior (actions and inactions) of top management was in total conflict with their own policies and recognized management practices to prevent and respond to concerns about discrimination and harassment.

This was not just a matter of not quite doing a good job or not acting in a professional manner. Even if you limit the assessment to their admitted behavior, from an HR perspective, the actions of top management were a complete failure to protect their employees and the conscious and admitted behavior of Mr. Resch was completely counter to their own policies and training materials and HR "basics" to prevent discrimination and harassment. The alleged behavior, if accurate, outlines a gross abuse of power and actions in complete disregard and undermining of their own policies.

Policies

In looking at a case of harassment, the following outline presents a benchmark against which to measure a company's practices. In my experience, policies and practices of an employer in taking all reasonable steps to address and prevent harassment include:

A. a clear, well articulated policy that offers:
   1. a full definition of the behavior that could be considered harassment
   2. a clear outline of a viable and accessible complaint procedure (with alternative places to go instead of the immediate supervisor) in which employees have confidence
   3. a statement that an objective, thorough, confidential and timely investigation will be conducted by trained, experienced and neutral professionals
   4. a strong management commitment against harassment
   5. a statement that anyone found to be harassing other employees will be subject to discipline up to and including termination
   6. a firm warning against any retaliatory action directed at a person who makes a complaint or provides information during the investigation.

B. fully and effectively communicating the harassment policy

C. doing effective management and employee training to make sure they understand all the facets of the policy and their individual responsibilities and they are held accountable

D. appropriately responding to complaints of harassment by:
   1. acting promptly and forthrightly
   2. fully communicating with the complainant and alleged harasser about status and resolution, balancing privacy interests of persons involved
   3. reaching a balanced, reasonable conclusion in a reasonable time frame

E. following up with the complainant to make sure things are "okay" and to call if there are additional questions or problems

F. managing the communication process with other employees

G. preventing future instances of harassment by taking appropriate corrective action. If there is anything less than a clear understanding of the harassment policy, make sure it is fully covered in training/retraining for employees and managers.

In a review of the information in this case, many of these steps were not take or were only partially taken.

To put these remarks on policy content in an appropriate context, it would be helpful to look at the purpose of a policy. A policy is the formal communication of the company to their employees to define issues in a clear and easily understandable way. Policies

establish clear steps to follow and outline what will (and will not) occur and what the employee has a right to expect. The goal is to help the employee know what to anticipate, make them comfortable in making that initial "approach" and identify who to go to. However, to be effective, the policy must also be written in a style and language appropriate to the audience and effectively implemented.

KI's later policies covered the major points and were consistent with applicable regulations and laws. While everything can always stand more "fine tuning", the harassment policy was straightforward and to the point. However, effective policy implementation is the key to making sure that it really works. In this case, it was the policy implementation that was problematic.

<u>Policy Implementation</u>

Implementation is making sure managers know the policy and confirm employees fully understand how it affects the workplace. Managers and employees need to understand the impact and importance of their own behavior. This necessitates adequate communication and credible "enforcement" of the policy. Communication usually means "publicity" within the organization and training and making sure all employees are personally notified. Credible enforcement means that the company employees charged with implementing the policy are knowledgeable, thorough and fully professional, especially if prevention is key.

The 2003 Harassment Policy outlines a zero tolerance towards harassment in the workplace, saying, "We will not tolerate harassment of company employees by anyone". It outlines various types of behavior that would be considered harassing and states that sexual harassment "also includes unwelcome conduct that is personally offensive, fails to respect the rights of others or interferes with an individual's effectiveness at work". An underlined statement says, "You are required to report the harassment to someone in management at KI". *It also states that KI's human resource team will promptly and thoroughly investigate all complaints of harassment by gathering relevant evidence.* The policy does not mention alternative sources of going to outside agencies to report any concern about possible harassment.

The Handbook also outlines the existence of the organization's use of an employee assistance program. A 1999 Harassment Policy of the company is shorter, and also includes a statement that "instigating or spreading rumors of alleged harassment among fellow employees is not the proper course". That policy indicates that all complaints will be promptly and discretely handled.

The 2000 Policy is very similar, but in the 2001 Harassment Policy, that statement about gossip is removed. Instead, an underlined statement says, "you are required to report the harassment to someone in management".

In the 2003 policy, (again posted in 2004 and 2005), the mandatory required to report is removed, but the Policy, itself, is a little bit more comprehensive.

An internal procedure to guide policy implementation (a several page outline on the handling and investigating of a harassment complaint), states that once a harassment complaint has been made or if KI is otherwise "aware that a problem exists" HR should:
- immediately investigate and gather relevant evidence
- review of personnel files and
- Interviewing individuals with relevant information.

It states that all interviews should be conducted by two members of KI's management teams, with one being from HR.

Legible notes should be taken during each interview. It was stated that even if the allegation appears questionable, treat it as valid until the facts have established otherwise. In discussing conducting the interviews, it also says that you should determine whether anyone else was subjected to similar conduct or was treated differently. It says to "determine the time relationship between an occurrence and the conduct and how the complainant would like the matter resolved.
- Can the complainant continue to work with or for the accused?
- Would productivity be adversely affected?
- Will it be embarrassing or awkward"?

The outline also mentions that the accused person's manager should be involved about any observation that they may had. The accused is also to be interviewed.

In concluding the investigation, it is outlined that the response to a harassment complaint should be evaluated on the efficiency in preventing future harassment. "If the case is not the first involving the accused, a repetition of the earlier sanction will likely be viewed as inadequate and may create or increase employer liability."

The outline also goes into detail about the investigatory summary report and a complete and detailed written report. It also mentions follow-up and monitoring to ensure that the policy is being followed and that there has been no retaliation or further harassment. The outline concludes with a statement that on an annual basis HR will conduct a training session for all managers on the KI Harassment Policy.

This detailed outline provides a checklist or template to guide HR. Most of the information that I have reviewed in this case indicate this outline was not followed. There is seldom, in any of the complaints mentioned in the "background" any indication that the steps that were mentioned in the investigatory procedure were even attempted.

A slide, as part of training for management says, "On preventing harassment, never assume friendliness equals sexual interest'. Don't assume your behavior is okay, just because no one has objected to it. If someone indicates your behavior is unwanted, stop immediately. If in doubt, don't say it, don't do it." Interestingly, this was the similar behavior complained about in some of the complaints against Mr. Resch.

policy on personal relationships at work

Policies on personal relationships at work should generally address the issue of potential favoritism that personal relationships may imply. Any such policy should be practical, realistic and enforceable. A good policy should talk about maintaining a positive work environment, and while you don't want to intrude on private lives, it is important to recognize the risk that personal, romantic, or sexual relationships have to disrupt the work environment or negatively impact other employees., especially if one of the parties is in a position to impact or influence the job or the working environment of the other party.

If personal relationships develop between two employees, it is my experience that the company should be advised to have those employees report their relationship to an appropriate person in HR. The policy should also cover the fact that personal relationships should not have either employee in a position to initiate, participate in (directly or indirectly) decisions involving a direct benefit, such as work assignments, performance appraisals, job classification, hiring or discipline to the employee direct, to the employee specifically or members of their immediate family or a domestic partner.

KI's policy on nepotism states that they "do not permit situations where a real or apparent conflict of interest is created in the employment context. Such conflicts can arise from family or intimate personal relationships". The Company's own training material says "workplace sexual harassment frequently is about *power, not romance...the proper use of power in the workplace can prevent harassment. The misuse of power can create sexual harassment".* The company's own material is directly on point in addressing the admitted behavior of Mr. Resch.

The KI training material for harassment indicted that workplace dating is a high risk situation, especially between a supervisor and a subordinate. . It states that even *"successful relationships may engender jealousy or resentment in co-workers and may lead to claims of favoritism or harassment".* Mr. Resch was not only the president and CEO; he was also the major stockholder in the Company. *He was incomplete and absolute control.*

When asked about what problems she saw in the CEO dating women employees, Ms. Hackbarth-Horn mirrored the training material when said "there could be huge perceptions of favoritism" … and there would also be "a concern of what would happen if the relationship didn't work".

The training material has a checklist for managers that tells managers not to ask inappropriate questions about an employees' or co-workers dating or sex life." This is one of the items mentioned by some of those that complained about Mr. Resch (DuBois, Jamiolkowski).

The checklist goes on to state that a manager "recognize the dating between a manager and an employee creates a high risk situation. Anything positive that occurs at work during a relationship may be perceived as favoritism...and anything negative that occurs when a relationship ends may be perceived as retaliation". "Manager-employee

dating may lead others to claim that a sexually offensive work environment has been created". (O'Brien)

Even if a company had complete, clear and well-written policies, if those policies were not credible with the employees and managers, they were not effective. The best "test" is to ask employees and managers what they know and understand about harassment, where do they go if they have a problem and are they comfortable in raising a complaint or concern about harassment. How does management make sure their efforts are effective? In multi-site organizations, this means ensuring an appropriate amount of consistency from one department, division, region or location to another. Effective implementation also means that there is a credible, accessible complaint procedure that employees can use with comfort, trust and security. In this case, there is a significant question about the effective implementation.

Training is key. While the company has provided extensive material information that they indicate has been used in company harassment training, it seems that these actual training efforts are fairly recent. When asked if there had been any prior sexual harassment training to her arrival in 2000, Ms. Hackbarth-Horn said she was "not able to put her finger on it". From the information I reviewed, it was very difficult to know who was trained and when. Were managers, and, most importantly, top management trained to clearly understand their responsibilities to prevent harassment, and be a role model and set an example in their own behavior?

role and responsibility of a supervisor/manager in policy implementation

Supervisors in the workplace have a dual responsibility – not just to respond to complaints but to observe the workplace and intervene if they encounter inappropriate behavior. Potential problems of having a first line supervisor be the primary "contact" point are that usually the supervisors are not adequately trained, they may not be (or viewed as being) objective. There may be (and usually is) little consistency in how the complaints are handled from one supervisor/department to another. Supervisors are sometimes reluctant to tell their supervisors or HR that something has occurred.

If a supervisor/manager receives a complaint, the series of instances outlined in this case indicate that the response may range from doing nothing to doing a very limited investigation to handing it off for attorneys (who report the findings to the CEO) to conduct an investigation. The quality, completeness and accuracy varied dramatically. Even when there was some investigation, there was a pattern of minimal follow-up. . .either to insure that the complainant knew what action had or had not been taken, to make sure there was no negative consequence to the complainant or to make sure the problem had been effectively remedied. For example, Mr. Krenke's action and inactions after Ms. Jamiolkowski reported her concerns to him in 2003 indicated that he did no follow up with her, did not communicate with her.

the investigation as part of policy and complaint procedure implementation

The required steps to gauge the effective management response to harassment complaints are the quality of the investigation – thoroughness, objectivity, accuracy, confidentiality and timeliness. Otherwise, the message you can give the employees is that this matter has very low or no priority. Employee trust in the "system" can be destroyed. To delay or take an unreasonable long time to resolve and conclude complaints is inconsistent with preventive case management.

In effect, what seems to have occurred in the handling of this series of complaints about top management (Mr. Resch), is that accountability and closure got completely lost or were ignored. It was too easy to say that someone else or the attorneys were "doing it". There was minimal follow-up. Employees were not informed of what was happening to their issues. Documentation was iffy or non-existent. Sometimes, incomplete or inaccurate information was given to upper management when they asked about particular instances. Or, as in most cases, HR was never informed of complaints.

If the top level manager is to one accused of inappropriate behavior, the organization, in my experience has a special responsibility to make sure there is an adequate and reasonable investigation that is conducted by someone who is not answerable to Mr. Resch. If an allegation of inappropriate behavior is confirmed after a complete and thorough investigation, adequate accountability and appropriate remedial action is key to prevention of future or repeated problems.

accountability for policy implementation

Mr. Olsen indicated that in terms of holding someone accountable and the discipline process, the first step would be a verbal warning, followed by a second step where something would be put in writing. Step three could be a period of time away from work. A fourth step would be if all of the other steps have been exhausted, and it might be termination.

Policy information from a revised KI Corrective Action Policy, revised in August of 2003, mentions that factors to be considered in determining the formal corrective action are:
- the employee's truthfulness
- the employee's willingness to cooperate in investigating the circumstances
- the employee's perceived ability and the willingness to improve and rectify the problem, the employee's past performance record
- the employee's attitude toward the company, managers and fellow co-employees
- the business needs of the company, and
- the harm caused by the employee and the severity of the conduct.

In his deposition, Mr. Olsen, indicated that Mr. Resch had been disciplined for inappropriate conduct. He said that was initially in the case of Ivy Berman, the situation with Sara Kimps, and the third time was about Ms. Bailis. In the case of Ms. Berman, he said Mr. Resch was given a letter. *In reviewing the contents of that letter, in my experience of dealing with hundreds of corrective action letters and memos, the content of the letter given to Mr. Resch would not be a usual and routine disciplinary letter.*

In going into further information about Mr. Resch and accountability Mr. Olsen indicated that the memo regarding Ms. Berman, Mr. Olsen indicated would fall between the second and the third step in the discipline process. He felt that for him just to sit down with the president of a multi-million dollar company and go through with him the expected actions would be a disciplinary action.

who manages the manager ?

One of the options when senior management is alleged to have acted inappropriately is for the Board of Directors to retain an external investigator that would not be "beholden" to any of those managers whose behavior they might be investigating. Any final report would go back to the Board. This process has the added value of being and appearing to be more neutral to both the complainant and those who are the alleged "wrong doers". Yet, Mr. Olsen did not recall any matter in which claims about Mr. Resch's alleged inappropriate conduct were brought to the attention of the Board of Directors or investigated by an external HR investigator retained by the Board.

In my experience, even informal complaints about possible managerial misconduct, even if not yet filed with an external agency and certainly before the polarizing formality of a lawsuit, are taken very seriously. They are dealt with (consistent with most harassment and discrimination policies, KI's included) and become the subject of a prompt, thorough and objective investigation. This does not mean having the corporate attorneys who represent and are paid by (and ultimately retained) by the CEO conduct the initial neutral fact finding. It also does not usually mean that the investigation can or should be done by internal HR staff, if they report the process or the results to the CEO (rather than the Board). In contrast, Mr. Olsen felt that he had acted responsibly by asking attorneys for the corporation to handle and investigate the allegations against Mr. Resch, even though their reports ultimately went to Mr. Resch (the alleged harasser). This sequence undermines and eliminates realistic accountability.

What happens to prevention efforts if the CEO (or other top management) are treated differently and given special or preferential treatment or, in essence, 'excused" from the same level of accountability to comply with corporate policies and external mandates? In my experience, if there is a different or looser standard of accountability for top management, the company has destroyed the credibility of their own policy and complaint procedure and guarantees outlined in their own policies.

While Mr. Olsen said that he did not want to see anyone treated with favoritism for any reason. He wanted to see everyone treated fairly, his actions run counter to that assertion.

Even if a company has state of the art policies, had trained all supervisors, managers and employees in equal employment and harassment and conducted the best, most thorough, complete, accurate and objective investigation, poor follow through or lack of closure and accountability would make all of those other steps meaningless.

From an HR point of view, it would usually be ideal for the HR function to report directly to the CEO or President of the organization so that they play a more active and influential role in strategic planning and policy formulation. However, that may not always be advisable, especially if HR is charged with implementing a policy that would or could impact the accountability of potential job security of the person to whom they directly report. For a period of time in the early 2000s', HR did report directly to Mr. Resch. During that period on time there were issues with HR being responsible for implementing the harassment policies that were challenged by Mr. Resch's' alleged and real behavior. HR becomes powerless to carry out their designated responsibilities in an effective and objective, credible manner, thereby shredding the intent and content of related policies. The very person who should have been leading the organization and acting as the key role model for the effective implementation and support of the organization's policies (Mr. Resch) deliberately put himself squarely at odds with the statements contained in KI's own training material for the implementation of harassment prevention.

Prevention

In my opinion, the steps taken to prevent harassment at KI in this series of complaints did not support and actively undermined their policy commitment to having a harassment free workplace.

With the myriad forums for complaint handling, there was no centralized point to ensure closure, completeness, follow-up and consistency. That left a significant void in the effective handling of employee complaints. This makes it impossible to identify patterns and certain locations that are "hot spots" within an organization. It leaves gaps in developing a consistent approach in corrective action and complaint handling. With the potential "disconnect" in information flow, a company has a much more difficult task in settling priorities, knowing how big or how small the problem may be and identifying solutions, such as training needs. In the information I reviewed, as a new allegation or complaint about Mr. Resch would surface, it was not viewed as a possible pattern. When or if was dealt with, each complaint would be treated in isolation from other, prior allegations, by staff not positioned or able to hold Mr. Resch accountable.

A routine and basic step that is always available to HR and management staff before, during or after an investigation is to thoroughly train and reaffirm the sexual harassment policy and talk to employees and managers about how to get questions answered and problems solved. If employees and managers don't know how to define harassment, it is management's obligation to tell them. If employees don't have trust in management to resolve complaints, it is management's duty to show them how effectively the process works. If employees don't believe that the company will enforce its policies, it is management's responsibility to convince them the company will live up to the commitments and promises it has made to their employees.

Management actions in assuring credibility in complaint handling and applying effective corrective action are key components for preventing harassment. In the series of complaints from female employees about Mr. Resch, there seemed to be ad hoc complaint handling and minimal corrective action. Investigations were not done or not completed. Feedback was non-existent. Complaints were often not reported to HR. Management behavior was high risk and counter to their own policies and training.

## Ms. Jamiolkowski concerns

Ms, Jamiolkowski made clear and pointed statements to her manager, Mr. Krenke. She also indicated that she had previously raised issues to two other management staff. A basic and routine process that would usually occur subsequent to receiving such information as mentioned to Mr. Krenke by Ms. Jamiolkowski in 2003 outlining her concerns about having to comment on Mr. Resch's behavior or possibly testify in a hearing (the complaint of Stephanie O'Brien) would be to immediately contact HR to assign it to a trained and knowledgable investigator within a very short time frame. Depending on the scope of the investigation, it could take another week to do basic interviews and record checks. One of the usual first steps in an investigation is to determine vulnerability and the possibility of continuing risk to determine if a temporary absence (of the complainant or the alleged "wrongdoer") from the premises is necessary

In this case, that would be accomplished by immediately checking with Ms Jamiolkowski to see if there were any unusual behaviors or experiences that could be attributable to Mr. Resch that would still be a concern of if there was a fear of any retaliatory action. Part of that inquiry would be for HR to find out if any other female employees or any other staff having any contact with Mr. Resch raised any question about the "propriety" of his behavior or said they were uncomfortable. Were any of his employees especially "vulnerable"...that is younger, or less likely/able to raise a complaint? Mr. Resch was described as having a certain type of female to whom he was attracted. Ms. Jamiolkowski was upbraided by one of her colleagues for even exposing a recently hired female employee to Mr. Resch by bringing her to a work function that would be attended by Mr. Resch.

In this entire process, care needs to be taken not to jump to conclusions and endanger the reputation of the alleged "wrongdoer", should the original allegation prove to be unfounded. An experienced and able investigator knows how to carefully balance this information. An investigation can be conducted in such a way that actual names or identities may be kept confidential, while still obtaining the necessary information to make a preliminary assessment or conduct an entire investigation. However, with the lack of active investigation and accountability, that did not seem to present any risk to Mr. Resch.

Even if a decision is made that someone (the accused or the complainant) needs to be "off premise" for a few days while the investigation is conducted, that can be easily handled without causing undue speculation and rumor. As far as anyone knew, they

could be taking a few days off. While this is a usual and routine question that is considered in many situations, in all of the information I reviewed, there was no instance that this step was taken or even considered for Mr. Resch in the various complaints made about him.

In this type of situation the investigation has to be done in a way that honors appropriate privacy and confidentiality guidelines and rules. That, also, can be done without compromising privacy and confidentiality concerns. Routine steps would be for the investigator to ask any/all of the staff that has usual and routine contact with Mr. Resch if they have had experienced or heard about any unusual, questionable or inappropriate workplace behavior that has made them personally uncomfortable. If so, what, when and who may have more information? A very effective and comfortable way to acquire pertinent information and find out if the impact of the alleged behavior is valid and causing discomfort to a wider array of employees is to ask for a suggestion of who would benefit from attending "charm school", explaining that would be one-on-one management or executive coaching.

Another basic and routine step would be to contact Ms. Jamiolkowski and to see if she had anything else she wanted to add or anyone she felt should be interviewed as part of a formal investigation. Where there any other items that she found unusual or "strange"? Confirm to her that you take this type of situation very seriously. In my experience, if someone has gone to the care and trouble to make such comments to management staff, there may be other, perhaps even mores troubling information that they have not mentioned in the initial disclosure.

Another step would be to confidentially review any HR/legal files to spot any prior complaints about Mr. Resch that would seem consistent with the type of complaint being made. Were there any other allegations about Mr. Resch's behavior focused on sexual content? Did HR/legal files indicate or confirm any of the types of questions or comments Ms. Jamiolkowski outlined? From the information I reviewed, different complaints about Mr. Resch were not revealed or made known to HR, to top management or to the Board....even when they became formal lawsuits.

If no other corroborating information is obtained through these initial steps, if necessary, the next step would be to interview similarly situated individuals as the complainant. If no additional information is found, then a direct interview (conducted by a skilled and experienced investigator) with Mr. Resch would be conducted. Any allegation needs to be handled with objectivity and real and perceived neutrality...to be fair both to the manager and the complainant. Other wise, the perception is often that it is a "whitewash". If it is against senior management, it can sometimes be a bit more complex and politically sensitive. In the case of several of the allegations against Mr. Resch, they were either referred to the external corporate attorneys for investigations or had little if any review or investigation. If those situations that were referred to outside attorneys were investigated, the results are unknown and do not seem to have resulted in any documented accountability designed to prevent future problems. Mr. Resch said he had never been counseled or disciplined.

When asked if he felt that it was appropriate in evaluating the attorney's recommendations or their findings of investigating a complaint of harassment against the president of the, Mr. Olsen indicated that he felt that worked because he "trusted the attorneys and they are professionals in that area". This would mean that the ultimate findings are reported to person being investigated, as opposed to the top HR person or Board. This thought process is totally counter to an objective and neutral fact finding process and result. In my opinion, the actions of Mr. Olsen were designed more to minimize any open review or investigation and simply allow business to continue as usual.

This investigation sequence outlines straightforward steps that would be usual and routine. These steps (if limited to interviews with the complaining parties and the accused) should take no more than one week to conclude. It should take a trained investigator several hours, spread out over a week to do this. (The time may be extended, depending on the number of files to be reviewed and number of employees to be interviewed). If the organization is really concerned, or any step reveals confirming information, the timetable is advanced and it becomes an extremely high priority, rather than just a high priority.

If HR is positioned, given the responsibility and authority to conduct investigation and respond to employee concerns, they need to be able to act quickly and effectively. They should know about any other prior complaints and investigations of sexual harassment so that they can identify any possible patterns. They need to have access to prior investigations. When Ms. Hackbarth-Horn was asked if "in November of 2002, Stephanie O'Brien claims that Karen got the position because Richard Resch had a sexual interest in her and then in August of the following year Karen tells you that she is upset because Stephanie has been spreading rumors about her that she was having a relationship with Richard Resch, did you connect those two?" She responded obliquely "again, you know, at the moment my thought process at that particular time, you know, I can't tell you what I was thinking back then, you know, surely both cases as they were brought forth were concerning to me".

This response does not indicate that she had key and relevant information about prior employee complaints (and their investigation and resolution). It does not appear that she became actively involved, or was allowed to become involved. If there were notes, she would be able to recall what she did. If there were HR interviews that were serious and designed to be an objective and effective fact finding there would be notes. The lack of notes and HR recall raises serious questions about the level of HR involvement. Is it a question of ability, responsibility, access, authority, confidence or something else? Was HR, effectively neutered? In terms of investigation or responding to concerns about Mr. Resch's behavior, it would appear so.

Whatever is done when an employee complains about behavior that may be harassment, an organization cannot afford to delay investigating until another complaint arises. If an organization is serious about effective policy implementation to prevent

discrimination and harassment, positive employee morale, security, safety and satisfaction, being able to have employees work in an environment that is professional and not dangerous of threatening (or harassing) is mandatory. If an organization has any indication that there is a possible problem, especially at the highest levels of management, HR basic management practices and the Company's own policies say you act and you act immediately. Seldom does an organization get such clear and reasonably presented information as presented by Ms. Jamiolkowski that is not already a formal complaint of a lawsuit. With that early opportunity and clarity, an organization should act immediately, reasonably, professionally and objectively. In my view, from the information I have reviewed in this case, none of those things happened.

When the manager of Karen Jamiolkowski, Brian Krenke was asked if he had ever done anything about her concerns that Stephanie O'Brien was initiating rumors that Ms. Jamiolkowski had received her promotion because of a possible sexual relationship with Mr. Resch, Mr. Krenke said that he did not confirm the allegations by talking to Stephanie's old team. He said that it would have been "difficult to ask them that question", indicating he did no further investigation himself.

When asked if he did anything to investigate Ms. Jamiolkowski's concerns, he said that he talked to Stephanie and she acknowledged it. He didn't talk to anyone else. He said Stephanie didn't say whether she was going to stop or not. He did not go to HR, because he didn't feel it was necessary, because "he had told her to stop". This sounds very much like a short sighted view of a manager that did not want to go further, did not see his responsibility to adequately explore or investigate the concerns or issues, which is counter to the Company's own training.

Mr. Krenke said that "I told her (Ms. O'Brien) about the allegations and asked her if she was doing it and if she was, to stop because it was hurting our ability to move forward with some of the institutional markets in Northern California". When asked if he specifically asked her if she had been making the allegations, he said "no". "I didn't think it was necessary.' He simply said "I told her to stop." He never took steps to find out confirming information from others, confirm Ms. Jamiolkowski's concerns or get back to her. By his inactions, he effectively minimized Ms. Jamiolkowski's concerns and the impact they might have on her and her career.

According to Mr. Krenke, when Karen Jamiolkowski came to him and expressed concern that she might be called to testify in the lawsuit that Ms. O'Brien had initiated, she said that she would have to indicate that Dick (Mr. Resch) had made inappropriate comments to her. She wouldn't lie. "I told her not to worry about it. Let's focus on managing your team." "I didn't want her too focused on outside things like this taking place, so I told her not to worry about it." Does this indicate that Mr. Krenke was being cavalier and dismissive in his response to her? Was he taking her concerns seriously? His behavior was consistent with other managerial inaction in marginalizing employee complaints and concerns about Mr. Resch, not going to the Board, not confronting Mr. Resch and in allowing the situation to be swept under the rug.

He said he told HR, (Mr. Olsen, not Ms. Hackbarth-Horn) about Karen's concerns. He doesn't recall telling Karen that he had passed her complaints on to HR. When asked if he was aware that there was actually an investigation of Karen's allegations, he said, "No". Ms. Hackbarth-Horn stated that Mr. Olsen had the HR function report to him for many years and had a great deal of expertise and knowledge and understanding of employment law, so he was equally qualified (as her) based upon his years of experience. Conversely, Mr. Krenke said that he knew there had been an investigation about Stephanie O'Brien's allegations that Karen had received her position because of a personal relationship with Mr. Resch. He knew this, not because he was ever interviewed as part of an investigation but because he recalled seeing a communication where individuals who made the (selection) decision were asked what they used to evaluate (candidates) and how they came upon on Karen as the candidate of choice.

who makes the final decision?

Mr. Olsen did not see a problem with the alleged harasser (the CFO) making the decision on how the claims against him were handled, because, in his view, the attorneys involved are hired by the company, even though the company (through the CEO) has to make the ultimate decision on how that complaint or claim is responded to. That is the type of convoluted and contradictory action that, in my experience, destroys employee trust in an organization's complaint procedure.

If a company is serious about prevention, it usually accompanies a management and management style that is open to comment, one that encourages open and comfortable employee exchange and input and actively supports an "open door" type of environment. While a more rigid or highly stratified organization can be very serious about a zero tolerance towards harassment, if effective, in my experience, it is usually accompanied by a strongly stated and frequently repeated commitment from the top company management accompanied by accountability for management behavior to be a role model to support company policies.

In a forthright statement contained in the harassment training material for KI, their own material says that the "supervisor **is** the company. Supervisors exercise authority on behalf of the employer....*If a supervisor knows about harassment, the company knows about harassment. If the supervisor fails to take action, the company fails to take action.*"

power, influence and use of power

Ms. Kristine Hackbarth-Horn, the Director of HR at KI and the Company's chief HR professional said that "the management style at KI was one more of an autocratic nature". It was a controlled environment, that was not where she wanted to be ... She went on to state that KI was a pretty top down controlled ... environment ... the culture worked well with their success for many years ... the process has worked well for the financial results of the organization." When she joined the organization, she was told

that it was "a very employee-empowered work environment, and the reality is that it was incredibly autocratic".

The CEO/President is the top management person in the Company. In this case, Mr. Resch was also the primary shareholder. That position gives him almost unlimited power and decision making authority over all of his employees. Did he use that power appropriately to prevent harassment in the workplace? Many top managers are removed from the every day part of the Company operations. Not Mr. Resch. He was in the halls, making sales calls, attending employee training functions, participating in trade show, actively visiting Company locations and customers throughout the country. This gave him ample opportunity to scrutinize and meet the employees. As the allegations made by several female employees indicates seem to define, he used his field visits to find new opportunities to introduce himself and "get to know" new employees.

When asked if employees might feel uncomfortable in talking to Mr. Resch because of his position in the company, Ms. Hackbarth-Horn indicated that "surely by the perception of who he was, I'm sure there were individuals at times inside the organization who didn't feel comfortable and may have been fearful to walk into his office or approach him on an issue."

She was also asked about his ability and equipment set up to tape record telephone conversations in his office .When asked if it was common knowledge that he tape recorded telephone conversations, Ms. Hackbarth-Horn indicated "no, no, un ah, no I wasn't aware of that, no. She was asked "If you had known that he had the ability to tape phone calls, would that have been a concern from an HR perspective? "Yes, it would have made me feel uncomfortable."

The Company training materials tell management to report any possible harassment situation or complaint to HR. That then assumes that HR is staffed and positioned to be able to investigate and resolve situations. That means HR staff must be sufficiently trained and able to discuss key issues with top management. Ms. Hackbarth-Horn indicated that she and Mr. Resch had challenging discussions even on such topics as health care. When asked if she ever spoke to Mr. Resch about his dating employees or workplace relationships, she said that she never brought that to his attention. When asked if she was afraid if he would get upset about it, she said, "Sure". When asked if he might get so upset that he would retaliate, she indicated that that she did not know what he would have done, but her feeling was that he had a lot of authority in the organization and "absolutely, there is that concern".

When Mr. Krenke was asked if he ever spoke to Mr. Resch about his conversation with Karen and her complaint to her manager, he said, "No, he didn't think it was necessary to speak to him". "I don't go to the president of the company to discuss personnel issues."

Mr. Resch also had the ability to automatically close his office door, so that others could not easily enter or leave his office. When asked what might be the response of people who sat behind his desk and had his automatic door closer close, Ms. Hackbarth-Horn indicated that "well, it happened to me, so I can tell you it is not a comfortable position to be in". This again goes to the exercise of power of the top manager.

From the type and nature of her responses given during her deposition and in looking at the reporting relationships, it is my opinion that Ms. Hackbarth –Horn was not positioned to control or tell Mr. Resch what to do or not to do and could not command accountability that he follow Company policy.

When asked what the procedure was at KI for conducting an investigation, Ms. Hackbarth-Horn indicated that HR would have reached out to the individual that brought the concern forward, sat down with them, tried to gather facts, hold discussions with individual parties that were involved and it would be dealt with in a confidential and sensitive manner. There would be no retaliation, and they would complete the investigation. It would absolutely include a discussion with the person who was accused. When asked if there would be notes, Ms. Hackbarth-Horn indicated "of course". "There should be."

There were allegations about Mr. Resch's behavior that occurred during her time in HR yet, when asked if she had ever had any discussion with Mr. Resch about his behavior, she said, "No". In the information I reviewed, I found no notes of a documented interview with Mr. Resch as part of an investigation in one any of the many situations in which he was alleged to have behaved inappropriately and engaged in alleged sexual harassment.

For example, Ms. Hackbarth-Horn was not aware that there were allegations by Ms. Legato that Mr. Resch had sexually harassed her. In relationship to the allegations by Valerie Legato, Ms. Hackbarth-Horn indicated that she worked with one of the attorneys to do the investigation. As part of the investigation, there were multiple discussions with Mr. Resch. "I was not involved in those discussions," a statement which seems to be totally contradictory to assertion she made about the investigation process and HR's role.

When the complaint procedure, which is the foundation stone of prevention efforts, is compromised or not effective, the prevention process is loses integrity. When asked if she was aware of Mr. Resch being disciplined in any respect in regard to any alleged sexual conduct, she said, "No". When asked if he was criticized within the company, she said that there was nothing she was aware of. She said that, "I didn't oversee Mr. Resch ... ultimately Mr. Resch was the individual in charge".

When asked if "he had no manager, she said that would be correct". When asked if the Board had ever criticized Mr. Resch regarding his alleged sexual harassment, she said, "I do not know of anything like that. I would not be privy to that." When asked if Mr. Resch ever needed to be disciplined, would she be involved, she indicated "my assumption would be that that would have been the responsibility with the Board or other members of the executive management". She stated that "I was never part of the executive team".  HR had no control over Mr. Resch, nor did it seem that any other manager or the Board did either.  He acted as he chose, did as he wanted and was not subject to any control or accountability

Conclusion

The ultimate decision about what did or did not occur in the various allegations about Mr. Resch's behavior is a decision for the jury. However in simply using and citing the Company's own policies and implementation outline in the Company training materials and statements of key managers and Mr. Resch, a clear picture emerges that Mr. Resch's admitted behavior was inconsistent with and totally contradicted the effective implementation of their own policy implementation outline. Mr. Resch's alleged behavior as outlined in a series of employee complaints would be in dramatic conflict with their own policies to prevent harassment and a gross abuse of power. Printed words become meaningless and a joke when so flagrantly ignored and ridiculed by the admitted and alleged behavior in this case. The actions and inactions of management staff responsible for implementing polices to prevent harassment, in my opinion nullify and mock the foundation, purpose and integrity of those policies.

*Rhoma Young*

**RHOMA D. YOUNG**
Oakland, CA
(510) 530-6746

Since 1983 Rhoma has been principal of Rhoma Young & Associates, management consultants in personnel practices and public policy issues. Her consulting encompasses planning and problem avoidance strategies in all facets of employee and labor relations. This centers on investigating, analyzing and resolving potentially "hot," costly and politically sensitive problems. Preventive strategies include designing performance appraisal and management systems, workforce reduction planning, formal/informal mediation and tailored management training.

The focus on equal employment includes complete affirmative action plan and program preparation, successful compliance review and settlement negotiation, charge and sexual harassment investigation and resolution and preventive measures to minimize potential liability. On numerous occasions she has testified as an expert witness in related court cases for plaintiff and defense.

Clients range from several Fortune 100 organizations to smaller electronics, health care, service, construction and manufacturing firms. She works closely with several major employment law firms. Prior to forming Rhoma Young and Associates, she held management positions with General Motors, Boise Cascade and Los Angeles County in labor and employee relations, personnel and corrections.

Aware of the frequent problems associated with employee recruiting and selection, Rhoma has worked closely with a broad array of companies to develop targeted recruiting strategies, supported by highly focused, tailored interviewing and selection criteria to improve the quality and cost effectiveness of the hiring process. She also conducts mediation and one-on-one coaching in highly sensitive manager/employee situations, appropriate workplace communication and anger management.

Rhoma has directed major labor market studies to target growth industries and identify short and long-range critical skill demands. Working closely with a major insurance company issuing employment practices liability insurance, she pioneered the design and implemetation of their risk redcution strategy through highly focused HR "audits" to identify potential liability problems and recommend practical, cost effective solutions.

With broad-ranging experience in workforce reductions and reorganizations, Rhoma has prviided strategic leadership to several organizations planning workforce reductions, including outplacement, balancing legal, productivity and cost factors.

Expert in planning and organizing, Rhoma has conducted seminars and planned conferences for several professional and industry groups. She has taught at U.C. Berkeley and San Francisco State University, teaching classes in Affirmative Action Plan preparation, effectively managing and evaluating employee performance, complaint investigation and resolution and handling discipline and termination.

Active in civic and professional groups, she is a member of the American Arbitration Association, was Vice President of Program Management for the 4,500 plus member Northern California Human Resources Association and was on the Board of Directors. She remains active in their Legislative Action Committee, while also being on the national Diversity and EEO Pnel of experts for the Society of Human Resource Management (SHRM). She is a licensed (in California) Private Investigator.

Rhoma was President of the Bay Area Executive Women's Forum and was a Coro Foundation City Focus participant. She has an M.A. from Pepperdine, was a Weinberg Fellow at Cornell's School of Industrial Relations and did her undergraduate work at UCLA.

# Case List for Rhoma Young

While I have been involved as a consultant/expert witness in a broad series of cases for both plaintiff and defendant, the following situations are most of those in which I have been deposed and/or testified in trial in the last four years.

Walker v. Contra Costa County Fire Department. Defense represented by Bernard Knapp. Issues are race, retaliation, selection and investigation. Deposed January 2006.

Pedroso v. Eden Medical Center. Plaintiff represented by Patricia Kelly. Issues are disability and interactive process. Deposed December, 2005.

Frost v. CDC. Plaintiff represented by Felicia Curran. Harassment, retaliation, quality of investigation. Deposed Fall, 2005. Case settled.

Zheng v. Siebel. Defense represented by Orrick. National origin, gender, failure to prevent, retaliation. Deposed September, 2005, Case settled.

Green et al v. Marcus and Millichap. Defense represented by Diann Kim. Sexual harassment, failure to prevent, wrongful termination. Deposed Septemeber, 2005. Case settled

Horani v Alameda County. Defense represented by Steve Wolan. Issues are national origin, disability, lack of accommodation, age, retaliation, and whistle blowing. Deposed August, 2005.

Good v. Network Appliance. Defense represented by Morgan Lewis. Issues are age, gender, retaliation, RIF and wrongful termination. Deposed August, 2005. Case settled.

Roe h. v. UC Regents. Plaintiff represented by Sandra Springs. Issues are sexual harassment, failure to prevent, retaliation. Student and employee. Deposed July, 2005.

Sharei v. Hancock Rothert. Defense represented by Jamie Allen of Jackson Lewis and defense represented by Alan Exelrod. Issues are sexual harassment, failure to prevent, gender, retaliation, LOA and wrongful term. Deposed June, 2005. Case settled

Mnaskanian v. 21st Century Insurance. Plaintiff represented by Nancy Doumanian. Deposed May, 2005. The issues were disability, accommodation and the interactive process. Testified in trial in January 2006.

Boyce v. Onizuka Civil Engineering Support Joint Venture. Defense represented by Susan Roos. Deposed May 2005. Issues were sexual harassment, age, workforce reduction, investigation and retaliation. Case settled

Alberigi v. County of Sonoma. Plaintiff represented by Steve Muphy. Deposed April, 2005. Disability, accommodation, interactive process, performance management and retaliation.

Witt v. Firsthand Funds. Defense represented by Ned Smithers. Wrongful termination, public policy issues, retaliation, performance management and mitigation of damages. Deposed March, 2005

Walden v. Fed X. Plaintiff represented by Linda Scaparotti. Sexual harassment, gender orientation harassment. Deposed January, 2005. Case settled

Hettick and Bryant v. Fed X. Plaintiff represented by John Winer. Sexual harassment, investigation, prevention efforts and retaliation. Deposed Oct 2004 and testified in trial December, 2004.

Mayer v. CSC. Defense represented by Scott Lawson of Quinn Emmanuel. Gender, wrongful termination, RIF, performance management. Deposed Summer 2004.

Kranson vs. Peralta Community College. Disability, accommodation and LOA. Plaintiff represented by Steve. Murphy. Deposed Fall, 2004. Case settled

Doe v. E-Bay. Defense represented by Lynne Hermle of Orrick and Melinda Riechert of Morgan Lewis. Deposed Fall of 2004. Sexual harassment, wrongful termination and retaliation.

Miller v. UPS. Wrongful termination, age and disability discrimination. Plaintiff represented by Dan Crawford. Deposed July, 2004

Baatin v. Stars. Wrongful termination and disability/WC discrimination, mitigation of damages and employment search. Defense represented by Gordon Fine. Deposed June, 2004.

Hochdefer v. Indigo. Wrongful termination, mitigation of damages and employment search. Defense represented by Tom Griffin of Grunsky, Ebey, Howell et al. Monterrey County. Deposed and testified May, 2004.

Andersen v. Alameda County Medical Center. Disability, accommodation, FMLA/ CFRA, retaliation and performance management. Plaintiff represented by Chris Dolan. Deposed April, 2004. Case settled.

1 | Mitchell F. Boomer [SBN 121441]
JoAnna L. Brooks [SBN 182986]
2 | JACKSON LEWIS LLP
199 Fremont Street, 10th Floor
3 | San Francisco, California 94105
Telephone: (415) 394-9400
4 | Facsimile: (415) 394-9401

5

6 | Attorneys for Defendants
KRUEGER INTERNATIONAL AND
7 | RICHARD J. RESCH

8

9 | IN THE UNITED STATES DISTRICT COURT

10 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12 | KAREN JAMIOLKOWSKI,                    ) Case No.: C 05 00053 MJJ
                                          )
13 |              Plaintiff,                ) **DEFENDANTS' DISCLOSURE OF**
                                          ) **REBUTTAL EXPERT WITNESSES**
14 |     v.                                )
                                          ) **F.R.C.P., RULE 26**
15 | KRUEGER INTERNATIONAL, RICHARD         )
J. RESCH AND DOES 1 THROUGH 20,          ) Trial:              April 24, 2006
16 | inclusive,                            )
                                          )
17 |              Defendants.              )

18 | TO PLAINTIFF AND HER COUNSEL OF RECORD:

19 |         In compliance with the Federal Rule of Civil Procedure, Rule 26, DEFENDANTS

20 | KRUEGER INTERNATIONAL AND RICHARD J. RESCH ("Defendants") hereby disclose the

21 | following rebuttal experts retained on behalf of Defendants.  By making this disclosure,

22 | Defendants reserve the right to call or not to call the witnesses listed as Defendants deem

23 | appropriate.

24 |
25 |         1.       Beth K. Whittenbury
                      Beth K. Whittenbury & Associates
26 |                  30213 Via Borica
                      Rancho Palos Verdes, California 90275
27 |                  (310) 613-2102

28

# EXHIBIT B

# Beth K. Whittenbury
# & Associates

*Experts in Conducting Fact-finding Investigations,*
*Mediations, and Sexual Harassment Training*

30213 Via Borica
Rancho Palos Verdes, CA 90275
310-613-2102
Fax: 310-544-6048
bkwhittenbury@cox.net
www.bkwhittenbury.com

February 28, 2006

Ms. JoAnna Brooks
Mr. Mitchell Boomer

Jackson Lewis LLP

Via Facsimile and Overnight Delivery

Confidential, Attorney –Client Privilege, Work Product

## Expert Witness Report
### Karen Jamiolkowski v. Krueger International, Inc., et al.

### My Background

Since 1990, I have been a licensed California attorney. My practice and related consulting has primarily focused on employment law. I have conducted numerous fact-finding investigations of employee complaints, advised on employer policy development, conducted many trainings relating to employment law and discrimination with an emphasis on sexual harassment, and testified as a court qualified expert witness on sexual harassment and discrimination matters. I have served a wide range of clients including, among others, service industries, non-profits, hospitals, publicly traded companies and companies with one major shareholder or owner. My expert witness work is currently split 50/50 between plaintiffs and defendants.

I taught Business Law for two different colleges for a total of 5 years, and I taught several college level Business, Government and Society (Business Ethics) classes. I have served on the Board of Directors for what was then known as the Northern California Human Resources Council, and on the Executive Board of the American Bar Foundation. I am currently the Western Regional Chair for the Fellows of the American Bar Foundation ("ABF"). The distinction of ABF Fellow is limited to one third of the top one percent of lawyers practicing in each state of the United States.

I have written extensively on the subjects of discrimination and sexual harassment. Many of these articles have been published in peer reviewed academic publications, as well as practitioner magazines and legal or business newspapers. In 2000, I authored a book, "Handling Investigations of Employee Complaints," published by BLI. I have attached my curriculum vitae listing my education, experience, publications and major presentations. I have also attached a list of the materials reviewed in this case and a list of the cases in which I have given deposition or court testimony in the last four years.

### Scope

I was retained as a rebuttal witness to Rhoma Young's testimony and expert witness report. Therefore, I limit this report to issues raised and covered by Ms. Young. My rate for work other than testifying at deposition or trial is $200 an hour. I charge $300 an hour for trial or deposition testimony. I understand that discovery is continuing in this case. Should any new information come to light that I have not reviewed, I reserve the right to change the opinions presented in this report.

# EXHIBIT C

## Case Background

I defer to Ms. Young's lengthy summary of the facts in this case with the following exceptions and/or additions. Several paragraphs of Ms. Young's "Background" section relate to cases filed by individuals other than the plaintiff in this case. My understanding is that I am to comment on the policies and practices at Krueger International ("KI") as they relate to Plaintiff, Ms. Jamiolkowski, and not as they relate to other employees or all employees who have worked at KI in other locations and throughout its various departments. However, I must add to Ms. Young's summary that when Ms. Jasper indicated her concern to her supervisor, Ms. Rice, Ms. Jasper asked that she never again be left alone with Mr. Resch. (Jasper Depo 18:11-15). She then stated that she never was again put in a position of being alone with Mr. Resch. (Jasper Depo 18:1-3). Ms. Jasper stated that Ms. Rice asked Ms. Jasper if she wanted to go to HR and Ms. Jasper declined stating that she felt it sufficient to report that matter to Ms. Rice. (Jasper Depo 18:6-8).

Ms. Young also states that no documented investigation by HR occurred with respect to Ms. DuBois' sexual harassment allegations. Ms. Dubois, however, did not complain through internal company channels. It is my understanding that Ms. DuBois' claims were initially reviewed by HR and referred to KI's attorneys for investigation because of the receipt of an attorney's demand letter. (Mark Olsen Depo. Pp. 121 – 125:18). Mr. Olsen testified he relied on counsel to conduct a thorough investigation. He also ensured that Ms. DuBois was placed on a paid leave while KI's attorneys investigated Ms. DuBois' complaints.

With respect to Ms. Young's description of the events that took place with respect to Ms. Legato, Ms. Young appears incorrect in her statement that "no documented, completed investigation on harassment by HR that occurred." (sic) Mark Olsen stated in his deposition that he knew Ms. Legato's claims were "being investigated." (Mark Olsen Depo. P.141, lines 13-14.) Ms. Hackbarth-Horn stated in her deposition that Exhibit 103 to that deposition was a copy of a memo that she made or notes of a conversation she had with Ms. Legato regarding her allegations of sexual harassment. (Hackbarth-Horn Depo p. 207, lines 10-15). Ms. Hackbarth-Horn also stated that, although she made repeated attempted to elicit the facts surrounding Ms. Legato's claims, Ms. Legato did not communicate all the allegations to her and eventually Ms. Legato communicated through her attorneys. (Hackbarth-Horn Depo. Pp. 207-208). There is evidence to suggest that at the point where Ms. Legato employed attorneys to speak on her behalf, Ms. Legato's claims were investigated by KI's attorneys in an effort to resolve Ms. Legato's concerns. Prior to that time, Ms. Hackbarth-Horn had begun an investigation based on the information she had gotten from the complainant, Ms. Legato. (Hackbarth-Horn Depo. P. 207-208, lines 23-12).

Although Catherine Morris made a complaint of pregnancy discrimination to HR and Ms. Morris claimed that HR did not remedy her situation, I reviewed e-mails which showed that Ms. Hackbarth-Horn not only investigated Ms. Morris' claim of pregnancy discrimination, but sent her investigation findings to Ms. Morris in an April 17,2002 letter. This letter shows that even though Ms. Hackbarth-Horn found no pregnancy discrimination with respect to Ms. Morris, she still authorized, ankd KI paid for, a professional to coach Ms. Morris and her supervisor, Ms. O'Brien on ways to work more effectively together. This letter also indicates that Ms. Hackbarth-Horn also authorized "diversity training throughout all of our sales offices in CA" even though she found no actual pregnancy discrimination with respect to Ms. Morris. When Ms. Morris' sales efforts declined further, Ms. Hackbarth –Horn was clearly involved with efforts to insure that Ms. Morris' case was handled fairly and in compliance with company policies and procedures.

Ms. Young's report also stated that, "Ms. O'Brien indicated that she did not want to be interviewed by HR as part of an investigation because they had prior opportunities to investigate previous concerns and had not done so." Although that statement characterizes what Ms. O'Brien felt, Ms. Hackbarth-Horn stated in her deposition that, "Stephanie O'Brien brought forth a concern reflective of her sexual orientation, but didn't really in that situation give us even a chance to investigate." (Hackbarth-Horn Depo, p. 40, lines 18-22). I did not find in the documents I reviewed, evidence that Ms. O'Brien raised her concern of sexual orientation discrimination through the proper channels at KI prior to quitting her job with KI and filing a lawsuit. Indeed, Ms. O'Brien's May 4, 2003 statement to the EDD, made under the penalty of perjury, does not state that Ms. O'Brien ever made a claim of discrimination internally within KI or in compliance with KI complaint procedures.

With respect to the Plaintiff in this case, I must add several points to Ms. Young's summary. Plaintiff's primary complaint seemed to be that Ms. O'Brien was spreading rumors about a fictitious relationship between Plaintiff and Mr. Resch. (Pl. Depo, pp.32-35, 74-77, 105:7-112:14, 268:15-269:10, 291:2-14; Hackbarth-Horn Depo. 181:20-182:9). Plaintiff also stated that when she complained to her supervisor, Mr. Kisslak, about Ms. O'Brien's rumors, he told Plaintiff that she had her job due to her abilities and not because Mr. Resch favored her as Ms. O'Brien alleged. He also told Plaintiff that he would speak to Ms. O'Brien on Plaintiff's behalf. (Pl. Depo. P. 76-77, lines 24 – 15). When Plaintiff complained to Mr. Krenke about Ms. O'Brien's rumors he too said that he would speak to Ms. O'Brien on Plaintiff's behalf. (Pl. Depo. 110:8-9). When Plaintiff's performance declined, she attributed her poor performance to the stress caused by the rumors put forth by Ms. O'Brien and not the behavior Plaintiff had experienced from Mr. Resch. (Pl. Depo. 268:15-269:10). Exhibits attached to Plaintiff's deposition in the form of e-mails between herself and her friend/spiritual guide, Ari, do not indicate that Plaintiff was in any way concerned or stressed due to Mr. Resch's behavior toward Plaintiff. Rather, such e-mails indicate that Plaintiff had some personal relationship issues (with an individual not related in any way to KI) that were causing her considerable concern. Plaintiff arranged to pick up Mr. Resch from his hotel during several business trips, agreed to have dinner and drinks alone with him on several occasions, and arranged for personal outings with him. The information I reviewed indicated that, unlike Ms. Jasper, Plaintiff never requested to be kept from a situation where she would be alone with Mr. Resch. Instead, she appeared quite creative in finding activities for them to do alone together, including, but not limited to kayaking on San Francisco Bay and Paragliding from a mountain top to the beach below. Plaintiff stated that she received raises and promotions while at KI. Although Plaintiff states she complained about Mr. Resch's behavior and Ms. O'Brien's rumors several times to at least two different members of management, Plaintiff does not allege that she ever complained to Human Resources until she was leaving the company.

<u>Opinion</u>

Legal guidance setting forth what a company should do to meet the legal requirement of a harassment free workplace generally discusses three steps a company should take to ensure a harassment free workplace: 1) a policy prohibiting harassment in the workplace; 2) and effective complaint procedure; and 3) training.

<u>KI's Policy:</u> I agree with Ms. Young's statement that the policies of "KI were straight forward and had the required components. . ." The harassment policy at KI states a management commitment to maintaining a workplace free of harassment. The policy clearly defines harassment using examples and gives the legal definitions where appropriate. The policy includes a statement defining potential discipline for violations of the policy up to and including termination of an employee found in violation of the policy. The policy encourages reporting harassment and gives multiple avenues for making a complaint. The policy clearly states that if an employee is uncomfortable raising the issue with a manager or finds that a matter is not satisfactorily resolved by a manager, that the employee "should bring the matter to the attention of the Corporate Human Resources Director." The Corporate Human Resources Director at the relevant time, I understand to be Ms. Hackbarth-Horn. The policy explains that an investigation will take place after the complaint is filed and encourages cooperation from all employees. The policy correctly explains that all reasonable efforts to maintain confidentiality will be followed, but does not promise confidentiality. The policy also forbids retaliation against anyone filing a complaint or participating in a resulting investigation. On the whole, I find KI's written harassment policy to be quite good and thorough.

<u>Effective Complaint Procedure:</u> The complaint procedure established by KI required employees to report incidents of harassment to a member of management and specified that if such a report did not result in satisfactory remedial action, that the employee report their concerns to the Corporate Director of Human Resources. My review of documents and evidence in this case suggests that some managers effectively responded to complaints of harassment while others did not. This response is consistent with that of most organizations. Should managers always respond correctly? We would like them to do so. The reality is that many do not. Ms. Rice effectively handled Ms. Jasper's concerns and Marie Smith appears to have effectively handled Ms. Kimp's concerns. When harassment complaints were made to HR, HR appears to have taken appropriate action under the policy. Ms. Hackbarth-Horn conducted or began conducting investigations of employee harassment complaints of which she was made aware, only stopping when lawsuits were filed and KI's corporate attorneys took over. Ms. Young, in her report, notes that Daniel Jones in HR reviewed a complaint made by Ms. Bailis. Mr. Resch was counseled on at least two occasions and subjected to the discipline of writing a clarifying memo to those who felt uncomfortable with his conduct.[1] According to Mark Olsen's notes, Ms. Bailis was satisfied with the memo from Mr. Resch as was Ms. Kimps. When Ms. Kimps ultimately left the company, she stated in her exit interview that she left KI for better career opportunities and advancement. She also stated in her exit interview that her favorite things about KI included the people, managers, and the overall friendly environment.

Plaintiff alleges that members of management failed to effectively handle her concerns. With respect to her concerns of rumors spread by Ms. O'Brien, Plaintiff's managers tried to assure Plaintiff that she had received her positions and raises as a result of her good work performance. They also stated they would talk to Ms. O'Brien, ostensibly to ask her not to spread anymore rumors about Plaintiff. They did not conduct an investigation into the allegations contained in Ms. O'Brien's rumors. Since those managers personally knew the reasons why Plaintiff received her promotions and raises, I don't believe the standards of the profession required them to investigate the truth of an allegation which they personally knew to be false.

---

[1] On page 21 of Ms. Young's report she states that she "found no notes of a documented interview with Mr. Resch as part of an investigation in any one of the many situations in which he was alleged to have behaved inappropriately and engaged in alleged sexual harassment." (sic). I found notes of interviews between Mr. Olsen and Mr. Resch in response to allegations of sexual harassment by Ms. Bailis and Ms. Kimps.

It is generally a difficult thing for managers to stop rumors in the workplace. Attempts should be made, but it is rare that management can effectively stop such behavior altogether. Plaintiff's case was not an exception to this general rule. Ms. Young states in her report that Mr. Krenke did not investigate whether Ms. O'Brien was in fact, spreading the rumors reported to him by Plaintiff. Ms. Young also states that Mr. Krenke talked to Ms. O'Brien about her spreading rumors and "she acknowledged it." He then told her to stop. In my opinion, if the accused admits the behavior, no further investigation is necessary to determine the truth of the allegations. Mr. Krenke took remedial action – he told Ms. O'Brien to stop. He did not report the matter to HR, because he felt he had handled it.

Plaintiff did not report her concerns about Ms. O'Brien's rumors to HR until just before she tendered her resignation from KI. As soon as Ms. Hackbarth-Horn became aware of Plaintiff's concerns, she initiated an investigation, but again Plaintiff hired attorneys to file suit. The case was then removed to the legal department and out of HR. (Hackbarth-Horn Depo. 181:20-186:23).

With respect to Plaintiff's allegations concerning Mr. Resch's behavior towards her, it is unclear whether she made formal complaints to her managers or merely related incidents that had happened without indicating that she was seeking remedial action on the part of her managers. Again, Plaintiff did not complain to HR until just before she left the company and then according to Ms. Hackbarth-Horn, Plaintiff's complaints were that of Ms. O'Brien's rumors, the stress of what was happening in the high tech market and some things going on in her personal life. (Hackbarth-Horn Depo. 181:20-182:9). Allegations with respect to Mr. Resch's actions were made to HR for the first time in Plaintiff's resignation e-mail. (Hackbarth-Horn Depo 184:13-16). As soon as Ms. Hackbarth-Horn, the Corporate HR Director, received Plaintiff's e-mail containing allegations of improper conduct on the part of Mr. Resch, she tried to start an investigation, but before she could get more information from Plaintiff, plaintiff hired a lawyer and the case got turned over to KI's legal department.

In summary, when employees complained to their managers under KI's complaint procedure they received mixed results. However, KI, anticipating that some managers would be more effective than others at handling employee complaints (as is the case in most organizations) specified in KI's complaint procedure that employees dissatisfied with the results of a complaint to management should then report their concerns to the Corporate Director of Human Resources. When employees followed KI's complaint procedure in this respect, it appears that the complaints were consistently handled and/or investigated. Therefore, it appears that KI's complaint procedure when completely followed was effective in many cases. Plaintiff failed to completely follow KI's complaint procedure.

Training: The materials I reviewed showed that KI conducted Unlawful Harassment Training for its managers and supervisors in 2001, 2003 and 2005. The training materials I reviewed appeared very thorough and covered the necessary subjects. Sexual Harassment training for supervisors only became mandated by law in California in 2005. The California law mandates that supervisors receive two hours of training on sexual harassment in the workplace every two years. It is interesting to note that KI was conducting such trainings every two years beginning at least 4 years before the California law required such training. As Ms. Young points out in her report, the training materials raised several points directly related to Plaintiff's allegations, showing that the company had taken affirmative steps to address such issues within the organization. Ms. Young asks the following question in her report, "Were managers, and most importantly, top management trained to clearly understand their responsibilities to prevent harassment, and be a role model and set an example in their own behavior?" Ms. Young fails to answer her own question in her report. However, her report indicates that such topics were covered in the training materials. Therefore, KI took appropriate steps to teach the right lessons concerning harassment to its management personnel.

**Other issues:** Ms. Young devotes several pages of her report to a discussion of Mr. Resch's position of power within the company. I certainly do not dispute that he was a majority shareholder, CEO and Chairman of the Board of KI. However, KI had supplied its management employees, including Plaintiff, with policies, procedures and training on how to avoid harassment in the workplace. Plaintiff failed to fully avail herself of these procedures. We must ask if such a failure to use every avenue for complaint made available to her was reasonable under the circumstances. The EEOC Enforcement Guidance: Vicarious Employer Responsibility for Unlawful Harassment by Supervisors discusses reasonable explanations for an employee's delay in complaining or failure to use the employer's complaint process. The Enforcement Guidance lists three legitimate reasons for the employee's failure to fully avail themselves of the employer's complaint process: 1) using the complaint mechanism entailed a risk of retaliation, 2) there were obstacles to complaints; and 3) the complaint mechanism was not effective.

My review of the relevant documents in this case did not disclose a reasonable basis for fear of retaliation on the part of Plaintiff. Indeed, Plaintiff claims that she made her concerns known to members of management who would have been in a far better position to retaliate against her than HR personnel. Further, of the many complaints against Mr. Resch discussed in Ms. Young's report and the documents pertaining to this case, none complained of actual retaliation beyond Mr. Resch avoiding them after they had complained of unwanted attention from him. (i.e. Tatton Depo 28:1-4)[2]. I don't see that Ms. O'Brien's complaint was one of retaliation for a complaint of sexual harassment, but rather she complained of sexual orientation discrimination. Therefore, it does not appear reasonable for Plaintiff to have refrained from reporting her claims to HR, if she was serious about them, for fear of retaliation from HR or the company.

The EEOC lists recognized obstacles to using a complaint procedure such as the process involving undue expense for the employee, inaccessible points of contact for making complaints, or unnecessarily intimidating or burdensome requirements for making complaints. In this case, all Plaintiff had to do to report her concerns to HR, was to pick up the phone and make a call or to send an e-mail to Ms. Hackbarth-Horn. Clearly there was no reasonable obstacle to complaining to HR for Plaintiff.

Finally, the EEOC discusses circumstances under which the employee might have a reasonable belief that complaining would be ineffective. Here it is important to note that the EEOC does not list the fact that the accused is the CEO of the company as a legitimate reason for believing that a complaint against him might be ineffective. Instead, the EEOC says that the complaint procedure might be considered ineffective if it requires the employee to complain to the offending supervisors. KI's complaint procedure clearly did not make such a requirement. Even if one makes that argument that since Mr. Resch was the CEO, anyone Plaintiff complained to must ultimately report to him, there is evidence that Mr. Resch was counseled and/or disciplined by a Vice-President (Mark Olsen) below Mr. Resch in the company chain of command. Mr. Resch was counseled one time after a complaint was made to Human Resources staff member below the Vice President level, namely Daniel Jones. Therefore, it appears that KI made attempts to give HR authority over Mr. Resch with respect to violations of personnel policies.

---

[2] Although Ms. Morris later claimed retaliation in her lawsuit, her initial internal complaint within the company alleged only pregnancy discrimination. In her 11/06/01 e-mail to Mark Lewis on which she carbon copied Ms. Hackbarth-Horn, Ms. Morris stated "I believe that a tremendous amount of data has not been taken into consideration and that personal issues, namely my pregnancy, have been unfairly counted against me. Thus making my termination as District Manager premature." Ms. Morris did not claim sexual harassment and she did not claim retaliation for previous complaints of sexual harassment. Rather, she attributed her demotion solely to pregnancy discrimination. In a follow up e-mail to Ms. Hackbarth-Horn responding to a request for more information concerning Ms. Morris' claims, Ms. Morris writes "My concerns are in response to the many derogatory comments made to me over the last two months by male upper management, **comments that were directly related to my condition.** I have nothing else to say at this time." (11/19/2001 e-mail to Hackbarth-Horn, emphasis added) Ms. Morris did not appear to add a retaliation claim until she filed a lawsuit through her attorney.

The EEOC also states that complaint procedures might be considered ineffective if the complainant was aware of instances where other co-workers had complained and nothing was done. Again, where other KI employees had complained to HR in the form of Ms. Hackbarth-Horn, Daniel Jones, or Mark Olsen, there is evidence that the complaints were addressed either through investigations and subsequent remedial action or the actual counseling of Mr. Resch with corresponding written follow up including Mr. Resch's personal promise that there would be no retaliation for coming forward with concerns, even allegations concerning his own behavior.

Therefore, having discussed matters relating to Mr. Resch with her immediate supervisors, it does not appear reasonable for Plaintiff to have refrained from taking the further step of informing HR.

## Conclusion

Ms. Young correctly asserts that Mr. Resch as majority owner, Chairman of the Board and CEO of KI was in a position of power within the company. However, the relevant issue is whether the company took the appropriate steps to guard against illegal harassment and to provide a means of redress for concerns of illegal harassment within the company. KI promulgated a clear, articulate and legally sufficient anti-harassment policy. KI provided a complaint procedure that allowed multiple avenues for complaint while addressing a situation where a manager might not adequately handle a complaint by requiring dissatisfied complainants to report concerns to the Corporate HR Director. KI also trained supervisors and managers every two years beginning in at least 2001, on the subject of illegal harassment in the workplace. Plaintiff failed to fully avail herself of the protections afforded her under KI's policies by not bringing her concerns to the attention of HR until she decided to resign and file a lawsuit.

Respectfully submitted,

Beth K. Whittenbury

## Materials Reviewed

1. Rhoma Young Expert Witness Report
2. Deposition of Jessica Jasper
3. KI's Harassment Policies and Training Materials
4. Plaintiff's Deposition Vol. I and II and accompanying exhibits
5. Hackbarth-Horn Deposition Vol. I
6. Documents relating to Stephanie O'Brien's Claims
7. Mark Olsen Deposition Vol. I
8. Terri Tatton Deposition Vol. I
9. Richard Resch Deposition Vol. I and II
10. Jill Hendricks (DuBois) Deposition Vol. I
11. Documents regarding Jill DuBois' Claims
12. Documents relating to Ms. Bailis' Claims
13. Documents relating to Ms. Kimp's Claims
14. Documents relating to Valerie Legato's Claims
15. Documents relating to Catherine Morris' Claims

Case List for Beth K. Whittenbury

Tricia Taylor v. County of Los Angeles. Plaintiff represented by Curt Surls, Bornn and Surls. Settled prior to deposition, 2005.

Sharon Rodrigues v. Bayer Corp. Defense represented by Mitchell Boomer, Jackson Lewis LLP. Deposed February 2006.

Blacksher v. Sysco Food Services of San Francisco. Plaintiff represented by June Bashant, Rouda, Feder, Tietjen & Zanobini. Not yet deposed 2006.